**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HONX, INC.,[1] | ) Case No. 22-90035 (MI) |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF TODD R. SNYDER,**
**CHIEF ADMINISTRATIVE OFFICER OF HONX, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Todd R. Snyder, hereby declare under penalty of perjury:

**Introduction**

1.      HONX, Inc. ("HONX," (pronounced "Hone·ex"), the "Company," or the "Debtor") is a subsidiary of Hess Corporation ("Hess"), a publicly-traded global energy company.  HONX is the corporate successor of Hess Oil Virgin Islands Corporation ("HOVIC"),[2] which owned and operated an oil refinery in St. Croix, U.S. Virgin Islands (the "Refinery") from the beginning of its construction in 1965 until 1998.  Since 1998, the Company has remained a non-operating entity with minimal assets consisting primarily of a 50% ownership in a joint venture from 1998 to 2016, and post-2016 it has continued its corporate existence solely to manage its alleged asbestos liabilities related to the Refinery.  For the avoidance of doubt, the Company

---

[1]     The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is HONX, Inc. (2163).  The location of HONX's service address in this chapter 11 case is:  1501 McKinney Street, Houston, Texas, 77010.

[2]     Any references to HOVIC, HONYC (as defined herein), or HONX in this declaration all refer to the same entity— the Debtor—at different points in the Debtor's corporate history.  In May 2020, for efficiency reasons and to consolidate its corporate entities closer to its business operations, Hess effectuated a plan of merger pursuant to which HOVIC merged with and into a newly-formed New York corporation, Hess Oil New York Corp. ("HONYC").  Prior to the commencement of this chapter 11 case, HONYC changed its name to HONX.  *See* Part I herein and **Exhibit B** for a discussion and illustration of the Debtor's corporate history.

has been in continued existence for the last 57 years; it is not the result of a recent corporate spinoff through any corporate reorganization, but rather the same corporate entity that directly or indirectly operated and owned the Refinery until 2016.  HONX has commenced this chapter 11 case to address and fairly resolve its alleged asbestos liabilities in an effective, efficient, and equitable forum—the United States Bankruptcy Court for the Southern District of Texas (the "Court")—pursuant to section 524(g) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

2.      In 1998, HOVIC entered into a joint venture with Petróleos de Venezuela, S.A., or PDVSA V.I., under which each entity held 50% ownership in HOVENSA L.L.C. ("HOVENSA"). At that point in 1998, HOVENSA assumed operation of the Refinery and HOVIC's operation of the Refinery ceased.  HOVIC has not operated the Refinery since 1998.  In 2015, HOVENSA commenced a chapter 11 case in the United States Bankruptcy Court for the District of Delaware, *In re HOVENSA LLC*, No. 1:15–bk–10003–MFW (Bankr. D.V.I Sept. 15, 2015).  As part of that bankruptcy, in January 2016, HOVENSA liquidated its assets, including the Refinery, in a sale to Limetree Bay Terminals, LLC and subsequently confirmed a chapter 11 plan, in which equity holders did not receive a recovery.  Accordingly, HONX has not held any financial interest in the Refinery since 2016.

3.      HONX commenced this chapter 11 case to address the alleged existing and future asbestos and toxic tort liabilities related to the Refinery (the "Asbestos Claims") in an equitable and efficient manner.  There are approximately 580 cases pending naming HONX as a defendant or co-defendant which allege exposure to asbestos and other toxic substances at the Refinery.[3]  The claims are concentrated within the Island of St. Croix with the vast majority of Asbestos Claims

---

[3]      In total, there are over 700 cases alleging damages arising from the Refinery filed against HONX and/or Hess.

alleged by plaintiffs represented by a single law firm, which has informed HONX that it believes approximately 500 or more lawsuits could be filed in the next several years.  Indeed, for three decades, the Debtor has been managing a relatively dormant docket of cases in the U.S. Virgin Islands, and recent local legislation is now providing an opportunity to accelerate certain asbestos cases to trial, regardless of whether such claims are representative of the highest priority or most meritorious claims, which will likely burden both HONX and its adversaries with defense and litigations costs, depleting resources and delaying or limiting recoveries to legitimate claimants for years.  HONX anticipates that, absent the filing of this chapter 11 case, litigation of asbestos-related claims could consume an enormous amount of HONX's and Hess's time and resources for decades to come with unpredictable and potentially unfairly preferential outcomes to legitimate claimants.

4.      HONX intends to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish a claims trust consistent with the requirements of section 524(g) of the Bankruptcy Code that would be approved pursuant to a chapter 11 plan.  Resolving the Asbestos Claims in a comprehensive manner through a section 524(g) trust will be the most efficient and equitable use of resources, expenses, time, and will benefit and all of HONX's stakeholders—including present and future claimants.

**<u>Background</u>**

5.      I am the Chief Administrative Officer of HONX, which is a wholly-owned subsidiary of Hess.  I am also a Managing Director and the Global Head of Restructuring of the Piper Sandler restructuring group, TRS Advisors, HONX's proposed financial advisor in this chapter 11 case.  I earned my Bachelor of Arts at Wesleyan University, and my Juris Doctor at University of Pennsylvania Carey Law School.  Prior to joining Piper Sandler, I was the founder

and chief executive officer of TRS Advisors LLC until its acquisition by Piper Sandler in late 2020.  Prior to founding TRS Advisors LLC, I was the executive vice chairman and co-head of North American Restructuring at Rothschild & Co.  Previously, I was a managing director in the restructuring and reorganization group at Peter J. Solomon Company.  I also previously practiced law in the Business Reorganization department of Weil, Gotshal & Manges LLP.

6.      I am generally familiar with HONX's business, financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances that resulted in the commencement of this chapter 11 case, and in support of HONX's petition for relief under chapter 11 of the Bankruptcy Code filed on the date hereof (the "Petition Date") and related first day motions.

7.      The statements in this declaration are based upon my personal knowledge, information obtained from my colleagues at TRS Advisors under my ultimate supervision, HONX's other advisors, my review of relevant documents and information concerning HONX's financial affairs, or my opinions based upon my experience and knowledge.

8.      Substantially contemporaneously herewith, HONX is filing various motions and pleadings seeking "first day" relief (collectively, the "First Day Motions") to ensure a smooth transition into chapter 11.  I am familiar with the contents of each First Day Motion and believe that the relief sought therein (a) is necessary to enable HONX to fairly and efficiently manage the Asbestos Claims in this chapter 11 case, (b) constitutes a critical element in achieving successful confirmation of a chapter 11 plan, and (c) best serves HONX's estate and the interests of HONX's stakeholders.  The facts set forth in each First Day Motion are incorporated herein by reference.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances

compelling the commencement of this chapter 11 case, and in support of HONX's chapter 11 petition and First Day Motions.

9.      To familiarize the Court with HONX and the circumstances leading to this chapter 11 case, I organized this declaration as follows:

- **Part I** provides an overview of HONX's corporate history and structure;

- **Part II** describes the circumstances leading to the commencement of this chapter 11 case and HONX's objectives for this chapter 11 case; and

- **Part III** summarizes the relief requested in and the evidentiary support for the First Day Motions.

## I.      Overview of HONX's History and Governance.[4]

### A.      The Refinery.

10.      In February 1965, the Debtor broke ground to build the Refinery.  The Refinery was built on approximately 1,500 acres in a series of phases from 1965 to 1974.  Once built, the Refinery (pictured below) was the largest refinery in the Hess family of companies and had a peak processing capacity of 650,000 barrels of oil per day, making it one of the largest refineries in the world at the time.



---

[4]      An illustrative timeline is attached hereto as **Exhibit B**.

11.    It is my understanding that the Debtor has never manufactured or directly sold any asbestos-containing products.  Rather, the Debtor's sole relationship to asbestos-containing products (and related litigation) is as the former owner and operator of the Refinery, which was designed and built by independent contractors.[5]  Throughout its history, the Debtor contracted with general and independent contractors to design and construct the Refinery, including by sourcing, installing, and managing insulation, as well as gaskets and cement piping.  These contractors were contractually and legally responsible for the safety of their employees, including warning and protecting them from exposure to asbestos and following all applicable laws and regulations.

12.    The lead general contractor during the majority of construction was Litwin Corporation (later Litwin PanAmerican) ("Litwin"), who was responsible for, among other things, designing refining units, purchasing materials, and inspecting, and managing construction of the refining units.  Thus, while the Debtor reviewed the specifications and plans throughout the construction of the Refinery, all of the material specifications—including the specifications for insulation products—were developed by outside contractors and provided to the Debtor.

13.    I understand that refining processors require insulation materials that must meet certain design and material specifications to perform under extremely high temperatures.  During construction of the Refinery and until the 1980s, the Debtor did not have its own insulation specifications but instead relied on the design specifications of its general contractors.  During the construction of the Refinery in the 1960s and early 1970s, those design specifications could be fulfilled through the supply of calcium silicate or, in the alternative, asbestos.  While calcium silicate is considered a safe alternative to asbestos, some calcium silicate insulation in the 1960s

---

[5]    HONX's parent, Hess, has never owned or operated the Refinery, nor has it manufactured, directly purchased, or possessed any asbestos-containing products in relation to the Refinery.

and 1970s made use of asbestos fibers.  As a result, the Debtor's general contractors sourced and installed asbestos containing insulation during at least some of the phases of construction of the Refinery, although the presence of asbestos at the Refinery was not confirmed until 1982.

14.     During the construction of the Refinery, Hess assisted in facilitating the purchase of insulation materials by the Debtor.  Specifically, the Debtor would provide Hess with specifications for the necessary insulation materials (including manufacturer, quantities, diameters, and material type) and, in certain instances, Hess would facilitate the ordering of these materials and assist in expediting the materials to the Debtor.  Hess never owned or possessed any of the asbestos containing products it ordered for the Debtor's Refinery and expedited to St. Croix. Instead, Hess acted as an intermediary in the Debtor's acquisition of the materials, facilitating the Debtor's purchase of materials that were ultimately installed in the Debtor's Refinery by employees of the Debtor's contractors.  Throughout the entirety of the Debtor's operations at the Refinery, Hess's presence at the Refinery was limited to discrete oversight activities, including assisting the Debtor through periodic inspections regarding worker safety and providing periodic guidance and recommendations regarding safety and health policies and procedures.

15.     Prior to any identification of asbestos at the Refinery, the Debtor instituted a number or respiratory policies and practices designed to protect workers from harmful dusts, including, among other policies, a formal Respiratory Protection Policy issued in 1976. Respirators, dusts masks, and other personal protective equipment were available from the beginning of the construction at the Refinery.

16.     During the 1960s and 1970s, the Debtor's general contractor, Litwin, oversaw installation and maintenance of the components containing insulation.  During that time, Litwin and the Debtor sourced insulation products from Borinquen Insulation Company ("Borinquen"),

which was responsible for selecting insulation manufacturers.  Borinquen discontinued the use of asbestos containing products and began eliminating asbestos from the materials it was sourcing to the St. Croix facility in the 1970s.  By July 1973, Borinquen confirmed in writing to the Debtor that it would supply exclusively asbestos free products for manufacturing and installation specifications at the Refinery.

17.     The Debtor strictly prohibited the use of any asbestos related products in 1983 following its first confirmation that insulation at the Refinery contained asbestos.  Asbestos was discovered at the Refinery during a maintenance process known as "turnaround."  Because maintenance of the refinery and its processing equipment required continuous inspection, cleaning, and repairs, contract workers conducting turnarounds were sometimes exposed to insulation.  The Debtor used independent contractors to manage the turnaround process and the workers involved, and Litwin was responsible for managing the turnaround process during the 1970s and 1980s.  During one such turnaround in October 1982, an insulation supervisor contracted by Litwin identified the possibility of asbestos in one section of insulation, which was tested and confirmed by Litwin.

18.     From this point forward, the Debtor took steps to ensure that its workers would not be exposed to hazardous levels of asbestos.  The Debtor issued an asbestos policy modeled on OSHA regulations and subsequently adopted the Hess Asbestos Policy and an Asbestos Management Program.  The Debtor's policies and procedures provided guidelines that were imposed on all contractors and their employees.  Before any workers were involved in the removal or cleanup of any potential asbestos containing insulation at the Refinery, the insulation was tested to confirm whether it contained asbestos.   If positive, a crew trained in removing asbestos-containing insulation would remove the insulation using appropriate safety precautions—

including full personal protection equipment, barricade tape and signs, wet methods, asbestos plug sampling, glove bag technique and/or use of an isolation tent—which protected the abatement crew and other workers at the facility from exposure to asbestos.  In 1987, the Debtor instituted the Asbestos Abatement Program to proactively identify the presence of asbestos in the areas of the facility where workers may be present and to facilitate its removal consistent with national safety standards.

19.     From my discussions with the Company regarding previous litigation, the Refinery is a predominately outdoor environment for most workers, and the data regarding exposure levels measured at the Refinery demonstrates that a threshold exposure to asbestos at the facility would have been limited.

**B.     The Company's Joint Venture—HOVENSA.**

20.     In 1998, the Debtor formed a 50-50 joint venture with Petróleos de Venezuela, S.A.—HOVENSA.  HOVENSA acquired the Refinery through the joint venture transaction and operated the Refinery from October 1998 until February 2012.  In February 2012, the Refinery ceased all refining operations after suffering losses of $1.3 billion in its last three years of operation.  For the next three years, HOVENSA used the Refinery as an oil storage and distribution facility until the Refinery was completely shut down in March 2015.

21.     On September 16, 2015, HOVENSA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States District Court of the Virgin Islands, Bankruptcy Division, to run a sale process for its assets that also ultimately led to the resolution of HOVENSA's environmental liabilities.  The sale transaction was completed in January 2016, and HOVENSA's plan was subsequently confirmed, which resulted in the cancellation of the Debtor's equity in HOVENSA.  Since that time, the Debtor has not held any financial interest in

the Refinery and neither the Debtor nor Hess have any business operations currently in the U.S. Virgin Islands.

22.    As part of HOVENSA's chapter 11 plan, HOVENSA's estate released all of its direct and derivative claims against Hess and the Debtor, and Hess and the Debtor also received certain consensual third-party releases of claims arising from HOVENSA's operation of the Refinery.  Specifically, the Debtor and Hess received releases from third parties that voted in favor of the plan and did not affirmatively opt out of the releases provided for in the plan.[6]

### C.    Recent Corporate Changes.

23.    In May 2020, for efficiency reasons and to consolidate its corporate entities closer to its business operations, Hess effectuated a plan of merger pursuant to which HOVIC merged with and into a newly-formed New York corporation, HONYC.  Prior to the commencement of this chapter 11 case, HONYC changed its name to HONX in an effort to (a) avoid confusion between HONX and the large public company, Hess, and (b) recognize that although HONX remains a New York-incorporated entity, its principal place of business is in Houston, Texas, where its officers that are responsible for managing its litigation docket are located.[7]  Virtually all of HONX's alleged liabilities are legacy liabilities of HOVIC stemming from HOVIC's ownership and operation of the Refinery from 1965 to 1998.  HONX currently has no operations, no

---

[6]    Since confirmation of HOVENSA's chapter 11 plan, HONX has continued to be sued for damages that it believes may have been released pursuant to the HOVENSA plan and confirmation order.

[7]    Prior to scheduling of the Mohansingh Trial (as defined herein) in January 2022, HONX's senior management team analyzed anticipated asbestos and asbestos-related litigation but had not spent time litigating any active matters since the Gomez Settlement (as defined herein) in 2018.  Accordingly, in 2020, HONX had taken the position that its "nerve center" was in New York.  Since the scheduling of the Mohansingh Trial in January 2022, HONX's principal place of business has been in Houston, Texas, where the officers responsible for managing HONX's litigation docket—essentially the only material activities of HONX—are based.

employees, no funded third-party debt, and minimal assets aside from the Funding Agreement (as defined herein) described below.



24.      As a result of its historical corporate progression, the Debtor is now a non-operating entity that continues to be named as a defendant in litigation by plaintiffs seeking damages for alleged exposure to asbestos and other toxic torts, such as the Asbestos Claims.  This chapter 11 case is not the result of an attempt to spin off liabilities from a parent corporation through any corporate reorganization.  Instead, as evidenced above, the Debtor's status as a non-operating entity with minimal assets is the result of natural corporate changes over its 57 years of existence.

25.      Now, the Debtor, which has always been named as a separate defendant in litigation over these Asbestos Claims, is able to utilize the process outlined in section 524(g) of the Bankruptcy Code to achieve its goals of effectively, efficiently, and equitably addressing its Asbestos Claims.  Section 524(g) of the Bankruptcy Code was enacted by Congress precisely for this scenario—to deal with legacy asbestos liabilities in a value-maximizing and efficient manner.

II.     **Circumstances Leading to This Chapter 11 Case and HONX's Objectives.**

      A.     **Historical Tort Litigation Arising from the Refinery.**

      26.     Starting in 1987, plaintiffs began bringing lawsuits against the Debtor and Hess in the U.S. Virgin Islands alleging damages related to asbestos and other toxic tort-related injuries incurred while employed at the Refinery.  From 1987 to 2018, approximately 1,000 plaintiffs filed suit against the Debtor and Hess, under numerous theories of tort liability, generally alleging exposure to asbestos-containing compounds and products arising from the Debtor's prior ownership and operation of the Refinery.

      27.     Each of these 1,000-plus lawsuits presented unique facts, circumstances, and allegations.  While these lawsuits contained common allegations of asbestos exposure and related injuries, they involved workers employed by the Debtor or by different contractors, who worked in different roles, at different times, in different areas of the Refinery, while different policies and procedures were in place.  Because of these litigation burdens, hurdles, and expense, the Debtor and Hess have historically sought alternative ways to resolve asbestos and other litigation related to the Refinery short of taking cases to trial irrespective of the underlying merits of the claims. Between 1995 and 2018, the Debtor and Hess managed to settle approximately 1,100 claims, with 498 claims settled in a single settlement agreement in 2018 (the "Gomez Settlement").

      28.     The Gomez Settlement provided for a more orderly and efficient process to resolve a manageable number of claims on a monthly basis with certain agreed terms and damages thresholds.  Akin to the prior settlements, in order to avoid substantial litigation expenses, these settlements included claims irrespective of their underlying merits.  Specifically, the Gomez Settlement set forth a non-binding mediation process to resolve future claims that "relate to and/or arise out of any alleged exposures to any and all toxic substances associated with the St. Croix Refinery."  Pursuant to the Gomez Settlement a maximum of five new claims would be submitted

each month for consideration.  Future claimants wishing to participate in the claims resolution process could toll the applicable statute of limitations by submitting a letter to defense counsel (the "Tolled Cases").  Burns Charest LLP negotiated the Gomez Settlement, agreed to the mediation process, and agreed not to solicit any more claimants.  As part of that settlement agreement, the Company and Hess agreed to confidential settlement ranges depending upon the medical condition experienced by the plaintiff, pending a threshold showing of certain facts and medical evidence.

29.     The Gomez Settlement was, at the time, believed to be a comprehensive solution to the Debtor's and Hess's asbestos liabilities associated with the Refinery.  Approximately 660 Tolled Cases were submitted for mediation pursuant to the Gomez Settlement.  However, in February 2020, the first and only mediation pursuant to the Gomez Settlement was held.  This mediation was unsuccessful, and plaintiffs' counsel decided to abandon the mediation process and file suit instead.  Since then, plaintiffs' counsel has filed a number of the Tolled Cases.  In the last two years, more than 570 additional cases have been filed, with another approximately 500 claims asserted to be brought soon.

30.     For the Debtor to defend against each of these cases, it must assess hundreds of different health profiles and medical situations.  Each case requires fact and expert analysis and discovery into events that occurred up to forty or fifty years ago.  It is my understanding that the challenges and expense of discovery are multiplied as a result of Hurricane Hugo in 1989.  Naturally, litigating each case is extremely costly and time-consuming.  Moreover, the Debtor has exhausted any applicable insurance policies for defending against these claims, so it and Hess must expend material out-of-pocket resources to mount their defenses.

**B.     Decision to Commence This Chapter 11 Case.**

31.     The Debtor's decision to commence this chapter 11 case is a result of a lack of an alternative mechanism to efficiently and equitably address its alleged asbestos liabilities.  After negotiating the Gomez Settlement, the Debtor and Hess believed that they understood the entire universe of claims against the Debtor and Hess and had a mechanism to resolve them through mediation.  However, a surprising and curiously-timed influx of asbestos claims against the Debtor and Hess made clear that it is nearly impossible for the Debtor to obtain finality when it comes to potential asbestos liability claims, absent a bankruptcy case.  Moreover, I understand that as a result of a Virgin Islands' preference statute, 5 V.I. Code § 31(b) (2022), plaintiffs in civil actions over the age of sixty-five may request an expedited trial date within 180 days, and that as a result, the Debtor is expected to incur material near-term costs defending against the alleged asbestos claims in fact and expert-testimony intensive trials.

32.     Indeed, the Debtor has spent the past several months preparing for trial in *Mohansingh v. Hess Oil Virgin Islands Corp. et al.*, SX-2006-CV-00231 (V.I. Super. Ct.) (the "Mohansingh Trial").  The plaintiff in the Mohansingh Trial, Mr. Mohansingh, worked at the Refinery from 1970-1981 and 1988-2009.  He filed his complaint against Hess and the Debtor in 2006, alleging he was injured through exposure to asbestos "and asbestos containing products" while working at the Refinery.[8]  Mr. Mohansingh is 76 years old, and he filed a preference motion in September 2021, which the court granted.  Based on conversations with the Debtor's other advisors, I understand that since requesting the preference action, the Mohansingh Trial has been

---

[8]     In support of his claims, Mohansingh has retained as an expert witness Dr. Christopher John who opines that Mohansingh has evidence of "bilateral parenchymal fibrosis diagnostic of asbestosis."  It is my understanding that Dr. John relies in part on 15 year old "B reads" of x rays conducted by Dr. Jay Segarra, who has diagnosed 29,000 claims of asbestosis.  Dr. Segarra has come under scrutiny for a supporting a litigation driven maneuver referred to as a "retread" in which individuals with previous asbestos claims are later reinvented as having silicosis, or vice versa.

an active litigation; however, the trial court has denied every request for summary judgment.  The Mohansingh Trial is scheduled to begin on May 2, 2022.  Contemporaneously with the filing of the chapter 11 case, the Debtor filed a motion seeking a continuance of the Mohansingh Trial through and including May 4, 2022.  Mr. Mohansingh filed a motion to sever the Debtor from the proceeding and establish a new case number and docket for Mr. Mohansingh's claims against the Debtor.  The Virgin Islands Superior Court denied the Debtor's motion for a continuance and granted Mr. Mohansingh's motion to sever the Debtor from the proceeding.

33.     HONX and Hess have already spent millions of dollars in litigation fees in preparation for this one trial.  These litigation costs will only continue to mount and deplete the Debtor and Hess of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials.  Section 524(g) of the Bankruptcy Code, on the other hand, provides an effective, efficient, and equitable mechanism for the Debtor to address its asbestos exposure in a single forum—the Bankruptcy Court.

### a.     Corporate Governance Changes.

34.     Before commencing the chapter 11 case, on April 18, 2022, HONX appointed Matthew R. Kahn and D.J. (Jan) Baker (collectively, the "Disinterested Directors") to its board of directors (the "Board").  Messrs. Kahn and Baker are experienced independent board members with no prior affiliations with Hess.[9]  Messrs. Kahn and Baker have been delegated broad decision-making authority with respect to matters that may constitute a conflict between HONX and its corporate parent, Hess.  HONX instituted other governance changes as well.  Timothy B.

---

[9]     Mr. Kahn served as an independent/disinterested director for HOVENSA during its chapter 11 case, but did not report to the Company, Hess, or otherwise have a role in the operation of those two entities.

Goodell and John P. Rielly, each of whom also serve as Senior Vice Presidents for Hess, resigned from HONX's board of directors (on April 18, 2022) and as officers of HONX (on April 18 and 19, 2022, respectively).  Jason Wiley, Associate General Counsel of Hess, and Edd D. Prince, Assistant General Counsel of Hess, were appointed to serve in their place.  Lastly, HONX appointed me, Todd R. Snyder, as the Chief Administrative Officer.  HONX also engaged advisors—including Kirkland & Ellis LLP and Jackson Walker LLP as legal counsel, Piper Sandler's restructuring group, TRS Advisors, as a financial advisor, and Bates White LLC as a claims analyst—to advise the Board as to its potential tools to address its Asbestos Claims, including through a potential chapter 11 process.  Hess is separately represented by Haynes and Boone, LLP to represent its interests in connection with this chapter 11 case and in connection with negotiation of the Funding Agreement and any potential future negotiations with HONX.

### b.      The Funding Agreement.

35.      After HONX established an independent decision-making protocol and retained restructuring advisors, HONX started to take proactive steps to determine if it could address its Asbestos Claims and related liabilities through chapter 11.  One requisite step was determining if HONX could obtain the financing necessary to ensure that it could fund a successful chapter 11 case, including the professional fees expected to be incurred and the ultimate funding of a section 524(g) trust, while also remaining independent from Hess during a chapter 11 case.  As discussed above, HONX has no material assets.  Accordingly, the Disinterested Directors and HONX's advisors proposed to Hess that the parties enter into a funding agreement pursuant to which Hess would potentially fund HONX's chapter 11 case, both by advancing funds to satisfy administrative and professional fees and by committing additional proceeds to fund a

section 524(g) trust.[10]   After several rounds of good faith and arm's-length negotiations, HONX and Hess agreed to a funding agreement (the "Funding Agreement"), attached hereto as **Exhibit A**. Key terms of the Funding Agreement[11] include:

- Initial Funding Request:   Approximately $11,000,000 paid in two tranches, (a) $4,000,000, plus $1,500,000 as a liquidity reserve, disbursed on the Funding Agreement effective date, and (b) $4,000,000, plus $1,500,000 as a liquidity reserve, paid out 70 days after the Petition Date.

- Hess's covenant to reserve trust amounts:   Hess covenants and agrees that it shall maintain a reserve of $10,000,000 to fund any future section 524(g) trust.

- Permitted Funding Uses:   HONX may use funding provided under the Funding Agreement for payment of (a) ordinary course costs and expenses, (b) costs of the chapter 11 case, including professional fees as approved by the Bankruptcy Court, and (c) up to $10,000,000 to fund a section 524(g) trust.

- Milestones:

  - No later than one Business Day after the Petition Date, HONX shall commence an adversary proceeding in the Bankruptcy Case seeking:

    - a TRO enjoining the plaintiff from proceeding to trial against Hess in the Mohansingh Trial, and subsequent preliminary injunction;

    - a Preliminary Injunction enjoining the Asbestos Cases against Hess until the Bankruptcy Court enters an order extending the automatic stay pursuant to section 362 of the Bankruptcy Code to the Hess;

    - an extension of the automatic stay pursuant to section 362 of the Bankruptcy Code to Hess, or in the alternative an extension of the preliminary injunction to Hess, until the Plan Effective Date

  - No later than three Business Days after the Petition Date, the Bankruptcy Court shall have entered the TRO;

---

[10]   Hess has also provided funding for professional expenses incurred prior to the Petition Date as a permitted use under the Funding Agreement.

[11]   The summaries contained in this declaration are qualified in their entirety by the provisions of the Funding Agreement.   To the extent anything in this declaration is inconsistent with the Funding Agreement, the terms of the Funding Agreement shall control.   Capitalized terms used in this summary but not otherwise defined shall have the meanings ascribed to them in the Funding Agreement.

o   No later than 14 days after entry of the TRO, the Bankruptcy Court shall have entered the Preliminary Injunction Order;

o   No later than 65 days after the Petition Date, the Bankruptcy Court shall have entered the Stay Extension Order;

o   No later than 75 days after the Petition Date, HONX shall have filed the Estimation Scheduling Motion;

o   No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Estimation Scheduling Motion;

o   No later than 365 days after the Petition Date, HONX shall have filed a Plan and Disclosure Statement;

o   No later than 480 days after the Petition Date, the Court shall have entered the Confirmation Order; and

o   No later 550 days after the Petition Date, the Effective Date shall have occurred.

- Covenants of Hess:  (a) Hess shall maintain the Funding Account, but shall not withdraw any funds from the Funding Account or otherwise exercise control over the Funding Account; (b)  Hess shall continue to provide HONX with reasonable administrative support with respect to operation of HONX's business in the ordinary course of business and consistent with historical practice; and (c) any successor to Hess upon consolidation or merger shall assume the funding obligations of Hess as laid out in the Funding Agreement.

- Covenants of HONX:  (a) HONX shall not use the proceeds of any payment made pursuant to the Funding Agreement for any purpose other than a Permitted Funding Use; (b) HONX shall use any cash on hand as of the Effective Date to reduce any payments necessary for Hess to satisfy the Aggregate Trust Amount; (c) HONX shall use any cash on hand not arising from the Funding Agreement to reduce any payment necessary for Hess to satisfy a Funding Request or the Minimum Balance; and (d) HONX shall provide Hess a Budget semi-monthly commencing on May 15, 2022 (or following day that is not a weekend or bank holiday).

36.     Critically, the Funding Agreement will enable HONX to fund this chapter 11 case and, further, a section 524(g) claims trust.  The Funding Agreement provides HONX with an ability to advance this chapter 11 case to claims estimation, plan confirmation, and emergence, and provides a potential source of recovery for any valid asbestos claimants.

C.     **Objectives of HONX's Chapter 11 Case.**

37.     HONX's goal in this chapter 11 case is to negotiate and ultimately confirm a plan that would, among other things, (a) establish and fund a claims trust to resolve current and future asbestos-related claims pursuant to section 524(g) of the Bankruptcy Code and (b) provide for an injunction that will permanently protect HONX and its affiliates, including Hess, subject to an adequate contribution, from any future asbestos-related claims.  HONX believes it has sufficient assets, including cash available under the Funding Agreement, (a) to fund a section 524(g) trust that will be governed by procedures that efficiently and fairly review claims and compensate current and future asbestos claimants, and (b) otherwise satisfy the requirements necessary to qualify for section 524(g) relief.

a.     **Temporary Restraining Order until an Extension of the Automatic Stay or a Preliminary Injunction is Granted.**

38.     Substantially contemporaneously herewith, the Debtor filed an adversary complaint (the "Complaint") to ensure it can achieve these goals.  In the Complaint, the Debtor seeks a temporary restraining order ("TRO") to prohibit the plaintiff from continuing to prosecute the Mohansingh Trial scheduled to begin on May 2, 2022.  Additionally, upon expiration of the TRO, the Debtor requests the issuance of a preliminary (and ultimately permanent) injunction pursuant to section 105 of the Bankruptcy Code against the plaintiff in the Mohansingh Trial, and the parties to the Asbestos Claims, enjoining the continuance of the Asbestos Claims and the Mohansingh Trial.  Finally, the Debtor seeks a preliminary (and ultimately permanent) injunction, pursuant to section 362 of the Bankruptcy Code, extending the automatic stay to Hess with respect to all actions (including the Mohansingh Trial) until the effective date of a plan confirmed in the Debtor's chapter 11 case.

39.     It is my understanding that following the filing of the chapter 11 petition, representatives of HONX engaged in discussions with the primary counsel for the majority of existing plaintiffs, but counsel for the plaintiffs would not agree to a continuance of the Mohansingh Trial.

40.     As more fully described in the Complaint, if the Mohansingh Trial is allowed to proceed against Hess in the U.S. Virgin Islands' territorial courts, HONX's ability to fairly estimate the Asbestos Claims will be jeopardized due to (a) the potential for conflicting decisions in this Court and the territorial courts with respect to liability, (b) the volatile nature of trial outcomes and likelihood for inequitable treatment of similar claims if some are tried and others are not, and (c) its inability to meaningfully engage in negotiations with counsel to holders of Asbestos Claims if they are continuing to pursue litigation against Hess during the pendency of this case.  Additionally, litigation of the Mohansingh Action may influence the Debtor's liability because findings during the Mohansingh Action will likely bind the Debtor, despite the Debtor's absence from the litigation, if the Mohansingh Action continues against Hess alone after the Petition Date.  These issues would frustrate the purpose of section 524(g) of the Bankruptcy Code, which is to provide debtors a single forum in which to obtain a comprehensive resolution of asbestos liabilities.

41.     Absent the relief sought in the Complaint, the plaintiffs in the Mohansingh Trial will likely continue to litigate the same key facts related to asbestos exposure at the Refinery against Hess.  Given the overlapping claims and factual allegations against Hess and the Debtor, continued litigation of the Mohansingh Trial creates a substantial risk that findings of law or fact in the Mohansingh Trial could create an adverse record against the Debtor.  Thus, in order to protect its rights, the Debtor will have no choice but to actively involve itself in and defend the

Mohansingh Trial, at the same time it attempts to move forward with its efforts to resolve these identical claims through a chapter 11 plan.

42.    The continued prosecution of the Mohansingh Trial will also undermine any estimation proceedings that take place in the chapter 11 case.  As explained in the Complaint, the Debtor plans to commence an estimation proceeding in the chapter 11 case to estimate the claims of all current and future asbestos plaintiffs fairly and equitably, including by presenting evidence reflecting a representative sample of claimants.  Absent a TRO followed by a preliminary injunction, the Mohansingh Trial would serve as a pseudo-bellwether for the claims estimation proceeding that the Debtor will seek in the chapter 11 case.

43.    I understand that, based on discussions with the Company and the Company's other advisors, Mr. Mohansingh is far from an ideal representative for the hundreds of plaintiffs in the pending asbestos litigation against Hess and HONX for a variety of reasons:  (a) outside of the litigation, no medical professional has ever advised Mr. Mohansingh that he has an asbestos-related disease; (b) Mr. Mohansingh suffers from shortness of breath, due to his asthma, which is exacerbated by his obesity, advanced age, and other non-employment related health conditions; (c) Mr. Mohansingh did not work inside the Refinery where the asbestos-containing products existed—he worked as a dock attendant and foreman and spent the majority of employment outdoors, loading and unloading cargo or overseeing that work; and (d) after filing his complaint in 2006, Mr. Mohansingh signed a release of all claims against HOVIC and Hess in 2009.  In exchange for this release, Mr. Mohansingh received approximately one-year's wages and continued healthcare coverage for himself and his family.  Thus, moving forward with the Mohansingh Trial will jeopardize the fairness of the estimation proceedings and HONX's chapter 11 efforts.

44.     At a more global level, allowing the litigation to proceed against Hess in the U.S. Virgin Islands will frustrate HONX's ability to advance its chapter 11 case, resulting in immediate and irreparable harm to HONX.  Unsurprisingly, given that it is committed to fund an expensive chapter 11 process, Hess has conditioned its commitment to continue funding this process under the Funding Agreement on HONX securing extension of the automatic stay to Hess.

### b.     Negotiations with Asbestos Claimants.

45.     HONX hopes to reach a consensual resolution of the chapter 11 case with representatives for current and future claimants as soon as the representatives are in position and willing to begin discussions.  To that end, HONX is prepared to promptly engage in good-faith negotiations with any asbestos claimants committee and future claimants' representative appointed in this case.  HONX also plans to file a motion in the near term to schedule an estimation trial to determine HONX's asbestos claim liability, so it can utilize a key tool of section 524(g) of Bankruptcy Code in the event the parties are unable to reach a settlement.

## III.     Evidentiary Support for the First Day Motions.

46.     Along with this Declaration, HONX has filed the First Day Motions, seeking orders granting various forms of relief intended to facilitate the efficient administration of this chapter 11 case.  The First Day Motions include:

- *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Continue Use of Its Bank Account, and (C) Continue to Perform Intercompany Transactions, (II) Authorizing the Debtor's Bank to Charge Certain Fees and Other Amounts, and (III) Granting Related Relief*;

- *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to File a List of the Top Law Firms Representing the Largest Numbers of Asbestos Plaintiffs Asserting Claims Against the Debtor in Lieu of the List of the Twenty Largest Unsecured Creditors, (II) Authorizing the Listing of Addresses of Counsel for Asbestos Claimants in Creditor Matrix in Addition to the Asbestos Claimants' Addresses, (III) Authorizing the Debtor to Redact*

> *Personally Identifiable Information, (IV) Approving Certain Notice Procedures for Asbestos Claimants, (V) Approving the Form and Manner of Notice of the Commencement of This Chapter 11 Case, and (VI) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>"); and

- *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (II) Granting Related Relief.*

47.    HONX, via the First Day Motions, is seeking the authority to, among other things, ensure the continuation of HONX's cash management system, which I believe is essential to fund HONX's expenses in this chapter 11 case.  I believe that the relief requested in the First Day Motions is also necessary to allow HONX to successfully and efficiently negotiate a consensual plan and successfully complete this chapter 11 case.

48.    I understand that venue is proper in the Southern District of Texas because HONX's principal place of business is in Houston, Texas.[12]  HONX is a non-operating entity, and its primary activity is managing asbestos and toxic tort litigation related to operations at the Refinery, which is performed by officers and directors located in Houston, Texas.  HONX's financial decisions related to the asbestos litigation are directed and controlled by HONX's officers and directors, some of which are located in Houston, Texas, and in consultation with Hess, whose officers responsible for such litigation are working out of its office in Houston, Texas.

49.    I am familiar with the content and substance of the First Day Motions.  The factual statements contained in each First Day Motion are true and correct to the best of my knowledge, information, and belief, and each such factual statement is incorporated herein by reference.  I

---

[12]    HOVIC, HONX's predecessor, was incorporated in the U.S. Virgin Islands from its date of incorporation until May 2020 when HOVIC merged into HONYC (n/k/a HONX), a New York corporation.  Post-merger, HOVIC ceased to exist.  While historically HONX has been operated out of both New York and Texas, since January 2022, when the Mohansingh Trial was scheduled, HONX's operations have shifted primarily to Houston, Texas.

believe that the relief sought in each of the First Day Motions is necessary to enable HONX to efficiently navigate its chapter 11 case and constitutes a critical element in successfully restructuring HONX's liabilities.

**IV.    Conclusion.**

50.    I am optimistic about HONX's ability to achieve a consensual resolution to address HONX's outstanding and future liabilities efficiently and equitably.

51.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:  April 28, 2022                            */s/ Todd R. Synder*
                                                  Todd R. Snyder
                                                  Chief Administrative Officer
                                                  HONX, INC.

**<u>Exhibit A</u>**

**Funding Agreement**

## FUNDING AGREEMENT

This FUNDING AGREEMENT (as amended, restated, modified or supplemented from time to time, this "Agreement"), dated April 27, 2022 (the "Agreement Effective Date"), is by and among Hess Corporation, a Delaware corporation (the "Payor") and HONX, Inc., a New York corporation (the "Payee," and together with Payor, the "Parties").

## RECITALS

A.      The Payee is currently a defendant in approximately 580 product and tort liability lawsuits (the "Asbestos Cases") alleging exposure to asbestos-containing compounds and products and other toxic compounds from the Payee's prior ownership of an oil refinery in St. Croix, U.S. Virgin Islands.  The Payee could receive at least approximately 500 more claims, and maybe more, both informally and through additional lawsuits.  As a result, the Payee has considered seeking relief under the Bankruptcy Code (as defined below) for the purpose of confirming a Plan (as defined below).

B.      The Payor is the sole stockholder of the Payee and has been named as a co-defendant in the Asbestos Cases.

C.      The Payor has agreed, pursuant to the terms of this Agreement, to provide support to the Payee sufficient to pay the costs of the Payee's Chapter 11 Case (as defined herein), as well as to satisfy other liabilities of the Payee specified herein on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.      Definitions.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Aggregate Trust Amount" means the lesser of (a) $10,000,000 and (b) the Parties' Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof for the purposes of funding one or more trusts, for the benefit of existing and future claimants, created pursuant to the Plan confirmed by a final, non-appealable order of the Bankruptcy Court and, to the extent required, the District Court; *provided, however*, that the amount set forth in the foregoing clause (a) may be increased pursuant to written agreement of the Parties.

"Agreement" has the meaning specified in the first paragraph hereof.

"Asbestos Cases" has the meaning specified in the first paragraph of the Recitals.

"Asbestos Related Liabilities" has the meaning specified in **Schedule 1** to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means:  (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Budget" means a monthly cash forecast as prepared by the Payee and showing projected cash receipts and expenses by category for the Chapter 11 Case on a monthly basis for the four month period commencing on the 1st day of the month immediately following the Petition Date, as the same may be revised and updated semi-monthly.  A copy of the initial Budget is attached hereto as **Schedule 4**.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Houston, Texas or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means:  (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Chapter 11 Case" means any case pending for the Payee under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Confirmation Order" means a final, non-appealable order of the Bankruptcy Court and the District Court, confirming the Plan, in a form acceptable to the Payor.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Disclosure Statement" means a disclosure statement pursuant to section 1125 of the Bankruptcy Code with respect to the Plan, in a form acceptable to the Payor.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on **Schedule 2** to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Initial Funding Request" means: (a) half of the Minimum Balance plus $4,000,000, which will be funded into the Funding Account on the Agreement Effective Date (the "First Tranche"); and (b) the remaining half of the Minimum Balance plus $4,000,000, which will be funded into

the Funding Account 70 days after the Petition Date (the "Second Tranche"), subject to the terms of this Agreement.

"Milestones" have the meaning specified in Section 2(f) of this Agreement.

"Organizational Documents" means:  (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Parties" has the meaning specified in first paragraph of this Agreement.

"Payee" has the meaning specified in first paragraph of this Agreement.

"Payee Material Adverse Effect" means:  (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Material Adverse Effect" means with respect to the Payor:  (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor" has the meaning specified in first paragraph of this Agreement.

"Permitted Funding Use" means each of the following:

(a)     the payment of any and all reasonable costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers, directors, officers, or professionals of the Payee and with respect to payment obligations owed to officers of the Payee other than indemnification obligations, approved by the independent directors of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b)    the payment of any and all reasonable costs and expenses of the Payee incurred in anticipation of[1] or during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers, directors, officers, or professionals of the Payee and with respect to payment obligations owed to officers of the Payee other than indemnification obligations, approved by the independent directors of the Payee); *provided* that with respect to costs and expenses of administering the Bankruptcy Case that comprise Retained Professional Fees (as defined herein), the Payee shall not pay the Retained Professional Fees from the Funding Account unless and until the following have occurred:  (A) the Bankruptcy Court enters an order approving the retention of any Retained Professionals (as defined herein) in the Chapter 11 Case; and (B) the Retained Professional Fees (I) are approved by an order of the Bankruptcy Court, or if entry of an order is not required, (II) comply with any interim compensation procedures, which procedures have been approved by the Bankruptcy Court;

(c)    the funding of any amounts to satisfy:

(i)    the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof for the purposes of funding one or more trusts for the benefit of existing and future claimants created pursuant to the Plan confirmed by a final, non-appealable order of the Bankruptcy Court and, to the extent required, the District Court, up to the Aggregate Trust Amount; and

(ii)    in the case of (i), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)    the funding of any amounts necessary to cause the Funding Account to contain at least $3,000,000 at such time (the "Minimum Balance"); *provided however*, that the Payor shall only be required to fund amounts necessary to maintain the Minimum Balance until the effective date of the Plan according to its terms (the "Plan Effective Date"); *provided further* that any of the Payee's cash on hand resulting from a Payment under this Agreement, including any Minimum Balance, as of the Plan Effective Date shall reduce any Payments necessary for the Payor to satisfy the Aggregate Trust Amount on the terms set forth in Section 5(b); and

(e)    the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor, of any provision of this Agreement; *provided*, that, in the case of clauses (a) through (d) above, solely to the extent the Payee's other assets are insufficient to pay such costs and expenses and fund such amounts and obligations in full.

---

[1]    As of the Agreement Effective Date, the Payor has made Payments in the amount of $2,334,000 in anticipation of a Bankruptcy Case.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"<u>Petition Date</u>" means the date the Payee files the Bankruptcy Case.

"<u>Plan</u>" means a plan for the Payee providing the Payor and the Payee with all of the protections of section 524(g) of the Bankruptcy Code, in a form acceptable to the Payor.

"<u>Retained Professional(s)</u>" means:  (a) persons, advisors, and firms retained by the Payor pursuant to section 327, 328, or 363 of the Bankruptcy Code, or as otherwise approved by a Bankruptcy Court order; and (b) persons, advisors, and firms retained by any statutory committee or representative pursuant to section 328, 524(g), or 1103 of the Bankruptcy Code, or as otherwise approved by a Bankruptcy Court order.

"<u>Retained Professional Fees</u>" means the reasonable fees and expenses of the Retained Professionals incurred during the Bankruptcy Case.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Subsidiary</u>" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"<u>Voting Stock</u>" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.    <u>Funding Obligations and Procedures</u>.

(a)    <u>Funding Obligations</u>.  The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of <u>Section 2(b)</u>, to make payments to the Payee (each, a "<u>Payment</u>"), the proceeds of which shall be used by the Payee for a Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to (i) make Payments under this Agreement that in the aggregate exceed the aggregate amount of all Permitted Funding Uses, or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b)    <u>Funding Requests</u>.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in the form attached hereto as **Schedule 3** (each, a "<u>Funding Request</u>").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "<u>Funding Date</u>").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in <u>Section 2(d)</u> have been satisfied.  Except as required to comply with the minimum requirements in <u>Section 2(b)(i)</u>, the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 45 days following the date of

6

such Funding Request; *provided, however*, that the foregoing shall not apply to Payment of the First Tranche and the Second Tranche.

(c)  Payments; Interest for Late Payments.  Subject to the terms of this Agreement, including  the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request; *provided* that: (i) the First Tranche of the Initial Funding Request shall be paid upon the Agreement Effective Date, without the need for a separate Funding Request; and (ii) the Second Tranche of the Initial Funding Request shall be paid on the 70th day after the Petition Date, subject to the terms of this Agreement, including the satisfaction of the conditions in Section 2(d), without the need for a separate Funding Request.  All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this Section 2(c) and such failure shall continue for a period of ten days, the amount of the requested Payment shall thereafter bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.  For the avoidance of doubt, any interest paid pursuant to this provision shall not reduce the Aggregate Trust Amount.

(d)  Conditions to Payments.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; (ii) there shall have been no violation by the Payee of the covenants set forth in Section 5; (iii) the Funding Request complies with the Budget; (iv) the Payee is in compliance with the Milestones; and (v) the automatic stay or temporary injunction, as applicable, is in effect as to the Payor with respect to the Asbestos Cases and Asbestos Related Liabilities; *provided, however*, that if a Funding Request exceeds the Budget, the Payee may also request in such Funding Request a waiver of compliance with Section 2(d)(iii), which waiver the Payor shall not unreasonably withhold.

(e)  Milestones.  The Payor shall not be obligated to make any Payments to the Payee pursuant to a Funding Request unless the Payee is in compliance with the following milestones (the "Milestones") other than for Funding Requests in connection with a Permitted Funding Use incurred prior to the Payee's failure to meet a Milestone; *provided* that if the Payee fails to satisfy a Milestone but comes within compliance of the missed Milestone within 5 Business Days, the Payor shall automatically recommence making Payments pursuant to received Funding Requests without the need for any further action by the Payee; *provided further* that the Milestones may be extended as reasonably agreed to in writing between the Parties:

(i)  No later than 1 Business Day after the Petition Date, the Payee shall commence an adversary proceeding in the Bankruptcy Case seeking:

(1)  a temporary restraining order enjoining the plaintiff from proceeding to trial against the Payor in the case styled and numbered *Mohansingh v. Hess Corp., et. al*, Case No. SX-06-CV-231, pending in the

Superior Court of the Virgin Islands (the "<u>TRO</u>"), and subsequent preliminary injunction;

(2)     a preliminary injunction enjoining the Asbestos Cases against the Payor until the Bankruptcy Court enters an order extending the automatic stay pursuant to section 362 of the Bankruptcy Code to the Payor (the "<u>Preliminary Injunction</u>"); and

(3)     an extension of the automatic stay pursuant to section 362 of the Bankruptcy Code to the Payor, or in the alternative, an extension of the preliminary injunction to the Payor, until the Plan Effective Date (the "<u>Stay Extension</u>"); *provided that*, the adversary complaint set forth in this <u>Section 2(e)(i)(1)–(3)</u> is in a form acceptable to the Payor;

(ii)     No later than 3 Business Days after the Petition Date, the Bankruptcy Court shall have entered the TRO;

(iii)     No later than 14 days after entry of the TRO, the Bankruptcy Court shall have entered an order granting the Preliminary Injunction (the "<u>Preliminary Injunction Order</u>");

(iv)     No later than 65 days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Stay Extension (the "<u>Stay Extension Order</u>");

(v)     No later than 75 days after the Petition Date, the Payee shall have filed a motion seeking to schedule a proceeding to estimate the Asbestos Related Liabilities (the "<u>Estimation Scheduling Motion</u>") in the Bankruptcy Case, *provided* that such motion is in a form acceptable to the Payor;

(vi)     No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Estimation Scheduling Motion;

(vii)     No later than 365 days after the Petition Date, the Payee shall have filed a Plan and Disclosure Statement in the Bankruptcy Case, each in a form acceptable to the Payor;

(viii)     No later than 480 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(ix)     No later than 550 days after the Petition Date, the Plan Effective Date shall have occurred.

3.      <u>Representations and Warranties</u>.

(a)      <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)      <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)      <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)      <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payor.

(iv)      <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)      <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payor that:

(i)      <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the

9

laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)     Authorization; No Contravention.   The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)     Governmental Authorization; Other Consents.   No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

(iv)     Binding Effect.   This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.     Covenants of the Payor.

(a)     Funding Account.   The Payor covenants and agrees that until the termination of this Agreement, the Payor shall maintain the Funding Account, including payment of any and all costs and expenses associated therewith; *provided that* the Payor's maintenance of the Funding Account shall not permit the Payor to withdraw any funds from the Funding Account or otherwise exercise control over the Funding Account.  Every 30 days, or as otherwise reasonably

requested by the Payee, the Payor shall provide the Payee with all records and accounts associated with the Funding Account.

(b) _Aggregate Trust Amount._  The Payor covenants and agrees that until the termination of this Agreement, the Payor shall maintain a reserve of not less than $10,000,000, with respect to its obligation to fund the Aggregate Trust Amount.

(c) _Administrative Support_.  The Payor shall continue to provide the Payee with reasonable administrative support with respect to the operation of the Payee's business in the ordinary course of business and consistent with historical practices.

(d) _Provision of Financial Information_.

(i) In the event that the Payor is no longer a public company that no longer files financial information with the SEC within the applicable time periods required by the SEC, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements) Payor will furnish to the Payee (including, for the avoidance of doubt, any independent directors of the Payee) audited annual and unaudited quarterly consolidated financial statements prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments.

(ii) By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that:  (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof); _provided_, _however_, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(e) _Successor to Payor upon Consolidation or Merger_.

(i) Subject to the provisions of Sections 4(d)(ii) and 4(d)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; _provided_, _however_, that the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger,

sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of the Payor with an Affiliate thereof solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this Section 4(c)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among the Payor and its Subsidiaries.

(ii)     Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the Payor shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of the Payor, under this Agreement with the same effect as if such successor Person had been named herein. In the event of a succession in compliance with this Section 4(d)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)     Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.      Covenants of the Payee.

(a)      The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.

(b)      The Payee shall use any cash on hand resulting from a Payment under this Agreement, including any Minimum Balance, as of the Plan Effective Date to reduce any Payments necessary for the Payor to satisfy the Aggregate Trust Amount.  For the avoidance of doubt, any cash on hand arising from any source other than this Agreement, including settlements with non-Payor third parties, shall not reduce any Payments necessary for the Payor to satisfy the Aggregate Trust Amount.

(c)      The Payee shall use any cash on hand arising from any source other than this Agreement to reduce any Payment necessary for the Payor to satisfy a Funding Request or the Minimum Balance, as applicable.

(d)      The Payee shall provide the Payor a Budget semi-monthly, with the first Budget after the Agreement Execution Date being provided on May 15, 2022 (or the following day that is not a weekend or bank holiday).

6.      Events of Default.  Each of the following events constitutes an "Event of Default":

(a)      Payor Events of Default.

(i)      the Payor defaults in the funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(ii)      the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with Section 4(c) of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(iii)      the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a custodian of it or for all or substantially all of its property, (D) makes a general assignment for the benefit of its creditors, or (E) generally is not paying its debts as they become due; and

(iv)      a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (A) is for relief against the Payor, (B) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (C) orders the liquidation of the

13

Payor, and, in each case of (A) through (C) above, such order or decree remains unstayed and in effect for 60 consecutive days.

(b)     Payee Events of Default.

(i)     the Payee fails to comply with the Milestones, subject to the terms of the five (5) Business Day grace period described in Section 2(f) hereof; and

(ii)     the Payee breaches any of the covenants of the Payee set forth in Section 5 hereof and such breach continues for a period of five (5) Business Days.

(c)     Notice of Default.   Upon becoming aware of any Default or Event of Default, the Payor or the Payee, as applicable, shall promptly deliver to the Payee or the Payor, as applicable, a written statement (except as otherwise stated in this Agreement, email being sufficient) specifying such Default or Event of Default.

7.     Remedies.  Upon the occurrence of any Event of Default by the Payor, and at any time thereafter during the continuance of any such Event of Default by the Payor, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.  Upon the occurrence of any Event of Default by the Payee, and at any time thereafter during the continuance of any such Event of Default by the Payee, the Payor's sole remedy is to terminate this Agreement.  For the avoidance of doubt, if the Payor elects to terminate this Agreement the Payee is not required to return any Payments received prior to an Event of Default.

8.     Notices.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

Hess Corporation
Hess Tower 1501 McKinney Street
Houston, Texas 77010
Attention:  Timothy B. Goodell, General Counsel
Email: tgoodell@hess.com

with a copy to:

Haynes and Boone, LLP
1221 McKinney Street
Suite 4000
Houston, Texas 77010
Attention: Charles A. Beckham, Jr.
Email: charles.beckham@haynesboone.com

14

Payee:

HONX, Inc.
c/o Todd R. Snyder
1501 McKinney Street
Houston, Texas 77010
Attention:  Todd R. Snyder, Chief Administrative Officer
Email:  todd.snyder@psc.com

with a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Christopher T. Greco, P.C., Matthew C. Fagen, and Elizabeth H. Jones
Email: christopher.greco@kirkland.com; matthew.fagen@kirkland.com;
elizabeth.jones@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:  Jaimie Fedell and Heidi Hockberger
Email: jaimie.fedell@kirkland.com; heidi.hockberger@kirkland.com

9.    Governing Law; Submission to Jurisdiction.  This Agreement shall be governed
and construed in accordance with the laws of the State of Texas.  Any legal proceeding seeking to
enforce any provision of, or based on any matter arising under, this Agreement may be brought:
(a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the
Payee, in state or federal court in Houston, Texas; or (b) at any time there is a proceeding under
the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  The Payor and
the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of
the appropriate appellate courts therefrom) in any such legal proceeding.

10.    No Implied Waiver; Amendments.  No failure or delay on the part of the Payee to
exercise any right, power or privilege under this Agreement, and no course of dealing between the
Payor and the Payee, shall operate as a waiver thereof, nor shall any single or partial exercise of
any right, power or privilege under this Agreement preclude any other or further exercise thereof
or the exercise of any other right, power or privilege.  No notice to or demand on the Payor in any
case shall entitle the Payor to any other or further notice or demand in similar or other
circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or
further action in any circumstances without notice or demand.  The remedies provided in this
Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or
waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom,
shall in any event be effective unless the same shall be in writing, specifically refer to this
Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall

15

be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.   Counterparts; Entire Agreement; Electronic Execution.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.   Severability.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.   Transfer; Assignment.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with Section 4(c).  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.  Any purported assignment of rights or obligations under this Agreement by any party other than as permitted by this Section 13 shall be null and void.

14.   Construction.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  The word "including" means without limitation by reason of enumeration.  The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.   Rights of Parties.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HESS CORPORATION**, a Delaware corporation, as the Payor

By: _____
   Timothy B. Goodell,
   General Counsel

**HONX, INC.**, a New York corporation, as the Payee

By: _____
   Todd R. Snyder,
   Chief Administrative Officer

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HESS CORPORATION**, a Delaware corporation, as the Payor

By: _____

Timothy B. Goodell,
General Counsel

**HONX, INC.**, a New York corporation, as the Payee

By: _____

Todd R. Snyder,
Chief Administrative Officer

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Parties (as defined in the Agreement) related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to: (i) asbestos, including asbestos contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of asbestos, including asbestos contained in any product, with asbestos or any other material and (ii) catalysts, dust, particles, and fibers, as well as other alleged toxic substances, including but not limited to, ethylene oxide, toluene, xylene, and benzene, diesel fuel exhaust, sand particles, waste chemicals, and nickel (collectively, the "Tone Substances"), including Tone Substances contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of Tone Substances, including Tone Substances contained in any product, with asbestos or any other material, *provided*, that, with respect to the Payor, the Asbestos Related Liabilities only include liabilities arising from its relationship to the Payee.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)       "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)       "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)       "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)       "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)       "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

## **SCHEDULE 2**

**Funding Account**



## **SCHEDULE 3**

**FUNDING REQUEST FORM**

## PAYEE FUNDING REQUEST

Request Date: [•]

Funding Date: [•]

Hess Corporation
Hess Tower 1501 McKinney Street
Houston, Texas 77010
Attention:  Timothy B. Goodell, General Counsel
Email: tgoodell@hess.com

c/o: Haynes and Boone, LLP
1221 McKinney Street
Suite 4000
Houston, Texas 77010
Attention: Charles A. Beckham, Jr.
Email: charles.beckham@haynesboone.com

c/o: Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Christopher T. Greco, P.C., Matthew C. Fagen, and Elizabeth H. Jones
Email: christopher.greco@kirkland.com; matthew.fagen@kirkland.com;
elizabeth.jones@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:  Jaimie Fedell and Heidi Hockberger
Email: jaimie.fedell@kirkland.com; heidi.hockberger@kirkland.com

      Pursuant to Section 2(b) of the Funding Agreement dated April 27, 2022 (as amended, restated, modified or supplemented from time to time, this "Agreement"),[1] by and among Hess Corporation, a Delaware corporation (the "Payor") and HONX, Inc., a New York corporation (the "Payee"), the Payee requests a Payment in the amount of $[●].  [In connection with the Payment requested herein, the Payee hereby represents, warrants, and certifies to the Payor that the conditions set forth in Section 2(d) have been satisfied. **OR** In connection with the Payment requested herein, the Payee hereby represents, warrants, and certifies to the Payor that all of the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Funding Agreement.

## **SCHEDULE 4**

### **INITIAL BUDGET**

PRIVILEGED AND CONFIDENTIAL - PRELIMINARY DRAFT SUBJECT TO MATERIAL REVISIONS
PREPARED AT THE REQUEST OF COUNSEL

**Project Harbinger - Initial Preliminary Budget ($)**

| | Pre-Funding | Post-Funding | Chapter 11 | | | | Total |
|---|---|---|---|---|---|---|---|
| | Apr-22 | | May-22 | Jun-22 | Jul-22 | Aug-22 | |
| **Receipts** | | | | | | | |
| Initial Funding Request | – | $5,500,000 | – | – | $5,500,000 | – | $11,000,000 |
| Funding Request | – | – | – | – | – | – | – |
| Other | – | – | – | – | – | – | – |
| **Total Receipts** | **–** | **$5,500,000** | **–** | **–** | **$5,500,000** | **–** | **$11,000,000** |
| | | | | | | | |
| **Disbursements** | | | | | | | |
| Independent Directors | $84,000 | – | $12,000 | $72,000 | $72,000 | $72,000 | $312,000 |
| | | | | | | | |
| Debtor's Professionals | | | | | | | |
| Kirkland & Ellis | $1,700,000 | – | $1,000,000 | $1,000,000 | $1,000,000 | $1,500,000 | $6,200,000 |
| Jackson Walker (Local Counsel) | 250,000 | – | 50,000 | 50,000 | 50,000 | 100,000 | 500,000 |
| Chief Administrative Officer - TRS | 175,000 | – | – | 125,000 | 125,000 | 125,000 | 550,000 |
| Bates White | 50,000 | – | 75,000 | 75,000 | 75,000 | 150,000 | 425,000 |
| Stretto (Claims Agent) | 75,000 | – | 100,000 | 100,000 | 100,000 | 100,000 | 475,000 |
| Estimated Expenses | – | – | 71,500 | 71,500 | 71,500 | 103,000 | 317,500 |
| **Debtor's Professionals Subtotal** | **$2,250,000** | **–** | **$1,296,500** | **$1,421,500** | **$1,421,500** | **$2,078,000** | **$8,467,500** |
| | | | | | | | |
| Asbestos Claimants Committee | – | – | $300,000 | $300,000 | $300,000 | $600,000 | $1,500,000 |
| | | | | | | | |
| Future Claims Representative | – | – | $100,000 | $100,000 | $100,000 | $300,000 | $600,000 |
| | | | | | | | |
| Other | | | | | | | |
| US Trustee | – | – | – | – | $43,964 | – | $43,964 |
| | | | | | | | |
| **Total Disbursements** | **$2,334,000** | **–** | **$1,708,500** | **$1,893,500** | **$1,937,464** | **$3,050,000** | **$10,923,464** |
| | | | | | | | |
| **Liquidity** | | | | | | | |
| **Beginning Cash** | | $711,661 | $6,211,661 | $4,503,161 | $2,609,661 | $6,172,197 | |
| Net Receipts / (Disbursements) | | 5,500,000 | (1,708,500) | (1,893,500) | 3,562,536 | (3,050,000) | |
| **Ending Cash** | **$711,661** | **$6,211,661** | **$4,503,161** | **$2,609,661** | **$6,172,197** | **$3,122,197** | |

**Notes:**
1  US Trustee fee 0.8% of quarterly total disbursements
2  Actual timing of Budget disbursements is expected to vary due to Bankruptcy Court approval process for retained professionals' fees and expenses

**Exhibit B**

**Illustrative Timeline**

