**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HONX, INC.,[1] | ) Case No. 22-90035 (MI) |
| | ) |
| Debtor. | ) |
| | ) |

**MOTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS OF HONX, INC. TO**
**<u>DISMISS OR CONVERT THE CHAPTER 11 CASE</u>**

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is HONX, Inc. (2163). The location of the Debtor's service address in this chapter 11 case is: 1501 McKinney Street, Houston, Texas, 77010.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

HISTORICAL BACKGROUND ........................................................................... 9

    A.    Hess Targeted the USVI for Development of a Large Refinery............................ 9

    B.    Hess Made Itself, and the Refinery, Essential to the USVI, Leading to Further Government Concessions................................................................... 11

    C.    The Refinery Devastated the Environment of St. Croix ...................................... 15

    D.    The Refinery Saturated the Population with Asbestos ......................................... 18

    E.    The Refinery's Closure in 2012 and Subsequent HOVENSA Bankruptcy.......... 20

    F.    Hess Faced Further Asbestos Litigation, Prompting this Chapter 11 Case .......... 23

    G.    Hess Now Hides Ineffectively Behind a Transparent Subsidiary........................ 24

PROCEDURAL BACKGROUND......................................................................... 26

JURISDICTION AND VENUE ............................................................................ 26

RELIEF REQUESTED ......................................................................................... 27

ARGUMENT ........................................................................................................ 27

    I.    "Cause" Exists for Dismissal of the Chapter 11 Case ......................................... 29

        A.    "Cause" Exists Because the Chapter 11 Case Was Filed in Bad Faith ...................................................................................................... 29

            1.    The Absence of Any Possible Benefit to the Debtor Establishes Bad Faith.................................................... 30

            2.    The Lack of Investigation of Claims Against Hess Owned by the Estate Confirms the Debtor's Bad Faith ........................... 32

            3.    A Comparison to the "Texas Two-Step" and Similar Cases Clarifies the Failure of Good Faith on the Part of this Debtor ........................................................................................ 33

            4.    Even if the Debtor Stood To Benefit, Litigation Advantage Is Not a Legitimate Purpose for a Chapter 11 Filing.................... 43

B.  "Cause" Exists Because the Debtor's Estate Is Not Equipped for Any Purpose Other Than Substantial and Continuing Loss, Without a Hope of Rehabilitation ...............................................................45

C.  "Cause" Exists Because the Debtor's Failure To Maintain Insurance Endangers the Estate and the Public...........................................48

II.  The "Unusual Circumstances" Exception is Inapplicable .....................................49

III.  Under the Circumstances of the Chapter 11 Case, Dismissal Is Preferable to Conversion ........................................................................................51

CONCLUSION.................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Occupational Safety LLC v. Those Parties Listed on Appendix A to the Complaint
(In re Aearo Techs. LLC)*, Case No. 22-02890-JJG-11, Adv. Pro. No. 22-50059,
2022 WL 3756537 (Bankr. S.D. Ind. Aug. 26, 2022)........................................................ *passim*

*In re Alexandra Trust*,
526 B.R. 668 (Bankr. N.D. Tex. 2015)........................................................................43

*Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*,
431 F. App'x 272 (5th Cir. 2011) .............................................................................43

*In re Assadi*,
No. 1:20-CV-998-LY, 2021 WL 917489 (W.D. Tex. Mar. 9, 2021) ......................................50

*In re Baribeau*,
603 B.R. 797 (Bankr. W.D. Tex. 2019)........................................................................49

*In re Bestwall LLC*,
605 B.R. 43 (Bankr. W.D.N.C. 2019)..............................................................6, 34, 35, 40

*In re Briggs-Cockerham, L.L.C.*,
No. 10-34222-BJH-11, 2010 WL 4866874 (Bankr. N.D. Tex. Nov. 23, 2010).....................49

*Clarkson v. Cook Sales & Serv. Co. (In re Clarkson)*,
767 F.2d 417 (8th Cir. 1985) ...................................................................................47

*In re Cypress Fin. Trading Co., L.P.*,
620 F. App'x 287 (5th Cir. 2015) ..............................................................................30

*DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*,
Case No. 20-30080, Adv. Pro. No. 20-03004, 2021 WL 3552350
(Bankr. W.D.N.C. Aug. 11, 2021) .............................................................6, 34, 35, 40

*Dunn v. HOVIC*,
1 F.3d 1371 (3d Cir. 1993)...........................................................................5, 11, 43

*Dunn v. Owens-Corning Fiberglass*,
774 F. Supp. 929 (D.V.I. 1991) .................................................................................4, 43

*Edwards v. Hess Oil Virgin Islands Corp.*,
66 V.I. 218 (U.S.V.I. Super. Ct. June 29, 2017).............................................................19

*Edwards v. Hess Oil Virgin Islands Corp. et al.*,
No. SX-15-CV-382 (U.S.V.I. Super. Ct. July 5, 2017) ..........................................................19

*Elmwood Dev. Co. v. Gen. Elec. Pension Tr. (In re Elmwood Dev. Co.)*,
964 F.2d 508 (5th Cir. 1992) ...............................................................................................30

*In re Fleetstar LLC*,
614 B.R. 767 (Bankr. E.D. La. 2020) ...................................................................................51

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) .......................................................................................47

*In re Ford Steel, LLC*,
629 B.R. 871 (Bankr. S.D. Tex. 2021) ..................................................................................45

*Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*,
936 F.2d 814 (5th Cir. 1991) ............................................................................................29, 32

*Investors Grp. LLC v. Pottorff*,
518 B.R. 380 (N.D. Tex. 2014)..............................................................................................44

*In re Irasel Sand, LLC*,
569 B.R. 433 (Bankr. S.D. Tex. 2017) ..................................................................................46

*Lackawaxen Telecom, Inc. v. S. Canaan Cellular Invs., LLC (In re S. Canaan Cellular Invs., LLC)*,420 B.R. 625 (E.D. Pa. 2009)..................................................................................43, 44

*Little Creek Dev. Co. v. Commonwealth Mortg. Corp.* (*In re Little Creek Dev. Co.*),
779 F.2d 1068 (5th Cir. 1986) .............................................................................................1, 29

*In re LTL Mgm't LLC*,
637 B.R. 396 (Bankr. D.N.J. 2022) ................................................................................ *passim*

*In re M & C P'ship*,
No. 19-11529, 2021 WL 1679058 (Bankr. E.D. La. Apr. 28, 2021)......................................50

*In re NRA of Am.*,
628 B.R. 262 (Bankr. N.D. Tex. 2021)...............................................................................44, 50

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021),
*vacated on other grounds*, 635 B.R. 26 (S.D.N.Y. 2021)......................................................42

*In re TMT Procurement Corp.*,
534 B.R. 912 (Bankr. S.D. Tex. 2015) ..................................................................................45

*In re Woodruff*,
580 B.R. 291 (Bankr. M.D. Ga. 2018)................................................................................46, 47

## STATUTES AND RULES

11 U.S.C. § 108(a) ..............................................................................................7

11 U.S.C. § 524(g) .........................................................................................47, 48

11 U.S.C. § 1112(b) ...................................................................................... *passim*

28 U.S.C. §1334 ...............................................................................................26

28 U.S.C. § 1408 ...............................................................................................27

28 U.S.C. § 1409 ...............................................................................................27

Tex. Bus. Orgs. Code § 10.901 .....................................................................6, 35

Fed. R. Bankr. P. 1017 .....................................................................................27

Fed. R. Bankr. P. 9014 .....................................................................................27

## OTHER AUTHORITIES

Cynthia Sheps, *A Port in St. Croix: A Coup for Leon Hess?*, N.Y. Times (Aug. 12, 1979) ...13, 14

Matthew P. Johnson, *Black Gold of Paradise: Negotiating Oil Pollution in the US Virgin Islands, 1966–2012, in* 24(4) *Environmental History* 766, 771 (2019)............................11, 12

U.S. Dep't of Commerce, "Social and Economic Effects of Expanded Energy Facilities on the Island of St. Croix and the Territory of the Virgin Islands" (Mar. 1991)...................10, 11, 13

U.S. Dep't of the Interior, "Final Audit Report on Hess Oil Virgin Islands Corporation's Economic Impact on the Virgin Islands (No. 92-I-384)" (Feb. 7, 1992)..........................10, 11

U.S. Virgin Islands. Legislature. First Extension and Amendment Agreement. 1981 reg. sess. Bill No. 14-0242 ...............................................................................................13

U.S. Virgin Islands. Legislature. Second Extension and Amendment Agreement. 1990 reg. sess. Bill No. 18-0409 ...............................................................................................13

U.S. Virgin Islands. Legislature. Third Extension and Amendment Agreement. 1999 reg. sess. Bill No. 22-0259 ...............................................................................................15

U.S. Virgin Islands. Legislature. "To Authorize the Governor of the Virgin Islands to Execute a Certain Agreement Relating to the Construction of an Oil Refinery and Other Related Facilities in the Island of St. Croix, Virgin Islands, and for Other Purposes" (Sept. 1, 1965) ...............................................................................................9, 10

The Official Committee of Unsecured Creditors (the "Committee") of HONX, Inc., as debtor and debtor in possession (the "Debtor"), by and through its undersigned counsel, hereby moves, pursuant to sections 105(a) and 1112(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order, in the form attached hereto as **Exhibit A** dismissing this chapter 11 case or, in the alternative, converting this chapter 11 case to a case under chapter 7 of the Bankruptcy Code (the "Motion"). In support of this Motion, the Committee respectfully states as follows.

## PRELIMINARY STATEMENT[1]

1.      "Resort to the protection of the bankruptcy laws is not proper [when] there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's terminal euphoria." *See Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986) (internal quotation marks omitted). This case should be dismissed or converted to a chapter 7 case for "cause" under Bankruptcy Code section 1112(b)(1), including because:

(i)     it was filed in bad faith;

(ii)    the Debtor is undergoing continuing loss with no prospect of rehabilitation; and

(iii)   the Debtor's failure to maintain appropriate insurance poses a risk to the estate or the public.

2.      "Bad faith" has long been recognized as a non-statutory form of cause. The archetypal indication of bad faith is an entity seeking refuge in chapter 11 despite having no real prospects of reorganization or ongoing business to protect, or filing for bankruptcy solely to gain an illegitimate advantage in some arena (such as in ongoing litigation) divorced from its financial

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in the body of the Motion.

condition.  The Debtor's bad faith is particularly stark.  Not only does it lack any assets, business or employees, the Debtor commenced this case not for its own benefit, but in order to give its nondebtor parent, Hess Corporation ("Hess"), an escape from ongoing litigation.

3.       The bankruptcy "breathing spell" means nothing to Debtor, which has been out of business and non-operational for more than a decade, and has virtually no assets[2] in which its creditors can share, or around which it could possibly reorganize.  There is nothing here to resuscitate.  Rather, Hess has made a half-hearted attempt to attach puppet-strings to the husk of a company in hopes that this Court will mistake it for an entity that still can be given life support through the chapter 11 process.  This case is manifestly and solely about Hess, not the Debtor, and is aimed transparently at obtaining a litigation advantage for Hess.  That is not a valid use of the Bankruptcy Code, and dismissal therefore is plainly warranted.

4.       The Debtor has never even attempted to suggest that it has value to distribute and began the case with nothing more than a hollow Funding Agreement,[3] capped at $10 million and terminable at Hess's whim.  Hess represented to this Court that it was willing to modify the Funding Agreement and prevent this case from being a "garbage bankruptcy," but it has done nothing.  For its part, the Committee proposed reasonable revisions to the Funding Agreement *three and a half months ago*, but Hess has not budged—even retaining its unilateral right to

---

[2] Any references to the lack of assets held by HONX are based on the Debtor's own assertions, and not the Committee's still-unformed views regarding the potential presence of valuable estate causes of action against Hess.  Of course, not only has the Debtor failed to recognize or investigate these potential causes of action, but as a result of the litigation standstill agreed to as part of the Mediation Order, the Committee has not taken discovery regarding these issues.  The Committee intends in the near term to pursue such discovery and determine whether these causes of action are viable and should be brought.  To the extent that the Debtor now attempts to reverse course and assert that these causes of action represent a significant asset upon which a reorganization may be founded, the Committee submits that the Debtor's failure to act in any way to protect, investigate or monetize what would be its sole concrete asset constitutes "gross mismanagement of the estate," itself cause for dismissal or conversion.

[3] The "Funding Agreement" is that certain agreement, dated as of April 27, by and among Hess and the Debtor, attached as Exhibit A to the *Declaration of Todd R. Snyder, Chief Administrative Officer of HONX, Inc., in Support of Chapter 11 Petition and First Day Motions* [ECF No. 8] (the "First Day Declaration").

terminate the Funding Agreement or compel this case to proceed on a completely impracticable timeline.  Nothing has changed since the first day of this case, except that creditors have been delayed by the pendency of the case from seeking recourse against Hess, while what limited funds Hess has provided to the Debtor have been consumed by professional fees.

5.     But while the Debtor does not seek to improve *its* position or resolve *its* liabilities, this Chapter 11 Case was not filed without *any* purpose.  It was commenced and has been run exclusively for the benefit of Hess, the Debtor's parent and the primary defendant in hundreds of asbestos actions pending in the U.S. Virgin Islands (the "USVI"), where the Debtor's operations were located when the Debtor was still in business.[4]  The bankruptcy filing does not help the Debtor, which could have ignored every one of the hundreds of USVI actions against it, accumulated default judgments in every case, and its financial picture would have been unchanged: assets zero, liabilities irrelevant.  As a great poet once said, "[w]hen you ain't got nothing, you got nothing to lose."[5]  The Debtor did not file this case for its own protection.

6.     Instead, the Debtor seeks to protect Hess.  But Hess is not subject to the kind of financial distress that would justify even its own bankruptcy filing.  To be sure, hundreds of plaintiffs in the USVI have valuable claims against Hess, including direct premises and supplier liability claims that are not derived from the Debtor's liability.  Unlike its defunct subsidiary, however, Hess has assets more than sufficient to pay any conceivable judgment(s) against it.  Hess is a financially robust global behemoth, generating about $4 million in unlevered free cash flows *each day*, with a market capitalization of some ***$37 billion***.[6]  The financial exposure Hess faces in

---

[4] The Debtor was joined as a co-defendant with Hess in those lawsuits to which it is a party solely because its past conduct was relevant to proving some of the valuable claims against Hess.  Upon information and belief, the same is true of the non-asbestos litigation in which the Debtor is a defendant—and in any event, no litigants, asbestos or otherwise, could plausibly have expected to receive a recovery on their claims from HONX's assets.

[5] Robert Dylan, *Like a Rolling Stone*, on *Highway 61 Revisited* (Columbia Records 1965).

[6] *See* Hess Corp., Annual Report (Form 10-K) (Mar. 1, 2022).

connection with its former USVI operations, while meaningful to its victims, is microscopic to Hess itself.

7.      By way of illustration, out of the approximately 1,100 asbestos cases brought over the last 23 years, Hess has settled each and every one, entirely at its own cost.  At an inflation-adjusted total of ████████████████████████████████████████.  Hess's most recent settlement, in 2018, comprised approximately 500 such claims, ████████████████

████████████████████████████████████████████████████████

██████.  Paying *double* that amount to settle the present claims pool (approximately 900 claims) would cost Hess approximately ██████████—a large number in absolute terms, but a drop in the bucket compared to the wealth Hess possesses, which it extracted in material part from the government and people of the USVI over the past five decades.  The litigation underlying these present claims does not pose a threat to Hess's solvency.  Hess itself acknowledges as much, boasting to its investors in its first disclosure of the litigation after the petition date that it "believes that the resolution of these proceedings will not have a material adverse effect on our consolidated financial position, results of operations or cash flows."[7]

8.      So why did Hess cause the Debtor to file this case?  Two reasons: to avoid what Hess perceives as an unfavorable forum and to obtain the perceived benefits of delay.  The only asbestos case ever tried to a verdict in the USVI, the *Dunn* case in, resulted in a jury verdict in November, 1990 of $1.3 million in compensatory damages (remitted to $500,000 by the trial court)[8] and $25 million in punitive damages (remitted to $2 million by the trial court and later

---

[7] Hess Corp., Quarterly Report (Form 10-Q) for quarter ended June 30, 2022 at 12 (Aug. 4, 2022); Hess Corp., Quarterly Report (Form 10-Q) for quarter ended March 31, 2022 at 11 (May 5, 2022).

[8] *Dunn v. Owens-Corning Fiberglass*, 774 F. Supp. 929, 938 (D.V.I. 1991).

remitted to $1 million by the Third Circuit).[9]  Ever since, Hess, like every other asbestos defendant in the USVI, has been terrified of having its liability determined by members of the community that it devastated through its reckless and rapacious conduct—and **no** defendant has permitted an asbestos case to go to trial there.  Now, a 2021 change in USVI law (as described in greater detail *infra*) means that cases Hess has managed to keep at bay for years would, but for the intervention of this Chapter 11 Case, proceed swiftly to trials and verdicts in USVI courts.  Hess caused the Debtor to file this case in an attempt to forestall that reckoning, and to seek a release of its liability without ever having to confront the victims of its tortious acts.

9.      The approach Hess has taken appears designed to create a protracted, seemingly hopeless process, including lengthy (and nonbinding) estimation proceedings, with the evident intention of exhausting and demoralizing Hess's USVI victims.  While Hess cannot force a discount on claimants under the Bankruptcy Code, Hess no doubt will still count it as a win if its dilatory strategy is allowed to play out.  Every day that goes by in this case, and every day the USVI actions remain enjoined, Hess continues to generate millions in free cash flow, while asbestos claimants suffer, witness memories fade, and evidence grows stale.  Like most defendants, Hess would prefer litigation and judgments years into the future to litigation and judgments right now.

10.     And what of creditors?  They never sought recoveries from HONX in the first place, and accordingly have no interest in this case.  Hess mimics the form and terminology of the so-called "Texas Two-Step" bankruptcy cases, where creditors have direct recourse only against a "BadCo" debtor and any liability faced by the nondebtor parent is only derivative.  But that is not the situation here.  The Debtor's creditors hold separate tort claims (including claims for

---

[9] *Dunn v. HOVIC*, 1 F.3d 1371, 1391 (3d Cir. 1993).  Although HOVIC's name remained in the caption, the Debtor and Hess had settled this action prior to the jury trial.

"premises" and "supplier" liability) ***directly*** against Hess and need not rely on derivative liability at all. The promise to creditors made by the framers of chapter 11, an orderly resolution of claims against a limited fund, is meaningless where no such limited fund exists. Indeed, ***no*** true source of recovery—limited or otherwise—exists at the Debtor level, and the creditors' claims cannot threaten to exhaust Hess's $37 billion in market capitalization. Nor has Hess provided funding of the kind afforded debtors in cases like *DBMP*, *Bestwall*, *Aldrich Pump*, *LTL* and *Aearo*.[10] By contrast, the Funding Agreement here does not mandate that Hess pay the Debtor's liabilities, nor does it absolve Hess of its own liabilities. Most importantly, it does not endow the Debtor with sufficient existence to be the subject of a chapter 11 case. In short, this case was filed in bad faith—in the interests of Hess, rather than the Debtor or its creditors—and should be converted or dismissed accordingly.[11]

11.     But bad faith is not the only ground for the relief sought by this Motion. The Bankruptcy Code also provides that "cause" for dismissal or conversion exists where a debtor faces "substantial or continuing loss to or diminution of the estate and the absence of a reasonable

---

[10] The Texas law utilized in the first four of these cases, the so-called "divisional merger," requires as part of this isolation process that an affiliate render the transaction claimant-neutral, by endowing the "BadCo" with assets and/or guaranteeing payment of liabilities through a robust funding agreement. Tex. Bus. Orgs. Code § 10.901. The ongoing *Aearo* case did not make use of the Texas law, but nevertheless involved a "Funding Agreement [that] provides for an *uncapped*, *non-recourse* commitment from 3M [the debtor's parent] to fund *all* of the [debtors'] liabilities."). *3M Occupational Safety LLC v. Those Parties Listed on Appendix A to the Complaint (In re Aearo Techs. LLC)*, Case No. 22-02890-JJG-11, Adv. Pro. No. 22-50059, 2022 WL 3756537, at *13 (Bankr. S.D. Ind. Aug. 26, 2022).

[11] Even if Hess itself had filed for bankruptcy, the result would be the same: a case in which a company with over seven billion dollars in shareholders' equity based on book value (and market capitalization of over 37 billion dollars as of September 2, 2022) sought refuge not from enterprise-threatening litigation but from several hundred claims that do not threaten its liquidity or solvency would be equally subject to bad-faith dismissal as a mere litigation tactic. That Hess offers not itself, but its attic portrait, as a sacrifice to achieve this result only makes matters worse. And while some courts—most recently in *LTL*—have focused on "enterprise-wide" distress as a reason for a defunct or newly-created debtor's filing where such distress threatens the debtor's ability to recover under an uncapped funding agreement, *e.g.*, *In re LTL Mgm't LLC*, 637 B.R. 396, 418 (Bankr. D.N.J. 2022), such a theory cannot support this filing, where distress cannot threaten Hess's ability to contribute the paltry sum contemplated under this Funding Agreement. Indeed, even if the Funding Agreement were amended to provide true coverage for claimants, the absence of any true distress on the part of Hess ***or*** the Debtor—in addition to the lack of assets, Hess's continued liability and the fact that there has never been a single trial against Hess on any of the approximately 1,100 claims that have been brought—only further distinguishes this case from the situations facing those courts.

likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  The prospect of substantial and continuing loss likewise was guaranteed *a priori*, when the Debtor accepted an illusory Funding Agreement that only requires payment from Hess for as long as Hess is pleased with the case and its trajectory.  The Funding Agreement also purports to cap[12] the value available to fund the case and pay creditors at a woefully insufficient, and frankly disingenuous, $10 million.  Indeed, this Court aptly warned the Debtor and Hess that without a significant move above this position, this would be a "garbage bankruptcy" that would not last long. [13]

12.    But according to the Debtor itself, the Funding Agreement is the **only** significant asset in the estate.[14]  This asset cannot appreciate in value, because Hess cannot be compelled to fund creditor recoveries even in the minimal amount contemplated by the Funding Agreement and, indeed, Hess retains the ability to terminate the Funding Agreement at its pleasure.  While the Debtor may have claims against Hess, the Debtor has no assets that could be used to prosecute those claims.[15]  Moreover, any such claims could be extinguished under Bankruptcy Code Section 108(a) through the protracted process debtor seeks, which has no hope of leading to a confirmable plan.

13.    In addition, "rehabilitation" here is not only unlikely, but impossible.  While the term "rehabilitate" has been construed to mean something beyond merely confirming a plan, the Debtor is not "reasonably likely" to clear even this lower bar.  Indeed, central to the present scheme

---

[12] As discussed *infra*, this is in stark contrast to the funding agreements in place in other cases, where the Debtor's rationale for filing has included the risk that enterprise-wide distress could risk access to funding agreements that provide a legal right to funding for their full liabilities.

[13] Apr. 29, 2022 Hr'g Tr. at 29:16–18.

[14] First Day Decl. ¶¶ 23 ("minimal assets aside from the Funding Agreement"); 35 ("HONX has no material assets.").

[15] Significantly, the Debtor has not behaved as if these claims exist in the first place—the Disinterested Directors, contrary to common practice, appear not to have investigated any potential litigation claims prior to filing the petition, and may only have commenced any investigation at all upon prompting from the Committee.  The Committee, to date, is not aware of any investigation having commenced.

is a chapter 11 plan centered around a 524(g) trust, which would enable Hess to channel its liability and obtain a release in exchange for what it hopes will be a modest contribution.[16]  But, as the Debtor is well aware, any such plan must be accepted by ***75% of claimants in each affected class***. As the Committee has made clear, obtaining the claimants' necessary support will require a contribution by Hess far in excess of the value contemplated at the outset of the case—something more akin to what claimants have received in prior settlements.  Expecting claimants, almost 99% of whom are represented and advised by the same law firm that forged the *Gomez* settlement just four years ago, to accept a steep discount in a case where they collectively hold a veto on any settlement or plan is not realistic.  And Hess's decision to start at such a low value has sent a very unfortunate message to creditors regarding Hess's willingness to achieve consensus, and may make it more difficult for the Debtor to obtain acceptance, even of a more reasonable plan.

14.     In short, no prospect of rehabilitation exists because both the claimants (through voting) and Hess (by eliminating the Funding Agreement, the Debtor's only asset) have the right to veto any plan that may be put forward.

15.     Finally, cause for dismissal or conversion exists where the Debtor "fail[s] to maintain appropriate insurance that poses a risk to the estate or to the public."  11 U.S.C. § 1112(b)(4)(C).  The Debtor has no insurance remaining to address any of its asbestos liability— so either this is a false bankruptcy where no assets exist, or it is one where the estate remains unprotected.  This, too, represents cause for the Court to dismiss or convert the Chapter 11 Case.

16.     Once cause is established, the Court is called upon to assess whether unique circumstances justify refraining from acting on that cause, and whether a chapter 7 case might serve some legitimate purpose for creditors and the debtor.  Here the answer is clear: the Debtor

---

[16] First Day Decl. ¶ 4.

has no prospect of reorganizing, no estate to be safeguarded by a trustee, and cannot benefit from an orderly liquidation. Likewise, this Chapter 11 Case will do nothing to preserve value for the benefit of creditors (and, in fact, will have the opposite effect), and creditors would rather—as they are entitled to—be litigating against Hess in the Virgin Islands without intermediation by the Debtor. Under these uniquely unpropitious circumstances, where a chapter 11 case can benefit ***no party*** other than nondebtor Hess, this Court should dismiss the Chapter 11 Case expeditiously.

## HISTORICAL BACKGROUND

### A.  Hess Targeted the USVI for Development of a Large Refinery

17.     As in any asbestos case, the harm suffered by claimants at the hands of Hess and the Debtor has deep roots. The harm wrought on these claimants began in the 1960s, when Leon Hess, an American oil tycoon who had founded a multi-billion-dollar global energy empire, sought a location to build a large oil refinery to expand the business throughout the United States. Hess chose the USVI and St. Croix specifically, in order to take advantage of the political opportunities for substantial tax breaks and other benefits unique to the USVI.

18.     The USVI government granted Hess unparalleled tax incentives and other benefits in an effort to stimulate the local economy, create quality jobs, and transition its largely agrarian population into industrial labor.[17] Specifically, the USVI legislature granted the USVI governor the ability to enter into an agreement with Hess regarding the construction of the oil refinery, which, after being ratified by the legislature, obtained the force of law.[18] Hess specifically sought out and obtained extraordinary benefits from the USVI government under this agreement, which included provisions declaring that several zoning laws were inapplicable and that Hess and its

---

[17] U.S. Virgin Islands. Legislature. "To Authorize the Governor of the Virgin Islands to Execute a Certain Agreement Relating to the Construction of an Oil Refinery and Other Related Facilities in the Island of St. Croix, Virgin Islands, and for Other Purposes" (Sept. 1, 1965), Act No. 1524 (Bill No. 2639).

[18] *Id.*

affiliates were exempt from the payment of all property and franchise taxes, license fees, excise or gross receipt taxes on exports, and import duties ordinarily imposed by the USVI government— as well as exemption from seventy-five percent (75%) of USVI income taxes—for a period of sixteen (16) years.[19]

19.     The savings from these concessions amounted to billions of dollars in total.[20] Indeed, an audit by the Department of Interior's Office of Inspector General showed that HOVIC was saving $3.61 for every one dollar it paid in taxes to the USVI, which eventually amounted to a total savings of $6.2 billion between when the first USVI agreement was negotiated and 1992.[21] Hess also secured an amendment to zoning restrictions in order to designate much of St. Croix's south shore land to industry—which, in effect, meant dedicating it to Hess.[22]  In return, Hess agreed, among other things, that not less than seventy-five percent (75%) of the operation and maintenance employees of the oil refinery would be residents of the USVI.[23]  To carry out this promise, Hess agreed to build and operate a school to train personnel in the skills necessary for employment at the oil refinery.[24]

20.     In addition to avoiding expenses, by operating the oil refinery in the USVI, Hess could avoid certain costs—and still keep certain benefits—applicable to mainland U.S. refineries. Specifically, Hess could avoid obligations under the Jones Act, which required mainland

---

[19] Id. at 491–92.

[20] As an example, without the tax concessions under the USVI agreement, HOVIC would have been required to pay approximately $400 million in taxes in 1979.  U.S. Dep't of Commerce, "Social and Economic Effects of Expanded Energy Facilities on the Island of St. Croix and the Territory of the Virgin Islands" (Mar. 1991), https://www.govinfo.gov/content/pkg/CZIC-td195-n83-s63-1981/html/CZIC-td195-n83-s63-1981.htm.

[21] U.S. Dep't of the Interior, "Final Audit Report on Hess Oil Virgin Islands Corporation's Economic Impact on the Virgin Islands (No. 92-I-384)" (Feb. 7, 1992) (USVI Compl. Ex. 1) at p. 1.

[22] U.S. Virgin Islands. Legislature. "To Authorize the Governor of the Virgin Islands to Execute a Certain Agreement Relating to the Construction of an Oil Refinery and Other Related Facilities in the Island of St. Croix, Virgin Islands, and for Other Purposes" (Sept. 1, 1965), Act No. 1524 (Bill No. 2639).

[23] Id. at 492.

[24] Id.

companies to use more expensive U.S.-flagged vessels to transport goods between mainland U.S. ports. A USVI refinery, on the other hand, could save Hess money by using foreign tankers with lower rates to ship products.[25] At the same time, operating in the USVI also enabled Hess to invoke Section 301 of the US Tariff Act of 1930 to export products duty-free into the mainland to support its mainland operations.[26]

21.     Hess also identified two important loopholes in the federal Mandatory Oil Import Program (the "MOIP") that made the USVI the ideal location for Hess to operate a refinery. The MOIP restricted the amount of foreign oil permitted into the United States. However, because the USVI was outside of the U.S. customs zones, oil imported into the USVI was not limited by the MOIP's restrictions.[27] Therefore, Hess's oil refinery had access to cheap foreign oil that was not available to mainland refineries. Additionally, oil exported from the USVI to mainland markets was subject to negotiable quotas. Hess lobbied for higher quotas and was awarded an import quota of fifteen thousand barrels per day in 1967.[28]

22.     Each of these benefits made the USVI an ideal location for Hess to develop its refinery and expand its business in the United States.

## B. Hess Made Itself, and the Refinery, Essential to the USVI, Leading to Further Government Concessions

23.     After reaching its initial agreement with the USVI governor, Hess began to build its refinery in St. Croix (the "Refinery"). In 1965, in connection with building the Refinery, Hess formed a subsidiary called Hess Oil Virgin Islands Corp. ("HOVIC"), as a Virgin Islands Corporation and wholly owned subsidiary of Hess Corp., which, after a recent reorganization, is

---

[25] Matthew P. Johnson, *Black Gold of Paradise: Negotiating Oil Pollution in the US Virgin Islands, 1966–2012*, *in* 24(4) *Environmental History* 766, 771 (2019) (hereinafter "*Black Gold of Paradise*").

[26] *Id.* at 772.

[27] *Id.*

[28] *Id.*

now the Debtor in this action.  The Refinery was built on approximately 1,500 acres of land from 1965 to 1974.[29]  By 1974, the Refinery became one of the largest oil refineries in the world, and, at its peak, had a processing capacity of more than 650,000 barrels of oil per day.[30]

24.     Unsurprisingly, the Refinery became one of the top private employers on St. Croix and paid substantial amounts of taxes and export fees to the island.  By the 1990s and 2000s, the Refinery employed more than two thousand direct and contract workers, playing an outsized role in the USVI economy.[31]  By 2011, employment at the Refinery accounted for approximately 15% of the USVI's active workforce.[32]  In addition to employing a large portion of the people of the Virgin Islands, the Refinery paid taxes and export fees to the USVI government that were substantial in context, although greatly diminished by  the major tax breaks the company had extracted.[33]

25.     Hess, through the Refinery, had an outsized influence on the USVI economy, and substantial leverage over its people.  As a result of the Refinery's significance to the USVI, Leon Hess was able to negotiate an extension of his tax and other benefits from the original agreement with the USVI governor.  Beginning in 1981, when the original agreement was set to expire, Leon Hess wanted to expand the Refinery and amend the original agreement to include even more favorable terms.  He announced a plan to relocate a large portion of his business, which would strip the island of the now much-needed jobs, if the USVI government did not consent to his

---

[29] First Day Decl. ¶ 10.

[30] *Id.*; *see also Black Gold of Paradise* at 774 (indicating that at one point the Refinery was the world's largest refinery until it was surpassed by Venezuela's Amuay refinery in 1981).

[31] *Black Gold of Paradise* at 784.

[32] *Id.*

[33] For example, in 1992, "petroleum products from HOVIC accounted for $2 billion of the $2.3 billion generated from the territory's exports." *Id.*

proposed amendments.[34]  At the time, the Refinery constituted eleven percent (11%) of the Gross Territorial Product for the USVI,[35] so it is unsurprising that Hess was able to obtain from the USVI government an agreement to amend and extend HOVIC's tax exempt status.  This extension, which was ratified as Act 4538, ultimately conferred on HOVIC a package of tax, regulatory, and other benefits worth hundreds of millions of dollars a year for another 16 full years.[36]  Act 4538 also obligated HOVIC to invest in the territory, including a commitment for HOVIC to build a vocational school for $3 million and construct a fluid catalytic cracking unit ("FCC Unit") for $200 million to maximize its production of petroleum products.[37]

26.    Hess sought—and obtained—a second extension of HOVIC's tax-exempt status and further concessions from the USVI government in 1990.  It was clear at this point that HOVIC had failed to meet several of its obligations under the prior agreements, including the construction of the first FCC Unit.[38]  Yet, in spite of HOVIC's breaches of its obligations, the USVI government once again agreed to amend and extend the agreement with HOVIC.  This second extension was ratified as Act 5588 on August 30, 1990.[39]

27.    Under Act 5588, HOVIC agreed to commence construction of the long-delayed FCC Unit by December 15, 1990.[40]  The agreement would expire "sixteen years from

---

[34]  Cynthia Sheps, *A Port in St. Croix: A Coup for Leon Hess?*, N.Y. Times (Aug. 12, 1979), https://www.nytimes.com/1979/08/12/archives/a-port-in-st-croix-a-coup-for-leon-hess.html.

[35]  U.S. Dep't of Commerce, "Social and Economic Effects of Expanded Energy Facilities on the Island of St. Croix and the Territory of the Virgin Islands" (Mar. 1991), https://www.govinfo.gov/content/pkg/CZIC-td195-n83-s63-1981/html/CZIC-td195-n83-s63-1981.htm.

[36]  *Black Gold of Paradise* at 772.  Act 4538 amended the parties' obligations under Act 1524 and extended its term for another 16 years.  U.S. Virgin Islands Legislature. First Extension and Amendment Agreement. 1981 reg. sess. Bill No. 14-0242.

[37]  U.S. Virgin Islands. Legislature. First Extension and Amendment Agreement. 1981 reg. sess. Bill No. 14-0242.

[38]  Amerada Hess Co., Annual Report (Form 10-K) (Dec. 31, 1993) (indicating that that the FCC Unit was not operational until 1993).

[39]  U.S. Virgin Islands. Legislature. Second Extension and Amendment Agreement. 1990 reg. sess. Bill No. 18-0409.

[40]  *Id.*

commencement of commercial production from the first fluid catalytic cracking unit."[41]  The FCC Unit finally began commercial operations in late 1993, which meant that Act 5588 would not expire until 2010.[42]  This allowed Hess to increase its sales of refined products throughout the United States even further, operating 535 gasoline stations under the "HESS" name in 1993, and then 929 "HESS" gas stations by 2000.[43]  HOVIC supplied more than 50% of the gasoline products sold by those gas stations.[44]

28.    Throughout the next decade, Hess continued to negotiate financial concessions with the USVI government as each agreement reached expiration.  In 1998, Hess entered into a joint venture with a subsidiary of the Venezuelan national oil company Petroleos de Venezuela S.A. ("PDVSA") to jointly manage the Refinery, and to build a delayed coking unit (also known as a "coker") to process heavy, high-sulfur Venezuelan oil.[45]  Hess successfully negotiated with the USVI government to extend Hess's tax-exempt status to PDVSA.  According to a complaint filed by the USVI government against Hess, Hess threatened that to shut down the Refinery if the coker was not built.[46]  The USVI government further alleged that at a 1998 presentation to the USVI senate, representatives from Hess noted that the Refinery employed 2,100 workers with an annual payroll of $129 million, and promised to hire an additional 2,000 workers to build the new coker,

---

[41] *Id.*

[42]  Amerada Hess Co., Annual Report (Form 10-K) (Dec. 31, 1993).

[43]  *Id.*; Amerada Hess Co., Annual Report (Form 10-K) (March 7, 2001) ("The number of HESS retail facilities increased to 929 at year-end 2000 from 701 at year-end 1999, and is expected to reach 1,150 by year-end 2001.").

[44] Compl., *Gov't of the United States Virgin Islands v. Hess Corp.*, No. SX-15-CV-358 (U.S.V.I. Sept. 14, 2015) ¶ 84.

[45] Decl. of Thomas E. Hill Chief Administrative Officer of HOVENSA, LLC., in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.,* No. 1:15–bk–10003–MFW (Bankr. D.V.I.) [ECF No. 3] ¶ 11; Amerada Hess Co., Annual Report (Form 10-K) (March 1, 2000); Compl., *Gov't of the United States Virgin Islands v. Hess Corp.*, No. SX-15-CV-358 (U.S.V.I. Super. Ct., St. Croix Div., Sept. 15, 2015) ¶ 93.

[46] *Id.* ¶ 95.

which would create an additional $150 million in annual payroll during the three-year construction period.[47]  In 1999, Act 6231 was adopted, with an expiration date in August 2022.[48]

29.    On June 30, 1998, approximately one year prior to the enactment of Act 6231, HOVIC and a PDVSA subsidiary known as PDVSA-VI created HOVENSA LLC ("HOVENSA"), a Virgin Islands limited liability company,[49] with HOVIC owning 50% of the shares of HOVENSA.[50]  On October 30, 1998, HOVIC and PDVSA-VI transferred the Refinery to HOVENSA, subject to joint management and operation by HOVIC and PDVSA-VI.[51]  At the height of its operations from 2005 through 2011, HOVENSA employed approximately 2,500 individuals, representing nearly 25% of St. Croix's workforce.[52]

## C.  The Refinery Devastated the Environment of St. Croix

30.    The USVI's economic expansion and population growth as a result of the Refinery came at the cost of severe environmental damage and asbestos exposure.  The Refinery's environmental damage extended to St. Croix's fresh water supply, brackish water lagoons and beaches, and the Refinery's operations resulted in enormous amounts of air pollution, eventually catching the attention of USVI and federal environmental agencies despite its intentionally remote location.

31.    The Refinery was built on top of the southernmost end of the Kingshill Aquifer, which is St. Croix's only major aquifer.[53]  In 1982, to comply with new regulations by the

---

[47] Id. ¶ 97.

[48] U.S. Virgin Islands. Legislature. Third Extension and Amendment Agreement. 1999 reg. sess. Bill No. 22-0259.

[49] Decl. of Thomas E. Hill Chief Administrative Officer of HOVENSA, LLC., In Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15–bk–10003–MFW (Bankr. D.V.I.)  [ECF No. 3] ¶ 11.

[50] *Id.* ¶ 13.

[51] *Id.* ¶ 2.

[52] *Id.* ¶ 13.

[53] *Black Gold of Paradise* at 779 ("In 2004, groundwater accounted for 60 percent of the roughly 3.6 million gallons of water per day consumed in the US Virgin Islands, and the Kingshill Aquifer alone was responsible for 67 percent of all groundwater withdrawals.").

Environmental Protection Agency ("EPA"), HOVIC began monitoring for groundwater pollution through newly-installed wells.[54] This installation process revealed significant amounts of oil contaminating the groundwater directly below the Refinery.[55] From 1987 to 2010, "HOVIC removed 42.3 million gallons of this oil from atop the water table, though much of the remaining million gallons was unrecoverable, and some of the chemicals in the petroleum had dissolved into the groundwater, permanently contaminating the aquifer beneath the [R]efinery."[56]

32.     Not only did the Refinery contaminate the island's water supply, but it also produced large amounts of emissions that negatively impacted the health of the island's inhabitants. Beginning as early as the 1960s, St. Croix residents started complaining about these emissions from the Refinery.[57] Beginning in 1987, the EPA required HOVIC to release annual reports concerning these emissions, and in 1989 "HOVIC reported that it had released 700,000 pounds of benzene, a carcinogen produced as a by-product of oil refining, that year."[58]

33.     In addition to this steady flow of harmful emissions, there were also various incidents over the course of several decades that released large amounts of pollutants. For example, on December 9, 2010, a valve on a coking unit malfunctioned and large amounts of liquefied petroleum gas, naphtha, diesel, and gas oil leaked for eight minutes.[59] As a result of this leak, hundreds of students at the local high school became ill, and the school closed later that morning amidst a visible haze and foul odor surrounding the school.[60] Reports later indicated that

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.* at 780–81.

[58] *Id.* at 781

[59] *Id.* at 781–82.

[60] *Id.* at 782.

the Refinery had released 5,000 pounds of hydrocarbons and 85 pounds of hydrogen sulfide.[61] Unfortunately, this was not an isolated incident as many more occurred between October 2009 and May 2011.[62]

34.     In 2005, the Virgin Islands Department of Planning and Natural Resources (the "DPNR") filed a lawsuit against HOVIC and HOVENSA[63] alleging that HOVIC's and HOVENSA's operations at the Refinery contaminated and injured the public's natural resources (including potential drinking water sources), the marine environment, plant life, and wildlife.[64] Hess, HOVIC and HOVENSA vigorously contested this lawsuit, and in May 2014, in anticipation of a sale, HOVIC and HOVENSA entered into a settlement agreement with the DPNR pursuant to which HOVENSA agreed to pay the USVI government $43.5 million.[65]  HOVENSA paid $3.5 million of the settlement amount immediately upon the execution of the DPNR settlement agreement.[66]

35.     On top of that liability, in January 2011, the U.S. filed a consent decree in the U.S. District Court of the Virgin Islands, St. Croix Division, which resolved allegations by the EPA of past violations of the Clean Air Act's requirements.[67]  HOVENSA paid $5.375 million in civil penalties and a deposit of an additional $4.875 million to an escrow account to be used for funding supplemental environmental projects.[68]

---

[61] *Id.*

[62] *Id.* at 781.

[63] *Dep't of Planning & Natural Res. v. Century Aluminum Co.,* No. SX-05-CV-62-HB (D.V.I. May 5, 2005).

[64] Decl. of Thomas E. Hill Chief Administrative Officer of HOVENSA, LLC., In Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.,* No. 1:15–bk–10003–MFW (Bankr. D.V.I.)  [ECF No. 3] ¶ 38.

[65] *Id.* ¶ 39 (in settlement of the purported $800 million in claims raised by the DPNR complaint).

[66] *Id.*  The remaining $40 million obligation remained outstanding as of the date that HOVENSA filed for bankruptcy in September 2015.  *Id.*

[67] *Id.* ¶ 42.

[68] *Id.* ¶ 43.

### D.  The Refinery Saturated the Population with Asbestos

36.     In addition to harmful external consequences to the environment, the operations of the Refinery also exposed thousands of workers and their families to asbestos.  The Debtor's Hess-hired Chief Administrative Officer asserts that the presence of asbestos at the Refinery was first publicly confirmed in 1982.[69]  According to the Debtor, during the construction of the Refinery in the 1960s and 1970s, and until the 1980s, HOVIC did not have its own insulation specifications but instead relied on the design specifications of its general contractors, some of which were fulfilled through the supply of asbestos.[70]  Hess facilitated the purchase of insulation materials for HOVIC.[71]  Beginning in 1983, HOVIC purportedly prohibited the use of asbestos-related products (without abating the existing asbestos hazards),[72] but certain plaintiffs who have filed asbestos-related lawsuits against Hess and HOVIC have claimed that they were exposed to asbestos at the Refinery after 1983 and into the late 1980s and 1990s.[73]

37.     The first lawsuit for damages related to asbestos exposure at the Refinery was filed against Hess and HOVIC in 1987 in the USVI.[74]  From 1987 to 2018, approximately 1,000 plaintiffs filed suit against HOVIC and Hess, under numerous theories of tort liability, generally alleging exposure to asbestos-containing compounds and products at the Refinery.[75]  By 2013, Hess had settled 606 asbestos-related cases for a nominal collective total of over ████████, without permitting a single case to reach trial.

---

[69] First Day Decl. ¶ 13.

[70] *Id.*

[71] *Id.* ¶ 14.

[72] *Id.* ¶ 17.

[73] *See, e.g.,* Compl., *Allen v. Hess Corp.*, No. SX-2020-CV-173 (U.S.V.I Super. Ct. St. Croix Apr. 7, 2021); *Fox v. Hess Corp.*, No. SX-20-CV-92 (U.S.V.I. Super. Ct. June 10, 2020).

[74] First Day Decl. ¶ 26.

[75] *Id.*

38.     On December 19, 2013, Ethelbert Gomez filed a lawsuit against Hess and HOVIC in the Superior Court of the Virgin Islands, alleging claims for damages resulting from exposure to asbestos.[76]  On the same day, sixty-four (64) other plaintiffs filed identical actions against Hess and HOVIC in the same court, and each plaintiff, including Gomez, titled their complaint "Master Complaint for 65 Individual Cases."[77]  Throughout the next few years, hundreds more lawsuits were filed against Hess and HOVIC in the USVI.  Multiple cases were coordinated under a master case titled, *In re Asbestos, Catalyst, and Silica Toxic Dust Exposure Litigation*, master case number SX-15-CV-096.[78]

39.     In 2018, Hess and HOVIC reached a global settlement of 498 lawsuits, referred to as the "*Gomez*" settlement, for a total of ███████.  The Gomez settlement agreement included a nonbinding mediation process to resolve future claims that concerned or arose out of alleged exposure to asbestos and other toxic substances associated with the Refinery.[79]  In accordance with this process, approximately 660 tolled cases were submitted to mediation, and the first mediation was held in February 2020.[80]  The mediation was unsuccessful, and the plaintiffs' counsel subsequently initiated lawsuits against Hess, with over 570 cases filed since February 2020 and approximately 500 additional claims "expected to be brought soon," according to the Debtor.[81]  In fact, there are approximately 900 present asbestos claimants, the bulk of whom suffer from

---

[76] Mem. Op. & Order, *Edwards v. Hess Oil Virgin Islands Corp. et al.*, No. SX-15-CV-382 (U.S.V.I. Super. Ct. July 5, 2017) at 2–3.

[77] *Id.* at 3.

[78] *Edwards v. Hess Oil Virgin Islands Corp.*, 66 V.I. 218, 222 (U.S.V.I. Super. Ct. June 29, 2017) ("Judge Molloy is presently coordinating the 2013 and 2014 cases under a master case, *In re: Asbestos, Catalyst, and Silica Toxic Dust Exposure Litigation*, master case number SX–15–CV–096.").

[79] First Day Decl. ¶ 28.

[80] *Id.* ¶ 29.

[81] *Id.* ¶ 30.

asbestosis, while a small number are afflicted with mesothelioma, lung cancer and/or colon cancer from their exposure to asbestos.

40.     Hess willingly settled more than a thousand asbestos-related lawsuits in the USVI before they could go to trial in front of a USVI jury.  Indeed, the closest that Hess came to taking one of these cases to trial was the scheduled trial in *Mohansingh v. Hess Oil Virgin Islands Corp. et al.*, SX-2006-CV-00231 (U.S.V.I. Super. Ct.), set to begin on May 2, 2022, less than a week after the commencement of the Chapter 11 Case, as described more fully below.

## E.  The Refinery's Closure in 2012 and Subsequent HOVENSA Bankruptcy

41.     As the same time that the asbestos-related lawsuits were beginning to grow precipitously, HOVENSA initiated a series of measures beginning in 2009 that ultimately led to a suspension of operations on February 16, 2012, triggering a staggering effect on the island's workers and economy.  While HOVENSA has claimed that it shut down the Refinery due to "the changing economic climate, industry competition and challenges, and the increasing cost to comply with environmental regulations[,]"[82] others have suggested different motives stemming from Hess's overall plans for the company as a whole.[83]   To that effect, in January 2011, HOVENSA reconfigured its operation of the Refinery "by idling a number of older units on the west side of the [R]efinery and reducing crude throughput from 500,000 to 350,000 barrels."[84]

---

[82] Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15-bk-10003-MFW (Bankr. D.V.I.) [ECF No. 3] (Sept. 15, 2015).

[83] *See, e.g.*, Compl., No. SX-15-CV-358 (U.S.V.I. Sept. 14, 2015) ¶ 163 (noting that the decision to close the Refinery "lined up with Hess Corp's plan to restructure its operations to focus exclusively on exploration and oil production rather than 'downstream' operations like refining and selling refined products").

[84] Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15-bk-10003-MFW (Bankr. D.V.I.) [ECF No. 3] (Sept. 15, 2015) ¶ 50.

During this period, and as further described *supra*, Hess, HOVIC and HOVENSA settled with various government agencies for significant amounts of money.[85]

42.     HOVENSA sustained approximately $1.3 billion in financial losses between 2009 and 2011.[86]  On January 18, 2012, HOVENSA announced its intent to suspend operations at the Refinery, at least temporarily.[87]  Approximately one month later, on February 16, 2012, HOVENSA officially suspended operations.[88]

43.     The abrupt closure of the Refinery by Hess (through HOVIC and HOVENSA) caused significant harm to individuals working at the Refinery and across the island as a whole and rendered Hess unpopular—to say the least—among the population.  Immediately upon the closure of the Refinery, more than 1,800 employees were put out of work and HOVENSA was required to make severance payments pursuant to the Virgin Islands Plant Closure Act.[89]  In addition to the loss of these jobs, the Refinery's abrupt closure negatively impacted the Virgin Island's economy by depriving the USVI government of significant annual tax revenues and forcing a sector change, from reliable petroleum to unpredictable tourism.[90]

44.     HOVENSA, through its financial advisor Lazard Frères SAS and Lazard Frères & Co. LLC, began to explore a potential sale of the Refinery.[91]  After receiving two bids, HOVENSA

---

[85] *See, e.g., id.* ¶ 43 ("[HOVENSA] resolved the EPA's allegations of past violations of the Clean Air Act's requirements by HOVENSA through a payment of $5.375 million in civil penalties and a deposit of an additional $4.875 million to an escrow account to be used for funding supplemental environmental projects. . . .").

[86] *Id.* ¶ 51.

[87] *Id.*

[88] *Id.*

[89] *Id.* ¶ 54.

[90] *See* The United States Virgin Islands Disaster Recovery Action Plan at 91 ("HOVENSA's closing in 2012 reduced employment on the Territory by almost 5%, increasing poverty levels and making the economy more dependent on tourism.  The closure also reduced annual tax revenue by an estimated $92 million, contributing to the Territory's rising level of public debt, which is currently at 72% of GDP.").

[91] Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15-bk-10003-MFW (Bankr. D.V.I.) [ECF No. 3] (Sept. 15, 2015) ¶ 58.

subsequently engaged in negotiations with Atlantic Basin Refining, Inc. ("ABR").[92]  The parties
negotiated to a near final purchase and sale agreement.[93]  However, on December 19, 2014, the
USVI legislature voted to reject the proposed operating agreement with ABR.[94]  According to the
USVI government, HOVENSA indicated that if the Refinery was not sold, it would begin
permanently shutting down all operations and terminating its remaining employees by March 1,
2015.[95]

45.     On September 14, 2015, the USVI Department of Justice filed a lawsuit against
Hess seeking over $1 billion in damages for a "pattern of misconduct" by Hess and its subsidiaries,
including HOVENSA, that allegedly stripped away assets while encumbering the government with
pollution liabilities.[96]  On September 15, 2015, the day after the USVI lawsuit was filed,
HOVENSA filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the District
of Delaware, *In re HOVENSA LLC*, No. 1:15–bk–10003–MFW (Bankr. D.V.I Sept. 15, 2015).[97]
HOVENSA explained that it had entered into a definitive stalking horse asset purchase agreement
with Limetree Bay Holdings, LLC, an affiliate of ArcLight Capital Partners, LLC ("Limetree
Bay"), for a purchase price of $184 million.[98]

46.     The sale was ultimately effectuated in January 2016, through which HOVENSA
liquidated its assets, including the Refinery, in the sale to Limetree Bay and confirmed a chapter

---

[92] *Id.*

[93] *Id.*

[94] *Id.* ¶ 59.

[95] Compl., *Gov't of the United States Virgin Islands v. Hess Corp.*, No. SX-15-CV-358, ¶ 236 (U.S.V.I. Super. Ct. Sept. 14, 2015).

[96] Compl., *Gov't of the United States Virgin Islands v. Hess Corp.*, No. SX-15-CV-358 (U.S.V.I. Super. Ct. Sept. 14, 2015).

[97] First Day Decl. ¶ 2.

[98] Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15-bk-10003-MFW (Bankr. D.V.I.) [ECF No. 3] (Sept. 15, 2015) ¶ 7.

11 plan, in which equity holders did not receive any recovery.[99]   Additionally, as part of HOVENSA's chapter 11 plan, HOVENSA's estate released all of its direct and derivative claims against Hess and HOVENSA, and Hess and HOVENSA also received certain consensual third-party releases of claims arising from HOVENSA's operation of the Refinery.[100]   Accordingly, Hess was able to sell the Refinery to a third party and pay a small amount to rid itself of environmental liability—small in comparison to the profits it made for almost fifty years.  But that bankruptcy did not clear Hess, or HOVIC, or HONX of their asbestos and toxic tort liability, which due to the latency period of toxic lung diseases only continued to increase over the following years as workers' diseases manifested.

**F.  Hess Faced Further Asbestos Litigation, Prompting this Chapter 11 Case**

47.    The commencement of this Chapter 11 Case on April 24, 2022, marked Hess's second bankruptcy for a USVI subsidiary.  The Debtor has stated that it commenced this chapter 11 case to address the alleged existing and future asbestos and toxic tort liabilities related to the Refinery in "an equitable and efficient manner."  As of the date of the bankruptcy filing, there were approximately 580 pending cases naming Hess and HONX as defendants that alleged exposure to asbestos and other toxic substances at the Refinery, with more than 700 pending cases in total alleging damages arising from the Refinery.[101]   Throughout this process, the Debtor and its predecessors have been bystanders (at most); as acknowledged by the Debtor at the commencement of this case, its conduct in litigation has been managed by employees of Hess's legal department whose primary loyalty is (appropriately) to the enterprise as a whole, not to the Debtor.

---

[99] First Day Decl. ¶ 2.

[100] Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions, *In re HOVENSA L.L.C.*, No. 1:15-bk-10003-MFW (Bankr. D.V.I.) [ECF No. 3] (Sept. 15, 2015) ¶ 22.

[101] First Day Decl. ¶ 3 & n.3.

48.     It is not the magnitude of litigation against the Debtor that prompted the Chapter 11 Case, nor is it the dollars that Hess was spending on defense costs—as Hess's securities filings demonstrate.[102]  Rather, this case appears to have been prompted most directly by Hess's fear of confronting USVI juries and by a 2021 change in USVI law, pursuant to which plaintiffs over the age of 70 (or over the age of 65 with certain health concerns) now are entitled to move to "fast-track" their litigation and compel a trial within 180 days of their motion.  *See* 5 U.S.V.I. Code § 31(b) (the "USVI Preference Statute").  Many asbestos claimants qualify for this "preference" and would be entitled to force Hess to litigate on an expedited timeframe.  After years of delay, spurred by Hess and exacerbated by the COVID-19 pandemic, claimants finally had a way to reach trial on their claims—which Hess could not tolerate.

49.     HONX specifically filed for bankruptcy less than one week before Hess's first asbestos-related trial was set to begin, in *Mohansingh v. Hess Oil Virgin Islands Corp.* et al., SX-2006-CV-00231 (V.I. Super. Ct.) (the "*Mohansingh* Trial").   The plaintiff in the Mohansingh Trial, Kadar Mohansingh, worked at the Refinery from 1970-1981 and 1988-2009, and he filed his complaint against Hess and the Debtor in 2006—***fifteen years ago***—alleging he was injured through exposure to asbestos "and asbestos containing products" while working at the Refinery. Hess and the Debtor filed for summary judgment, which the court denied, forcing Hess to defend itself at trial, settle the case or, as occurred here, run into court with a bankruptcy filing.

## G.  Hess Now Hides Ineffectively Behind a Transparent Subsidiary

50.     The Committee presents this extensive background because it is important to understanding what is really going on here and why it is that Hess so fears litigation in the USVI, and why a fully solvent company is taking a chance on a wild bankruptcy scheme to avoid paying

---

[102] *See* nn.6–7 *supra*.

for the harms it caused after decades of profiteering.  Hess knows that it will lack the advantages

of delay so often granted to large defendants in mainland courts, and must fight asbestos lawsuits

in St. Croix on a level playing field and a reasonable timeline instead of continuing to put plaintiffs

off indefinitely with the might of their legal department and outside counsel.  To avoid this fate,

Hess identified a subsidiary with no assets, and propped it up *just* enough to give the appearance

of an ordinary chapter 11 case. But since the closure of the Refinery and the bankruptcy of

HOVENSA, HOVIC—first under the name HONYC, and now on the eve of bankruptcy renamed

to HONX—has had no employees, operations, or third-party funded debt.  Indeed, the Debtor's

only "true" employees are the independent directors Hess installed for it on the eve of chapter 11,

whose experience notably includes repeatedly serving as independent directors appointed by

Kirkland & Ellis for their debtor clients.[103]  HONX has conceded that it has no material assets, and

therefore no estate to protect, other than a Funding Agreement that commits Hess to pay for a

chapter 11 case only to the extent it supports a plan (which it will do only if it obtains full relief

from all litigation under Bankruptcy Code section 524(g)).  The Funding Agreement—which

provides Hess with a level of veto power hitherto unheard of in chapter 11 and milestones that

would be extreme if granted to a true third-party lender—was designed only to provide HONX

with an ability to advance this chapter 11 case to claims estimation, plan confirmation, and such

"emergence" as may be possible for a business that has not operated for a decade.

     51.     But it is clear what this actually means: that the only form of plan the Debtor is

contemplating is one that disguises a settlement between plaintiffs and a ***nondebtor*** defendant,

Hess, which will pay for their recoveries just as it has done in all prior settlements.  The Debtor

---

[103] In 2019 alone, Matthew R. Kahn was an independent director in at least three cases with Kirkland.  *See, e.g.*, *In re HSP Liquidation, LLC (fka Hollander Sleep Prods., LLC)*, Case No.19-11608 (MEW) (Bankr. S.D.N.Y.); *In re Z Gallerie, LLC*, Case No. 19-10488-KBO (Bankr. D. Del.); *In re RMBR Liquidation, Inc. (f/k/a Things Remembered, Inc.)*, Case No. 19-10234-KBO (Bankr. D. Del.)

has nothing to offer claimants, neither assets of its own nor a mechanism to enhance any offer from Hess.  Hess, just as it was throughout the life of the Refinery, is the real party in interest here—and the real defendant—just as Hess all along has driven the industry, the business, the operations, the strategy, and the litigation.  And just as with so many expeditions to the Caribbean, Hess came to St. Croix, and now comes to this Court "to conquer, not to redeem."[104]

## PROCEDURAL BACKGROUND

52.     On April 28, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtor is authorized to continue to operate its business and manage its property as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in this case.

53.     On May 13, 2022 (the "Committee Formation Date"), the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed seven of the Debtor's unsecured creditors to serve as members of the Committee [ECF No. 91].  The Committee currently comprises the following members, each of whom either is suffering from asbestos-related disease acquired at the Refinery or is the survivor of a loved one who has died from such disease: (i) Jeanne David, (ii) Annette Beneville, on behalf of the estate of Bruce Torgerson, (iii) Dillon Inglis, (iv) James McNamara, (v) Glaston Quashie, as Personal Representative of Arnold Anthony, (vi) Hollis Prime, and (vii) Lyne James.

## JURISDICTION AND VENUE

54.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and the *Order of Reference*

---

[104] Mark Twain, Letter to the New York Herald regarding the Spanish-American War (Oct. 15, 1900), https://www.loc.gov/rr/hispanic/1898/twain.html

*to Bankruptcy Judges (District Court General Order 2012-6)*, dated May 24, 2012 (the "<u>Standing Order</u>").

55.     Venue for this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

56.     The legal bases for the relief requested herein are Bankruptcy Code sections 105(a) and 1112(b)(1) and Federal Rules of Bankruptcy Procedure 1017(f)(1) and 9014.

## RELIEF REQUESTED

57.     Pursuant to this Motion, the Committee requests entry of an order dismissing the Chapter 11 Case or, in the alternative, converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## ARGUMENT

58.     The Bankruptcy Code mandates that, with certain exceptions, the court "shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1). Several forms of "cause" are present in this Chapter 11 Case, including a paradigmatic example of the lack of a proper bankruptcy purpose known colloquially as "bad faith."  The Debtor's commencement of this case with the *sole* purpose of using the bankruptcy system to resolve—and hopefully cap—the liability of its entirely solvent parent, Hess, is a clear example of bad faith. And Hess's unwillingness to take seriously its own, independent obligations to the claimants in this case—each of which has a simultaneous claim against Hess that cannot be estimated and without whose votes a plan cannot be confirmed—renders improbable, if not impossible, any meaningful resolution to this case, much less the asbestos trust and third-party release over which Hess is salivating.

59.     In addition to bad faith, the Bankruptcy Code provides a non-exclusive list of specific acts and omissions that may constitute cause for dismissal or conversion.  11 U.S.C.

§ 1112(b)(4).  Two of those—substantial or continuing loss to or diminution of the estate with no hope of rehabilitation and failure to maintain insurance—each provide adequate and independent sources of "cause" for dismissal or conversion here.  *Id.* § 1112(b)(4)(A), (C).  In short, there is no serious doubt that "cause" exists here within the meaning of Bankruptcy Code section 1112(b)(1), rendering dismissal or conversion mandatory.

60.     Congress provided an escape hatch from the otherwise mandatory nature of dismissal or conversion for cause, but it is not one that applies here.  Neither "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" nor a "likelihood that a plan will be confirmed . . . within a reasonable period of time" are present here.  And the grounds for dismissal are—contrary to the requirements of the Bankruptcy Code—incurable.  *See* 11 U.S.C. § 1112(b)(2).

61.     Finally, it is dismissal rather than conversion that best suits this case.  The Debtor's lack of meaningful assets or prospects for reorganization, the existence of parallel direct claims against Hess for all harms suffered at the hands of the Debtor and its affiliates, and Hess's effective stonewalling of this Court's and the Committee's demands for adequate funding all combine to demonstrate that preserving this case under chapter 7 is neither necessary or appropriate.  The devastation wrought on a relatively small population by a truly massive defendant simply does not present the scenario with which the drafters of the Bankruptcy Code were concerned, where a limited fund and uncountable claimants leave a resolution through the Bankruptcy Court as the only way to ensure a fair and equitable resolution for claimants.  These claimants have a process available to them outside of this Court—indeed, it is their newfound ability to reach trial in the USVI based on a recent change in law that spawned this bankruptcy in the first place.

62. The path on which Hess has set the Debtor cannot lead to a serious resolution of any liability. The Debtor cannot confirm a plan of reorganization without the overwhelming support of creditors who have no reason or need to rely on the bankruptcy framework for resolution of their claims. As such, and upon dismissal, each and every claimant will (and should) be free to do what they were doing before the petition was filed—seek relief (and now, on an accelerated basis) for their harms in the courts of the U.S. Virgin Islands for the harm Hess and its affiliates (including the Debtor) inflicted on them.

63. Accordingly, this Court should dismiss the Chapter 11 Case.

## I.   "Cause" Exists for Dismissal of the Chapter 11 Case

64. Three independent bases of "cause" require dismissal of this Chapter 11 Case. First, the Debtor's bankruptcy was commenced and prosecuted in bad faith because its sole purpose is to benefit Hess rather than the Debtor (which has not been endowed with assets to preserve) or its creditors (who seek nothing from this empty vessel). Second, the corporate architecture of the Debtor combined with Hess's failure to reach a deal in mediation means that this Debtor has no chance of rehabilitation. And finally, the Debtor maintains no insurance policies or equivalent contracts that might protect its assets (if any) for the benefit of creditors.

### A.   "Cause" Exists Because the Chapter 11 Case Was Filed in Bad Faith

65. It has long been recognized, both in this Circuit and elsewhere, that "cause" for dismissal and conversion "include[s] the lack of good faith in [the] filing" of a chapter 11 case. *E.g., Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 816– 17 (5th Cir. 1991). The determination of a debtor's good faith or lack thereof for this purpose is based on an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Little Creek*, 779 F.2d at 1072. This standard "protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to

delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *Elmwood Dev. Co. v. Gen. Elec. Pension Tr. (In re Elmwood Dev. Co.)*, 964 F.2d 508, 510 (5th Cir. 1992).

1. The Absence of Any Possible Benefit to the Debtor Establishes Bad Faith

66.    The Fifth Circuit permits courts to take a broad view of the conduct that may constitute bad faith when conducting this on-the-spot evaluation.  For present purposes, however, the Court need look no further than the archetypal scenario demonstrating bad faith, where a bankruptcy case "impose[s] cost and delay, with absolutely no resulting benefit to [the debtor] or its creditors," because "there are no assets to marshal or liquidate."  *In re Cypress Fin. Trading Co., L.P.*, 620 F. App'x 287, 289 (5th Cir. 2015).

67.    Each characteristic of the paradigmatic bad-faith filing is present here.  *First*, there is no going concern.[105]   The Refinery itself ceased operations in 2012; the Debtors' indirect ownership of the Refinery through HOVENSA ended in 2015; and the Debtor itself has not had a hand in operations—indeed, has been nothing more than a pass-through entity for Hess—since 1998.[106]   Rather, the Debtor admits that "essentially the only material activities" in which it is engaged are "managing [its] litigation docket" through the activities of members of Hess's in-house legal team.[107]

68.    *Second*, the Debtor has no dedicated employees, only two outside directors hired on the eve of bankruptcy (and paid by Hess) and various Hess employees given second roles managing litigation as it concerned both Hess and the Debtor.  **Every one** of the Debtor's

---

[105] This feature alone sufficiently distinguishes the case from those on which Hess has tried and failed to model this process.  Central to the "good faith" findings in cases such as *LTL* **is that there is a real debtor with some, but potentially inadequate, capacity to pay claims based on go-forward revenues, both from a solid funding agreement and from genuine assets assigned to it at creation.**

[106] *See* First Day Decl. ¶ 20.

[107] *Id.* ¶ 23 n.7.

employees, officers and directors, prior to the reshuffle that took place on the eve of filing in April 2022, was simultaneously a Hess employee, paid by Hess.  Perhaps most striking of all, the Debtor's Chief Administrative Officer, Todd Snyder, upon information and belief, has not only his salary but his insurance provided by Hess.

69.     *Third*, with respect to prospects for rehabilitation, this case goes far beyond even the Fifth Circuit's paradigmatic landmark for bad faith and charts new paths into the depths of pointless chapter 11 activity.  Not only is there no ongoing business to protect as a source of value or for the benefit of employees, but there are not even any *assets* to maximize.[108]  According to the Debtor's Schedule of Assets and Liabilities, its sole asset is a small amount of cash—presumably cash provided by Hess under the Funding Agreement for the express purpose of funding this Chapter 11 Case.[109]  If this is true, then from the perspective of the Debtor, there was no economic difference between undergoing this chapter 11 process and simply not entering into the funding agreement because there is no going concern *of the Debtor* that was threatened by the ongoing litigation, no business or employees at risk from the many claims against it.  The only entity threatened by the prepetition litigation *status quo* was the one with assets that could be called upon to pay a judgment—Hess.[110]

---

[108] Other than potential estate causes of action against Hess that the Debtor apparently has no intention of pursuing and obviously could not pursue without losing its only source of funding.

[109] The Committee is not convinced that this is accurate, and, now that it is no longer subject to the litigation standstill contemplated by the Mediation Order, will investigate the value of the causes of action the Debtor may possess against Hess and their shared officers, directors and advisors for involvement in a history of transactions that deprived the Debtor of value to pay claimants.  *See Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of HONX, Inc. Regarding the Debtor's Application To Retain and Employ Kirkland & Ellis LLP as Counsel* [ECF No. 175].

[110] Compounding this concern, and as discussed in further detail *infra*, the Debtor has little prospect of *any* resolution to this case absent a significant shift in approach.  Indeed, without the contribution of significant additional value by Hess, *the Debtor stands no chance of confirming its desired chapter 11 plan*, which necessarily will require overwhelming creditor support.  This fact alone—the legal impossibility of confirming a 524(g) plan without a 75% vote that can be obtained only by wearing down creditors through an abusive process or making a financial contribution that Hess is unwilling to provide—explains why we are where we are.

70.     In short, neither the Debtor nor its creditors had anything to gain by entering bankruptcy.   From the point of view of creditors, they were pursuing litigation that only incidentally touched on HONX—as one of the bad actors, not a source of recovery.   The true target of that litigation was, and remains, the fully solvent Hess.   Consistent with this reality, the Debtor was engaged in that litigation in name only.   Those participating in the litigation on its behalf were Hess employees and officers, protecting the interests of Hess by denying actions and omissions by the Debtor and Hess collectively to avoid liability for Hess.   Any judgment entered against HONX and Hess would have been paid by Hess.   And each settlement of similar claims to date **has** been paid by Hess.

71.     Thus, any attempt to paint this litigation as an existential threat **to the Debtor** is nonsensical; there can be no existential threat to an entity that has had no existence for a decade.   Moreover, the idea that this case is intended to provide an "equitable result" for the plaintiffs— who but for the stay and the fanciful notion of an underfunded trust could achieve **full** compensation from Hess—is equally absurd.   It is the **non-existential** threat to Hess, not any threat to HONX or solicitude for creditors, that precipitated and that maintains this case.   And as the Fifth Circuit has observed in the context of a partnership, the "fate [of a debtor's owners] is irrelevant to the propriety of [a debtor's] filing."   *Humble Place*, 779 F.3d at 818.

2.   The Lack of Investigation of Claims Against Hess Owned by the Estate Confirms the Debtor's Bad Faith

72.     This Hess-first strategy is made clearer still by the approach the Debtor has adopted to date.   It is possible that the Debtor may possess one class of real, valuable assets: claims against Hess and certain shared officers, directors and advisors for liability in connection with the historical liabilities HONX was caused to incur and the transactions that led to its loss of assets. To be sure, pursuing such claims likely would not augment creditors' recoveries, as those creditors

have their own similar claims against Hess and could even pursue such fraudulent transfer claims outside of bankruptcy.

73.     Any debtor actually interested in maximizing estate value for the benefit of its creditors would have focused on investigating and monetizing those potentially valuable assets. But this is not what has happened here.  Rather than focusing on the **estate** they are charged with protecting, the Debtor's officers and directors began this case with guns pointed at the **claims** against that estate.  Indeed, at no point has the Debtor suggested that the supposedly disinterested directors ever made an effort to identify, much less investigate, any estate claims.  In essence, the Debtor conceded that the estate was empty of any value other than rights under the Funding Agreement—value that is both patently insufficient (until formally amended) and purely contingent on Hess's satisfaction with the course of this Chapter 11 Case.

### 3.     A Comparison to the "Texas Two-Step" and Similar Cases Clarifies the Failure of Good Faith on the Part of this Debtor

74.     Key differences between this Chapter 11 Case and so-called "Texas Two-Step" and similar cases illustrate why dismissal is required here.[111]  *First*, the Texas Two-Step and related cases seek to resolve nondebtor liability that is based solely on derivative theories like *alter ego*, veil-piercing or fraudulent transfer.  In those cases, a state-law corporate mechanism (in the case of true Texas Two-Step contracts) or a transaction utilizing an existing corporate "box" (in the case of *Aearo*, for example)[112] facilitated the formation of an entity with clear incentives to file for

---

[111] The Debtor has sought to distinguish these cases itself but only when it served the interests of HONX and Hess, *see, e.g.*, First Day Decl. ¶ 1 ("[HONX] is not the result of a recent corporate spinoff through any recent corporate reorganization"), but as discussed *infra*, this distinction does not favor the Debtor.  The most prominent decision finding that such a filing was in good faith, *In re LTL Mgm't LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022) is currently on appeal before the Third Circuit.  While the Committee reserves the right to address any further developments in that case, as discussed *infra* a finding of bad faith under these circumstances would be wholly consistent with the findings currently on appeal in *LTL*.

[112] *In re Aearo Techs. LLC*, No. 22-02890 (JJG), Transcript of July 27, 2022 Hearing at 12:18–25 [ECF No. 164] (Bankr. S.D. Ind. Jul. 27, 2022) (debtors' counsel) ("This is not a Texas Two Step or a divisive merger that you've

bankruptcy, for its own benefit and for the benefit of its creditors. Here, by contrast and as discussed *supra*, Hess's obligations to plaintiffs are direct and do not depend on holding Hess responsible for HONX's misconduct.

75.    *Second*, in considering the propriety of these structures, courts have held that the Bankruptcy Code asks only whether the filing itself was in good faith and does not examine (for these purposes) whether the prepetition transactions were similarly so. *See DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Case No. 20-30080, Adv. Pro. No. 20-03004, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (suggesting state-law remedies if the state-law transactions were improper). This Debtor, by contrast, seeks to ***use the Bankruptcy Code itself*** to accomplish the release of claims against its parent that such companies had already effectuated prior to filing, and puts the question of good faith squarely before this Court.

76.    The "Texas Two-Step" structure is premised on a unique feature of Texas corporate law: the ability to conduct a "divisive merger," pursuant to which corporate ***assets and liabilities*** are allocated among entities created through a corporate merger transaction. As a result, it is possible for companies—in advance of any bankruptcy filing—to use state law to separate into a "GoodCo" containing assets and free of tort liability and a "BadCo," containing some source of funding and housing all legacy tort liability. *See LTL*, 637 B.R. at 402; *In re Bestwall LLC*, 605 B.R. 43, 47 (Bankr. W.D.N.C. 2019).

77.    Critically, however, in cases where the debtor implements such a transaction and subsequently files for chapter 11 protection, Texas law requires the transaction resulting in the formation of the debtor to be ***creditor-neutral***, such that the nondebtor parent is obligated to

---

heard so much about in connection with the J&J cases. And while I personally have no issue with those types of transactions, that's not what we have here. This is an organic structure . . . .").

guarantee funding to cover any and all liabilities of the filing subsidiary. *See* Tex. Bus. Orgs. Code § 10.901 (providing that any divisive merger must not "abridge any right or rights of any creditor under existing laws"); *see LTL*, 637 B.R. at 402 (noting commitment to fund all amounts to satisfy debtor's talc-related liabilities, including a minimum of a $2 billion trust in a chapter 11 case); *Bestwall*, 605 B.R. at 47–48 (debtor funded with $32 million cash, $145 million in subsidiary equity interests and $18 million/year in cash flows, together with commitment to fund full amount of debtor's liabilities through 524(g) trust); *DBMP*, 2021 WL 3552350, at *11–13 (debtor funded with cash, equity interests in an operating subsidiary and indemnification rights, together with obligation of nondebtor to fully fund 524(g) trust); *Declaration of Ray Pittard in Support of First Day Pleadings*, *In re Aldrich Pump LLC*, No. 20-30608 (Bankr. W.D.N.C. June 18, 2020) [ECF No. 27] (debtors funded with cash, subsidiary equity interests, insurance agreements with $750 million in unexhausted coverage and related causes of action, together with commitment to fully fund the debtors' asbestos and indemnification obligations).   Given this requirement in the underlying law, there is no room in the Texas Two-Step structure for a corporate parent to condition its funding obligation on a particular form of plan or chapter 11 process.

78.     Like the Texas Two-Step cases, *In re Aearo Technologies LLC* is instructive on this point. [113]   Although the debtors therein—the manufacturers of what turned out to be defective combat earplugs—were not the result of a divisive merger, they have taken the position that the alleged harms giving rise to liability were the result of acts prior to the debtors' acquisition by their current corporate parent, 3M Company ("3M"). [114]   The *Aearo* debtors therefore contend that only they—and not 3M—were properly considered liable for the harm done to service members by their

---

[113] *See generally Informational Brief of Aearo Techs. LLC*, *In re Aearo Techs. LLC*, Case No. 22-02890 (Bankr. S.D. Ind. 2022) [ECF No. 12] (the "*Aearo* Informational Brief").
[114] *Aearo* Informational Brief at 53–54.

defective products.[115]   Nevertheless, and in order to facilitate a resolution of 3M's potential liability (whether vicarious, derivative or through the continued operation of the debtors' businesses), 3M provided the *Aearo* debtors with an **uncapped**, **non-recourse** funding agreement to "fund *all* of the Aearo [e]ntities liabilities," likewise not dependent on a particular form of plan.[116]  This commitment, together with the ongoing business assets remaining in the debtors' possession, could serve as *res* that at least had the potential to be appropriate for a reorganization.[117]

79.     These are the critical differences between so-called precedent cases and what Hess is now attempting.  Specifically, prior to bankruptcy, the "BadCo" in any Texas Two-Step or similar case **has assets to protect** and **is the only source of recovery for tort claimants**, such that the chapter 11 filing itself is a plausible course of action to protect the estate and its creditors.  This Debtor, by contrast, neither has assets nor serves as a necessary focal point for tort claims.  Moreover, only the **chapter 11 case itself** is presently cutting claimants off from access to Hess's value.  And, finally, Hess has no obligation under the Funding Agreement to provide for the Debtor's liabilities through a trust established under a plan it does not like.  Indeed, by entering into a so-called Funding Agreement that funds only the Chapter 11 Case (not the Debtor's liabilities), this Debtor has adopted only the terminology, not the substance, of the creditor

---

[115] *Aearo* Informational Brief at 53.

[116] *3M Occupational Safety LLC,* et al. v. *Those Parties Listed on Appendix A to the Complaint and John and Jane Does 1-1000 (In re Aearo Techs. LLC)*, Case No. 22-02890, Adv. Pro. No. 22-50059, 2022 WL 3756537, at *13 (Bankr. S.D. Ind. Aug. 26, 2022) (emphasis in original).

[117] *Aearo* Informational Brief at 3 ("3M's agreement to provide Aearo uncapped funding for Combat Arms personal injury liability will ensure full compensation is available, unconstrained by Aearo's ability to pay.").  The *Aearo* court has noted specifically the presence of evidence establishing that the uncapped *Aearo* funding agreement was the result of genuine negotiations between the debtors and 3M.  *See In re Aearo Techs. LLC*, Case No. 22-02890, 2022 WL 3756537, at *3–4 (Bankr. S.D. Ind. Aug. 26, 2022).

protections guaranteed in cases to which it would like to direct this Court in support of its *raison d'être*.

80.     The facts underlying the Texas Two-Step cases—and, in particular, *LTL*—make this distinction clear.   *LTL* involved the talc liabilities of Johnson & Johnson, a large pharmaceutical and consumer goods company.   Johnson & Johnson Consumer Inc. ("Old JJCI") was a subsidiary of J&J that held all the assets in respect of J&J's baby products business.   *LTL*, 637 B.R. at 400.   In 2015, as a result of certain intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder caused ovarian cancer and mesothelioma.   *Id.*   After 2013, when a plaintiff won a case alleging that she had developed cancer as a result of genital exposure to Old JJCI's product, such litigation had increased in scope and scale.   *Id.* at 401.   From 2013 to the petition date on October 14, 2021, litigation against Old JJCI escalated to the point that the company "ha[d] been served on average with one or more ovarian cancer complaint every hour of every day, every single day of the week."   *Id.*[118]   To the petition date, the high water mark of liability for J&J had been a $4.69 billion verdict (reduced on appeal to $2.25 billion).   *Id.*   Naturally, the deluge of talc-related litigation imposed a severe financial burden on Old JJCI.   *Id.*

81.     Facing massive tort liabilities for talc injuries, Old JJCI implemented a divisive merger under Texas law, which was completed on October 12, 2021, just two days before LTL filed for bankruptcy.   637 B.R. at 400-01.   The explicit purpose of this state-law transaction was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding."   *Id.* at 402.   As a result of that restructuring,

---

[118] The total number of claims settled by Hess since 2003, together with the current pool of claims, by contrast amounts to  approximately ███████████████████████████████████████████████████████████ ███████████████████.

Old JJCI ceased to exist and two new entities were created (i) LTL Management, LLC ("LTL"), the debtor, and (ii) New JJCI. *Id.* Following the divisive merger, LTL held certain of Old JJCI's assets and became ***solely responsible*** for JJCI's talc-related liabilities, while New JJCI held other assets of Old JJCI and was solely responsible for all other liabilities of Old JJCI. More specifically, through the divisive merger, LTL received, among other assets, rights and interests as payee under a funding agreement and equity interests in an affiliate with rights to a continuing royalty revenue stream.[119]

82.     The funding agreement between J&J, New JJCI, and LTL (the "LTL Funding Agreement") created two separate funding obligations for J&J and New JJCI. *First*, the LTL Funding Agreement obligated J&J and New JJCI, on a joint and several basis, to pay "any and all costs and expenses" ***up to the value of New JJCI***, excluding any talc liability that LTL would incur on a go-forward basis during its bankruptcy case.[120] 637 B.R. at 402. *Second*, the LTL Funding Agreement obligated J&J and New JJCI to fund, to the extent LTL's assets were insufficient, amounts sufficient to satisfy LTL's talc-related liabilities if there was no bankruptcy case, and, in the event of a chapter 11 filing, to provide the funding for a trust.[121] *Id.* The LTL Funding Agreement imposed no repayment obligation on LTL. *Id.* J&J and New JJCI also committed to fund a trust with $2 billion for the payment of current and future talc-related claims

---

[119] *See Declaration of John K. Kim in Support of First Day Pleadings* ¶ 24, (October 14, 2021) (the "LTL Kim Declaration"), *In re LTL Mgm't LLC*, Case No. 21-30589 (Bankr. D.N.J. 2021) [ECF No. 5].

[120] A comparison between the *LTL* funding agreement and the Funding Agreement underlying this case is attached as **Appendix A** to this Motion.

[121] "[The *LTL* Funding Agreement] obligates New JJCI and J&J to fund amounts necessary to (a) satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding." *LTL* Kim Decl. ¶ 27.

asserted against or related to LTL, which was a permitted funding per the terms of the LTL Funding Agreement.  Kim Decl. at ¶ 28.[122]

83.    In its first day papers, LTL made clear that the goal of the divisive merger, coupled with the subsequent chapter 11 filing, was to "make certain that the Debtor has **the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims** as Old JJCI did prior to the restructuring."  637 B.R. at 423 (emphasis added).  As a result of the divisive merger, and in stark contrast to HONX's situation, LTL's estimated value was approximately $373.1 million as of the petition date, **even without taking into account the LTL Funding Agreement**.  *Id.* at 402.  In short, at the time of filing, LTL was the only entity with direct liability for plaintiffs' talc claims, and was endowed—apart from its affiliates' agreement to fund a trust and chapter 11 case—with definite assets in the form of the Royalty A&M rights.

84.    Talc claimants nevertheless moved to dismiss LTL's case, arguing that the divisive merger and bankruptcy filing together amounted to nothing more than a litigation tactic—forcing LTL's creditors to negotiate in bankruptcy.  *Id.* at 403.  LTL responded, using language intentionally echoed by the Debtor here, that the purpose of its chapter 11 case was to provide an equitable resolution of present and future talc claims through establishment of a trust under Bankruptcy Code section 524(g).  *Id.* at 404.

85.    The court denied the motion to dismiss LTL's case, finding that addressing claims to preserve corporate value is "unquestionably a proper purpose under the Bankruptcy Code," and that LTL had the opportunity to take advantage of multiple aspects of the bankruptcy system,

---

[122] Through the divisive merger, LTL also gained the rights to certain royalty revenue streams.  Prepetition, Old JJCI organized Royalty A&M LLC ("Royalty A&M") as a direct subsidiary to which it contributed approximately $367.1 million in exchange for all of the equity in Royalty A&M.  *In re LTL*, 637 B.R. at 402.  Royalty A&M used those funds to acquire certain royalty streams from Old JJCI.  *Id.*  Through the divisive merger, LTL acquired Royalty A&M from Old JJCI and thereafter received the benefit of its royalty streams.  *Id.*

including the automatic stay. *Id.* at 408. The factual findings underlying the LTL court's reasoning were straightforward: LTL had a significant source of revenue that needed to be protected for the benefit of its creditors—the LTL Funding Agreement. Moreover, without the LTL Funding Agreement, those creditors—litigation claimants—only could recover against J&J or New JJCI based on an *alter ego* theory. The LTL Funding Agreement, by contrast, offered LTL "the funding available to satisfy present and future claims against Old JJCI, with the added contractual right to look to J&J and New JJCI as primary obligors without having to establish independent liability." *Id.* at 423. In other words, once the divisive merger had been accomplished, LTL was placed in the position where its chapter 11 filing was an ordinary business decision for the good of itself and its creditors,[123] which did not adversely affect the sources of value to which creditors could look for recovery. *Id.* at 424.[124]

86.    HONX, by contrast, does not present a typical bankruptcy scenario, even when viewed through the Texas Two-Step lens. The automatic stay imposed on HONX's creditors and the supplemental stay imposed in favor of Hess do not protect a debtor estate—as discussed, HONX has nothing to protect. And for all the echoing in the Debtor's opening speech of the *LTL* court's language regarding "equitable" resolution of claims, the premise for such an approach is that the solvent affiliates funding the case and trust are ***not*** liable on those claims, such that a funding agreement need replicate only the value to which creditors were entitled from the debtor

---

[123] This same pattern persists across other Texas Two-Step cases—although the debtor was the result of an unconventional corporate transaction, the debtor that emerged from that transaction had business assets that could be preserved by filing. *See In re Bestwall*, 605 B.R. at 47–48 (after divisive merger, debtor was sole repository of asbestos liability, was funded with equity interests in and cash flow from a nondebtor affiliate guaranteeing future income to pay claimants, and party to a funding agreement that guaranteed funding for section 524(g) trust); *In re DBMP*, 2021 WL 3552350, at *9 (debtor, the sole liable entity, was funded with entire equity interests in an operating subsidiary in addition to cash).

[124] The Bankruptcy Court's ruling in *LTL* remains on appeal to the Third Circuit. The Committee expresses no support for the "Texas Two-Step" approach, but it is clear that Hess's approach in this case falls well short even of that paradigm.

40

alone under state law.  That simply is not the case here where Hess is independently liable on creditors' claims.

87.      In addition, the Funding Agreement, unlike that in *LTL*, is wildly deficient from a technical perspective.  Specifically, Hess mandates compliance with a budget and milestones, as if it were an independent lender taking a risk by deigning to participate in this process rather than the cause of the case and the entity that seeks to benefit.[125]  Perhaps recognizing that it has failed to isolate itself from liability under any applicable law, Hess (unlike New JJCI or its brethren) designed the Funding Agreement such that its obligations are entirely contingent on an extraordinary extension of the automatic stay to protect Hess—a nondebtor—from ongoing lawsuits.[126]  And in terms of creditor treatment, Hess guarantees funding not for the Debtor's liabilities *simpliciter*, but for the Debtor's liabilities ***as determined in a plan to which Hess consents***.[127]

88.      There is nothing equitable about asking claimants against Hess to accept less through this unnecessary chapter 11 process than they would achieve by litigating against Hess in the jurisdiction where Hess's tortious conduct occurred.  The likelihood that the Debtor's vision of this case will lead to such an inequitable result is no accident: it is ensured by the design of the Funding Agreement, which differs so markedly from those adopted by entities that are serious about ***managing***, as opposed to ***dodging***, their tort liability.  The Funding Agreement provides only the costs and expenses of HONX's chapter 11 case (including professional expenses incurred

---

[125] *See* Funding Agreement §§ 2(d)(iii), 2(d)(iv) and 2(e). Cf. *LTL Funding Agreement* § 2(e).

[126] See Funding Agreement §§ 2(d)(v) and 2(e)(i)(3).

[127] See Funding Agreement, clause (c) of the definition of "Permitted Funding Use" and "Plan". Cf. LTL Funding Agreement, clause (c) of the definition of "Permitted Funding Use" (New JJCI obligated to fund all Talc-Related Liabilities, both pre- and post-petition, for the purposes of funding trusts created under any plan, regardless of New JJCI's support for such plan or the inclusion of Payor protections under Section 105 or 524(g) of the Bankruptcy Code, so long as such plan is confirmed by the Bankruptcy Court).

prior to the Petition Date) and the section 524(g) trust—and it does so only conditionally.[128]  Of specific concern to the Committee, unlike the *LTL* funding agreement, the Funding Agreement here absolves Hess, notwithstanding its separate liability and ability to pay for the harms inflicted on victims, of ***any*** obligation to fund a chapter 11 case that does not lead to third-party releases with which it is satisfied.[129]  While Hess remains liable for claimants' harms, no funding agreement so limited can replicate the value to which claimants would be entitled absent the Chapter 11 Case.[130]

89.     And significantly, unlike in mass tort cases like the opioid cases,[131] there does not appear to be any intention on the part of the Debtor or Hess to offer a bargain that would ease or mitigate the ***litigation risk*** claimants face by providing a streamlined claim evaluation process.[132]  Instead, the Debtor proposes an estimation process, by which it presumably anticipates "knocking out" claims to diminish the claims pool.  This process—which could not be used to set the size of a trust for purposes of confirming a plan were Hess the company in bankruptcy—means that Hess will force creditors to litigate their claims against Hess twice: once in this Court as an academic exercise, and once in the Virgin Islands for actual money.[133]

---

[128] First Day Decl. ¶ 35.

[129] A direct comparison between the provisions of the *LTL* Funding Agreement and the Funding Agreement between Hess and the Debtor is attached as **Appendix A** to this Motion.

[130] The Committee raised concerns regarding the Funding Agreement with Hess and HONX early in the Chapter 11 Case, and at their request provided a full markup of the Funding Agreement on June 2, 2022.  Three and a half months later, neither Hess nor the Debtor has responded.

[131] *See In re Insys Therapeutics, Inc.*, Case No. 19-11292 (Bankr. D. Del. 2019); *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y. 2019); *In re Mallinckrodt plc*, Case No. 20-12522 (Bankr. D. Del. 2020).

[132] *See In re Purdue Pharma L.P.*, 633 B.R. 53, 73 (Bankr. S.D.N.Y. 2021), (plan permitted States to avoid "lengthy, expensive, and . . . unnecessary litigation over the amount of their claims"), *vacated on other grounds*, 635 B.R. 26 (S.D.N.Y. 2021).

[133] The Committee's views on the Debtor's estimation proposal will be set forth in greater detail in an objection (the "UCC Estimation Objection") to the *Debtor's Motion for Entry of an Order Authorizing Estimation of Debtor's Aggregate Liability for Current and Future Asbestos Claims and Establishing a Schedule for Estimation Proceeding* [ECF No. 68], which the Committee anticipates filing in the near future.

4. Even if the Debtor Stood To Benefit, Litigation Advantage Is Not a Legitimate Purpose for a Chapter 11 Filing

90.     Even if the Court were to collapse the interests of Hess and the Debtor into one, and the benefit to Hess of avoiding Virgin Islands litigation were ascribed to the Debtor, this Chapter 11 Case would remain a bad faith filing because of the nature of the benefit Hess seeks. Hess is not here because the **magnitude** or the **scope** of its liability has become too much to handle. At the greatest measure of damages, the $1.5 million total remaining following the Third Circuit's *remittiur* in *Dunn*,[134] Hess would not be rendered insolvent by the approximately 1,000 present claims, or even by the highest expectation of future claims. Rather, the purpose of this filing is to gain an individualized and unfair advantage in what ought to be one-on-one litigation—in the *Mohansingh* case and those that will follow it.

91.     A bankruptcy case filed "to gain unfair advantage" in ongoing litigation lacks a valid bankruptcy purpose, and is therefore subject to dismissal as filed in bad faith. *Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, 431 F. App'x 272, 275 (5th Cir. 2011); *see also In re Alexandra Trust*, 526 B.R. 668, 680 (Bankr. N.D. Tex. 2015) (collecting cases). Likewise, without regard to fairness, "if the sole purpose of [a] bankruptcy filing is to obtain a tactical litigation advantage, the petition is considered to have fallen outside the legitimate scope of the bankruptcy laws and may properly be dismissed." *Lackawaxen Telecom, Inc. v. S. Canaan Cellular Invs., LLC (In re S. Canaan Cellular Invs., LLC)*, 420 B.R. 625, 630 (E.D. Pa. 2009).

---

[134] In *Dunn v. HOVIC*, a case where Hess and the Debtor's predecessor had settled prior to judgment, a USVI jury awarded $1.3 million in compensatory damages and $25 million in punitive damages against Owens-Corning Fiberglas Corp. to a plaintiff with pleural plaques. 1 F.3d at 1383. The District Court remitted the compensatory damages to $500,000 and the punitive damages to $2 million before judgment, and the Third Circuit further limited the punitive damages to $1 million to reflect its "consideration [of] the effect of successive punitive awards in asbestos litigation." *Id.* at 1391.

92.     Recognizing that some types of litigation may lead to genuine financial distress and necessitate a bankruptcy filing, courts distinguish between "prudent liability management" and "litigation gamesmanship" when assessing the good faith of a filer.  *In re NRA of Am.*, 628 B.R. 262, 273 (Bankr. N.D. Tex. 2021).  The former is characterized by an onslaught of litigation that poses an "existential threat" to an enterprise in the form of legal costs that cannot be borne, where a debtor is "faced with financial difficulties or a judgment that it cannot satisfy."  *Id.* at 280–81; *see also S. Canaan Cellular*, 420 B.R. at 632 (in the face of "the potential for execution upon [a] judgment that would eliminate" the debtors' sole assets, it was credible that the case had been "file[d] to preserve [the debtors' subsidiary] as an ongoing business concern and to maximize its value so as to preserve its equity and satisfy it and its partners' creditors").

93.     Impermissible gamesmanship, on the other hand, is characterized by optionality—by the situation where a case is commenced not in response to circumstances created by ongoing litigation, but to "circumvent" ongoing proceedings, with the proceedings themselves as the target.  *See, e.g.*, *Investors Grp. LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014) ("Merely obtaining a litigation advantage by pursuing bankruptcy is not dispos[i]tive of bad faith, *but when a bankruptcy court finds a party pursues bankruptcy for the purpose of securing litigation advantage in another forum, such intent is dispositive: it establishes bad faith and necessitates dismissal*.") (internal quotation marks omitted, emphasis in original).

94.     This case falls squarely on the impermissible side of the divide: neither the Debtor nor Hess faces an existential threat from USVI asbestos litigation.  The Debtor cannot have and eat its proverbial cake.  It cannot face an "existential threat" from this or any other litigation because it lacks the necessary existence—it long ago ceased to have any substance that could be threatened by judgments or collection actions.  And Hess would remain fully solvent even if all

claimants were to obtain the judgments they seek.  Hess has not sought recourse in this court because it has no need to do so; giving the population of this small island to which Hess has done such harm their due will not destroy Hess.  The Debtor is using the Chapter 11 Case to gain an advantage for Hess, not to preserve its or Hess's existence.

### B.  *"Cause" Exists Because the Debtor's Estate Is Not Equipped for Any Purpose Other Than Substantial and Continuing Loss, Without a Hope of Rehabilitation*

95.     Bankruptcy Code section 1112(b)(4)(A) provides a second ground for this Court to find cause to dismiss or convert the Chapter 11 Case by providing that "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."   Under the circumstances created by Hess, this form of cause is inescapable for the Debtor because it possesses no business through which it can augment the estate, and the Funding Agreement exists in its present form only to be diminished by the expenses of administering the estate.

96.     Subparagraph (A) requires two elements: (i) substantial or continuing loss or diminution, and (ii) the absence of a reasonable likelihood of rehabilitation.  The first of these may be satisfied in the alternative—it is not necessary that loss or diminution be both "substantial" and "continuing," either one satisfies the standard.  *See In re Ford Steel, LLC*, 629 B.R. 871, 879 (Bankr. S.D. Tex. 2021).  The ongoing fee burn, eating away at the amounts loosely guaranteed under the Funding Agreement, is both substantial and continuing.

97.     Loss is "substantial" if it is "sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors[.]"  *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015).  While the interest of creditors is—as discussed *supra*—almost uniquely divorced from the fate of this artificial estate, the estate itself is clearly impacted by the administrative expenses accrued during the course of the

Chapter 11 Case.  Indeed, the expenses of administering this case through the next few months may well exceed the greatest total value that has ever been in the estate at once pursuant to the funding agreement.

98.    And this loss is also "continuing" by its very nature—this is the exact situation faced by the court in *In re Irasel Sand, LLC*, 569 B.R. 433 (Bankr. S.D. Tex. 2017), where the Debtor's inability to bring money in through any means other than postpetition financing guaranteed "continuing" loss.  *See id.* at 441 ("[T]he Debtor can do nothing at this point ***but*** suffer continuing losses.") (emphasis added).  The sole meaningful assets in the Debtor's estate are the Funding Agreement and any potential estate claims against Hess for corporate looting.  But the Funding Agreement is, as described *supra*, largely illusory.  And to the extent estate claims exist, they cannot be a source of value without a coherent litigation plan for monetizing them, which the Debtor has shown no interest in pursuing and which Hess would be unlikely (to say the least) to fund.[135]  The Debtor's inability to generate revenue through any means, even ***with*** the benefits of Hess's largesse, render this case nothing other than an exercise in spending Hess's limited promise on professional fees.

99.    Moreover, this Debtor has no hope of "rehabilitation" within the meaning of the Bankruptcy Code.  As used in Bankruptcy Code section 1112(b), "[r]ehabilitation means to reestablish a business."  7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][ii]; *see also Irasel Sand*, 569 B.R. at 442 ("rehabilitation . . . means 'to put back in good condition, re-establish on a firm, sound basis'") (citation omitted); *In re Woodruff*, 580 B.R. 291, 298 (Bankr. M.D. Ga. 2018) ("Congress consciously used the word 'rehabilitation' and not 'reorganization' . . . to focus the court on the

---

[135] Indeed, even if a third party were willing to finance such litigation, the Committee does not anticipate that ***creditors***, who have separate claims against Hess which may be accessed without the intermediation of the estate, will have significant interest in using the Debtor as a clumsy vehicle for seeking the recovery that they could otherwise obtain from Hess directly.

question of whether a debtor can propose a financially viable plan for continuing operations, not on whether the debtor can propose a confirmable plan."). But the premise of rehabilitation is the presence of something to rehabilitate—an operating business, at least at the subsidiary level. Indeed, the bare minimum for a prospect of rehabilitation, a "certain source[] of income," is lacking here. *See Clarkson v. Cook Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985). "[A] chapter 11 case with negative cash flows, mounting costs to the estate, and no indication of operating as a going concern has no likelihood of rehabilitation." *In re Woodruff*, 580 B.R. at 298. There can be no "rehabilitation" of this Debtor, which has not had a business to reestablish or put on sound footing at least since the Refinery's shutdown in 2012 and the HOVENSA bankruptcy in 2016.[136]

100.    Even if the Bankruptcy Code did not require "rehabilitation" in this sense, this Debtor has no present prospects for a successful reorganization *at all* so long as it remains dedicated to the proposition that Hess must be able to purchase a § 524(g) injunction on the cheap. It is questionable whether using the shell of the non-operating Debtor as a corporate form for the creation of an entirely new "business" paying asbestos claims would constitute "rehabilitation" of the defunct Refinery enterprise. Nor is it clear that any plan could be confirmed absent Hess's consent (and thus financial support) pursuant to the terms of the Funding Agreement. But the Court need not reach such questions of statutory construction or feasibility, because such an

---

[136] Significantly, similar considerations may render impossible the Debtor's notion of confirming a plan that utilizes Bankruptcy Code 524(g) to release Hess from its liabilities. It has been suggested that the requirement to fund a 524(g) trust with the reorganized debtor's securities, 11 U.S.C. § 524(g)(2)(B)(i)(III), implies a requirement that the debtor emerge as a cashflow-positive business which will fund payments of future claims. *See, e.g.*, *In re Flintkote Co.*, 486 B.R. 99, 133–34 (Bankr. D. Del. 2012) (assuming without deciding the existence of such a requirement and rejecting a requirement that the go-forward business be identical to the debtor's prepetition operations); *see also* 140 Cong. Rec. S4523 (April 20, 1994) (stmt. Sen. Brown respecting enactment of 524(g)) ("The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that laid the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.").

outcome cannot be deemed "reasonably likely" when Hess—which requires, among other things, a 75% vote from the affected claimants[137] to confirm a plan establishing such a trust—has failed to increase its financial commitment, whether by amending the Funding Agreement or by making an offer in mediation that won the approval of such claimants.[138]  As this Court warned before the Committee's appointment,[139] Hess's negotiation posture continues to render rehabilitation far less than "reasonably likely."[140]

101.    Accordingly, and in connection with the ongoing, substantial loss to the estate that occurs every day, Bankruptcy Code section 1112(b)(4)(A) provides an additional form of "cause" for dismissal or conversion of this Chapter 11 Case.

### C. *"Cause" Exists Because the Debtor's Failure To Maintain Insurance Endangers the Estate and the Public*

102.    Finally, Bankruptcy Code section 1112(b)(4)(C) also provides that it is cause for dismissal or conversion if a debtor "fail[s] to maintain appropriate insurance that poses a risk to the estate or to the public."  To the extent that the estate has real assets—which it may not, but without which this is a bad-faith filing as described above—such assets must be preserved for the benefit of the Debtor's creditors.  The Debtor admits that it has no insurance protecting its assets.

---

[137] *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV).

[138] Of course, it is not the case that *no* plan could be confirmed in this case—indeed, if this motion is denied, the Committee may object to any extension of the Debtor's exclusivity (or seek to terminate exclusivity) and seek to file a plan; as can be expected, such plan would simply wind up the Debtor's minimal assets and would not constitute "rehabilitation" of any ongoing enterprise (because there is none to rehabilitate).

[139] Apr. 29, 2022 Hr'g Tr. at 29:16–18.

[140] Nor is it clear that even with the necessary approval by creditors, the plan Hess seeks is otherwise permitted under applicable law.  Bankruptcy Code section 524(g) provides a limited ability to overcome the requirement that a party must commence bankruptcy itself to get the benefit of a discharge—it permits an injunction to bar claims against a third party that arise by reason of such third party's (i) ownership of a financial interest in the debtor or an affiliate; (ii) involvement in the management of a the debtor or an affiliate; (iii) provision of insurance to the debtor or a related party; or (iv) involvement in a restructuring or financing transaction related to the debtor.  11 U.S.C. § 524(g)(4)(A)(ii). Here, Hess seeks a broad injunction that would prevent future litigation even of premises liability, supplier liability and other claims that arguably are based on Hess's ***direct involvement in the harm inflicted on asbestos victims***.  To the extent HONX seeks to confirm a plan granting such a broad injunction to Hess, presumably this would become a highly contested issue.

Indeed, in the case of the Funding Agreement and potential estate claims, it has resisted any efforts, including those of the Committee, to take any steps to preserve and capture the value of such "assets" for the benefit of parties, instead leaving the insufficient Funding Agreement as the sole source of recovery.  This, too, provides "cause" for dismissal.

## II.    The "Unusual Circumstances" Exception Is Inapplicable

103.    Once a finding of "cause" is established, the Court must convert or dismiss a case unless it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate[.]" 11 U.S.C. § 1112(b)(2). But even where such "unusual circumstances" exist—and they are not present here—the exception *cannot operate* where dismissal or conversion is premised on substantial or continuing loss without a reasonable likelihood of rehabilitation.  *In re Baribeau*, 603 B.R. 797, 803 (Bankr. W.D. Tex. 2019) (where "cause" for conversion is substantial or continuing loss without reasonable likelihood of rehabilitation, "as a matter of law, [d]ebtor cannot prevail on her argument that the exception provided in § 1112(b)(2) prevent[s] the Court from converting her case").  Such grounds exist here, as discussed above.  Hence, even a *successful* attempt by the Debtor to establish the presence of "unusual circumstances" together with the other requirements of paragraph (b)(2) cannot overcome the mandatory nature of dismissal or conversion under subparagraph (b)(4)(A).

104.    But the Debtor cannot demonstrate the presence of such "unusual circumstances" here.  As an initial matter, the Debtor bears the burden of proof.  *See In re Briggs-Cockerham, L.L.C.*, No. 10-34222-BJH-11, 2010 WL 4866874, at *3 (Bankr. N.D. Tex. Nov. 23, 2010) ("[T]he statutory framework establishes that the initial burden to establish 'cause' lies with the [movant] here, and if the [movant] establishes 'cause,' then the burden shifts to [opponents] to establish the 'unusual circumstances' exception to mandatory dismissal.").  In this case, there is no reasonable argument that the circumstances of this case—although admittedly unusual—render conversion or

dismissal "not in the best interests of creditors and the estate." *See, e.g.*, *In re NRA of Am.*, 628 B.R. at 285 ("While there are certainly unusual circumstances in this case, the Court does not find that they establish that dismissing the case is not in the best interests of creditors and the estate."); *In re Assadi*, No. 1:20-CV-998-LY, 2021 WL 917489, at *4 (W.D. Tex. Mar. 9, 2021) ("Though the Code does not define 'unusual circumstances,' it does not focus on unusual circumstances of a debtor's life; it focuses on unusual circumstances that make [dismissal or conversion] not in the best interests of creditors or the estate."). No creditor intends—or ***ever*** intended—to look to Debtor's scant assets for recovery. No reliance interests in the conduct of the case to date would justify maintaining the case as it limps towards the preservation of an eternal stalemate between Hess and its creditors. Indeed, even the estimation process sought by Hess and the Debtor could not generate such reliance interests, because ***favorable*** findings for creditors would still not only not be portable to another court, but also could not be used by creditors to compel Hess to increase its funding of a 524(g) trust.

105.    Finally, neither of the two mandatory factors beyond unusual circumstances favor application of the exception. The Debtor cannot show "a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time," 11 U.S.C. § 1112(b)(2)(A)—particularly not in a time period that is reasonable given the time pressure facing numerous terminally ill creditors.[141] And with respect to subparagraph (b)(2)(B), requiring that the Debtor cure the deficiency that constitutes "cause," the primary form of cause other than under subparagraph (b)(4)(A), the Debtor's lack of good faith in commencing these cases, remains equally uncurable.

---

[141] Significantly, this is a burden that cannot be met by the Debtor's representations alone. *See, e.g.*, *In re M & C P'ship*, No. 19-11529, 2021 WL 1679058, at *11-12 (Bankr. E.D. La. Apr. 28, 2021) (noting that because, among other reasons, the Debtor could not adequately provide testimony supporting a commitment letter for funding that purported to pay creditors in full, the 1112(b)(2) exception had not been established).

106.     The Committee reserves its right to address on reply any argument based on purported "unusual circumstances" that it has not anticipated here.  Nevertheless, the Committee is confident that whatever circumstances the Debtor put forward will not overcome the need for dismissal or conversion of this case.

### III.     Under the Circumstances of the Chapter 11 Case, Dismissal Is Preferable to Conversion

107.     Once cause for relief under Bankruptcy Code section 1112(b) has been found, a court must decide whether conversion or dismissal is the appropriate path.  Because the statutory factors establishing "cause" for conversion or dismissal are the same, courts have established a separate test (the "Remedy Factors") for which remedy—conversion or dismissal—is in the best interests of creditors and the estate. *See In re Fleetstar LLC*, 614 B.R. 767, 782 (Bankr. E.D. La. 2020).[142]  There is "no bright-line test" to determine the appropriate remedy in a given case; rather, these factors "help the court compare how creditors fare inside, as opposed to outside, bankruptcy." *Id.* at 781–82 (citation omitted).  As discussed below, each Remedy Factor favors dismissal over conversion here.

108.     **Factor 1 – Preferential Payments:**  No creditor has received preferential payments from HONX; indeed, as discussed in detail *supra*, no creditor **expects** payment from HONX.  Thus,

---

[142] The Remedy Factors are: (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset"; (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.  *Id*. (citing *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346–47 (Bankr. S.D.N.Y. 2010)).

there is no need for the Chapter 11 Case to remain open to address inequitable outcomes for the creditor body and dismissal is preferable to conversion.

109.   **Factor 2 – Loss of Rights Granted in the Case:**   No rights have been granted in the case to any party.  As discussed *supra* and in the forthcoming UCC Estimation Objection, the Debtor has not proposed a course for this case that ***could*** grant rights, much less proceeded down a path to actually doing so.  Therefore, this factor favors dismissal over conversion.

110.   **Factor 3 – Whether the Debtor Would File Another Case:**   The Debtor will not file another case upon dismissal because its sole purpose in seeking bankruptcy protection was to obtain the collateral benefits available to Hess through its particular 524(g) scheme.  A chapter 7 liquidation, or even a traditional chapter 11 case, would not benefit the Debtor (and indeed, would be administratively insolvent without the promise of the *de minimis* funding Hess has made in this case).  If HONX filed a second, true bankruptcy case, winding up and liquidating its nonexistent operations, it is unclear whether anyone would notice or care.  It has nothing, it can distribute nothing, it ***is*** nothing.  This factor therefore also favors dismissal over conversion.

111.   **Factors 4, 5 and 7[143] – Assets and Economic Value:**   As discussed at length *supra*, the Debtor's estate has no business assets, and the only potential sources of value for creditors are the illusory Funding Agreement and the potential causes of action against Hess that the Debtor may possess based on the entities' prior business relationships.  These causes of action, however, could not be monetized by a trustee without significant infusions of cash from an outside source other than Hess.  Moreover, there is no utility to creditors—each of which possesses freestanding claims against Hess itself—from bringing an uncertain amount of value into the estate and filtering

---

[143] Although this factor aims to address "single asset real estate" filings dismissed for bad faith because they have no purpose other than preventing foreclosure and buying time, the same principle applies to this Chapter 11 Case, in which the Debtor has no business assets to protect and seeks only relief from litigation on Hess's behalf.  In this "no-asset" case, the "single asset" factor cuts even more strongly in favor of dismissal rather than conversion.

some share of their recovery from Hess through the estate.  Thus, the fourth and fifth Remedy Factors (whether a trustee is better-positioned to recover value, and whether the estate is more valuable inside or outside of bankruptcy) both favor dismissal.

112.    **Factor 6 – Issues Better Resolved Outside of Bankruptcy:**  As the foregoing has made clear, the central issues in this case are one-on-one disputes between various litigants and Hess.  These disputes not only are better resolved outside of the bankruptcy arena, that is the ***only*** place they may be resolved.  Not only is it beyond the purview of a bankruptcy court to resolve litigation between nondebtors like the claimants and Hess, but the vast majority of claims at issue here are personal injury claims, which this Court would be without jurisdiction to resolve even to the extent they were asserted against a Debtor.  And the USVI preference statute ensures claimants a speedy resolution to their cases in the courts of their home, rather than forcing them to litigate *seriatim* before a single judge and consume the bulk of this Court's time liquidating claims one by one.  This factor therefore strongly favors dismissal over conversion.

113.    **Factors 8, 9 and 10 – Supervision and Custodianship:**  The final three Remedy Factors collectively aim at a determination of whether a trustee is needed in order to protect against further misconduct by a debtor's management.  While it certainly is the Committee's position that the Debtor has committed misconduct in the past, there is no present risk of ongoing harm from the Debtor's actions—it no longer has any interest in the Refinery that caused such massive environmental and individual devastation.  The passage of time leaves the Debtor unaffected, while helping Hess and hurting claimants, each of whom suffers from a disease that increases in effect over time, all of whom are ageing, and every one of which is eager to pursue their claims in USVI courts.  The appointment of a trustee to restrain the impotent Debtor's actions, although it may have helped had it been accomplished decades ago, is profoundly unnecessary.

114.     In short, the Remedy Factors point univocally to one conclusion: the creditors of HONX, which are also creditors of Hess, will fare better outside of bankruptcy than they will with a vestigial chapter 7 case distracting them from litigation against Hess.   Accordingly, case law counsels that the Court should dismiss, rather than convert, the Chapter 11 Case.

**<u>NO PRIOR REQUEST</u>**

115.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[The remainder of this page has been left blank intentionally.]*

WHEREFORE, the Committee respectfully requests that the Court (i) dismiss the Chapter 11 Case or, in the alternative, convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code and (ii) grant the Committee such other and further relief as is just, proper, and equitable.

Dated: September 22, 2022

Respectfully Submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

 /s/ *Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr. (State Bar No. 00793386; S.D. Tex. 30464)
2300 N. Field Street, Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com

-and-

Arik Preis (admitted *pro hac vice*)
Mitchell P. Hurley (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Theodore James Salwen (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: apreis@akingump.com
Email: mhurley@akingump.com
Email: sbrauner@akingump.com
Email: jsalwen@akingump.com

*Counsel to the Official Committee of Unsecured Creditors of HONX, Inc.*

## CERTIFICATE OF SERVICE

I certify that on September 22, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Marty L. Brimmage, Jr.*

Marty L. Brimmage, Jr.

## Appendix A

## Comparison Between *LTL* and *HONX* Funding Agreements

| PROVISION | LTL Funding Agreement[145] | HONX Agreement[146] |
|---|---|---|
| **1.  *Funding Terms*** | | |
| (a)  **Funding Cap** | ***Lesser of JJCI Value*** (a calculation based upon the market value of assets of Payors) ***and Permitted Funding Uses***<br><br>LTL Funding Agreement § 2(a). | Up to amount of Permitted Funding Uses, ***provided Asbestos Related Liabilities capped at lesser of (i) $10M and (ii) such claims established by court or final settlement to fund trust pursuant to a "Plan"*** acceptable to Payor and approved by the Bankruptcy Court (including District Court if required) (the "Aggregate Trust Amount")<br><br>HONX Agreement § 1 at 1 ("Aggregate Trust Amount"). |
| (b)  **Funding Obligations** | Payor shall fund current and 30-day projection of Permitted Funding Uses upon each Funding Request<br><br>LTL Funding Agreement § 2(b). | Payor shall fund current and 45-day projection of Permitted Funding Uses upon each Funding Request (*provided First Tranche of $5.5M made on Agreement Effective Date and Second Tranche of $5.5M made 70 days after Petition Date*)<br><br>HONX Agreement § 2(b). |
| (c)  **Permitted Funding Uses** | To the extent that cash distributions received by, and solely in the case of clause (iii) below the other assets of, Payee are insufficient to fund such amounts: | To the extent that the assets of Payee are insufficient to fund such amounts: |
| | (i)  ***All*** ordinary course business costs and expenses incurred pre-petition, including indemnification or other obligations owed to managers or officers<br><br>LTL Funding Agreement § 1 at 4 (section (a) of "Permitted Funding Use"). | (i)  ***Reasonable*** ordinary course business costs and expenses incurred pre-petition, including indemnification or other obligations owed to managers or officers, ***directors or professionals; provided non-indemnification obligations owed to officers must be approved by independent directors***<br><br>HONX Agreement § 1 at 4 (section (a) of "Permitted Funding Use"). |
| | (ii)  ***All*** costs and expenses incurred during the pendency of any Bankruptcy Case<br><br>LTL Funding Agreement § 1 at 6 (section (b) of "Permitted Funding Use"). | (ii)  ***Reasonable*** costs and expenses incurred ***in anticipation of*** and during the pendency of any Bankruptcy Case; ***provided Retained Professional Fees must be approved by Bankruptcy Court or agreed compensation procedures*** |

---

[145] The "LTL Funding Agreement" as used herein means that certain Amended and Restated Funding Agreement, dated as of October 12, 2021, among Johnson & Johnson and Johnson Consumer Inc. (for purposes of the second column of this chart, "Payors"), and LTL Management LLC (for purposes of the second column of this chart, "Payee").

[146] The "HONX Agreement" as used herein means the agreed and filed version of the HONX Funding Agreement, dated as of April 27, 2022, between Hess Corporation (for purposes of the third and fourth columns of this chart, the "Payor") and HONX, Inc. (for purposes of the third and fourth columns of this chart, the "Payee").

| PROVISION | LTL Funding Agreement[145] | HONX Agreement[146] |
|---|---|---|
| | | HONX Agreement § 1 at 5 (section (b) of "Permitted Funding Use"). |
| | (iii) *All Talc Related Liabilities, both pre- and post-petition, for the purposes of funding trusts created under any "plan", regardless of Payor's support for such plan or the inclusion of Payor protections under Section 105 or 524(g) of the Bankruptcy Code*, confirmed by the Bankruptcy Court and related ancillary costs and expenses (including litigation and appeals)<br><br>LTL Funding Agreement § 1 at 6 (section (c) of "Permitted Funding Use"). | (iii) Asbestos Related Liabilities *solely post-petition and only up to Aggregate Trust Amount, for the purposes of funding trusts created under a "Plan"[147] acceptable to Payor, which must include 524(g) protections*, confirmed by the Bankruptcy Court and related ancillary costs and expenses (including litigation and appeals)<br><br>HONX Agreement § 1 at 5 (section (c) of "Permitted Funding Use"). |
| | (iv) Amounts to maintain a minimum balance of *$5M* in the Funding Account<br><br>LTL Funding Agreement § 1 at 6 (section (d) of "Permitted Funding Use"). | (iv) Amounts to maintain minimum balance of *$3M* in the Funding Account, *until the Plan effective date*, provided any of Payee's cash on hand from Payor payments reduces payments to satisfy Aggregate Trust Amount<br><br>HONX Agreement § 1 at 5 (section (d) of "Permitted Funding Use"). |
| | (v) *Obligations of Payee owed to Payor or its affiliates (including indemnification obligations)*<br><br>LTL Funding Agreement § 1 at 6 (section (e) of "Permitted Funding Use"). | (v) *[No analogous basket]* |
| | (vi) Payee's costs of enforcing remedies and collecting unfunded payments by Payor<br><br>LTL Funding Agreement § 1 at 6 (section (f) of "Permitted Funding Use"). | (vi) Same as LTL Funding Agreement<br><br>HONX Agreement § 1 at 5 (section (e) of "Permitted Funding Use"). |
| (d) **Payor Termination Payment** | None | None |
| (e) **Conditions to Payments** | As of the date of each Funding Request:<br><br>(i) Payee's reps & warranties are true and correct (without regard to the impact of any Bankruptcy Case)<br><br>LTL Funding Agreement § 2(d)(i). | (i) Same as LTL Funding Agreement<br><br>HONX Agreement § 2(d)(i). |
| | (ii) Payee has not violated any Payee covenants (see Row 2(b) below)<br><br>LTL Funding Agreement § 2(d)(ii). | (ii) Same as LTL Funding Agreement<br><br>HONX Agreement § 2(d)(ii) |

---

[147] "Plan" under the HONX Agreement means "a [chapter 11] plan for the Payee providing the Payor and the Payee with all of the protections of section 524(g) of the Bankruptcy Code, in a form acceptable to the Payor." [Emphasis added.]

| PROVISION | LTL Funding Agreement[145] | HONX Agreement[146] |
|---|---|---|
| | (iii) *N/A (no Budget)* | (iii) *Funding Request complies with the Budget[148] (but Payee may request waiver, not to be unreasonably withheld)*<br><br>HONX Agreement § 2(d)(iii). |
| | (iii) *N/A (no Milestones)* | (iv) *Payee is in compliance with Milestones*<br><br>HONX Agreement § 2(d)(iv). |
| | (iv) *N/A* | (v) *Automatic stay or temporary injunction is in effect as to Payor with respect to the Asbestos Cases and Asbestos Related Liabilities*<br><br>HONX Agreement § 2(d)(v). |
| **2.   Covenants** | | |
| (a)   **Milestones** | *None* | *Payor not obligated to make Payments unless Payee in compliance with the following* (subject to 5 business day cure period):<br><br>(i)   No later than 1 Business Day after Petition Date, commence adversary proceeding seeking (a) TRO against Mohansingh plaintiff, (b) preliminary injunction of Asbestos Cases until extension of automatic stay, including until Plan Effective Date;<br>(ii)  No later than 3 Business Days after Petition Date, Bankruptcy Court grants TRO;<br>(iii) No later than 14 days after entry of TRO, Bankruptcy Court grants Preliminary Injunction;<br>(iv)  No later than 65 days after Petition Date, the Bankruptcy Court grants Stay Extension;<br>(v)   No later than 75 days after the Petition Date, Payee files motion to schedule a proceeding to estimate the Asbestos Related Liabilities in a form acceptable to the Payor;<br>(vi)  No later than 100 days after the Petition Date, Bankruptcy Court grants the Estimation Scheduling Motion;<br>(vii) No later than 365 days after the Petition Date, Payee files a Plan and Disclosure Statement in the Bankruptcy Case, each in a form acceptable to Payor;<br>(viii)No later than 480 days after the Petition Date, Bankruptcy Court enters the Confirmation Order; and<br>(ix)  No later than 550 days after the Petition Date, the Plan Effective Date occurs |

---

[148] "Budget" under the HONX Agreement means a monthly cash forecast showing projected cash receipts and expenses by category on a monthly basis for the 4-month period commencing May 1, 2022, as may be revised and updated semi-monthly.

| PROVISION | LTL Funding Agreement[145] | HONX Agreement[146] |
|---|---|---|
| | | HONX Agreement § 2(e). |
| (b) **Covenants of Payee** | (i)   Funds must be used for Permitted Funding Uses<br><br>LTL Funding Agreement § 5. | (i)   Same as LTL Funding Agreement<br><br>HONX Agreement § 5(a). |
| | (ii) *N/A* | (ii) ***Payee shall use any cash on hand from Payor Payments (including any Minimum Balance) as of the Plan Effective Date to reduce Aggregate Trust Amount (but cash on hand from other sources, including settlements with non-Payor third parties, shall not reduce Aggregate Trust Amount)***<br><br>HONX Agreement § 5(b). |
| | (iii) *N/A* | (ii) ***Payee shall use any cash on hand arising from any source other than Payor Payments to reduce amounts under any Funding Request or the Minimum Balance***<br><br>HONX Agreement § 5(c). |
| | (iv) *N/A (no Budget)* | (iii) ***Delivery of semi-monthly Budget***<br><br>HONX Agreement § 5(d). |
| (c)   **Covenants of Payor** | (i)   To the extent not already filed with SEC, Payor shall provide audited annual financial statements (within 90 days of year-end) and unaudited quarterly financials (within 60 days after each of first 3 quarters)<br><br>(ii)   Successors bound by Funding Agreement (and no merger or sale unless pro forma no Default or Event of Default)<br><br>LTL Funding Agreement § 4(a), (b). | (i)   Same as LTL Funding Agreement<br><br>(ii)   Same as LTL Funding Agreement<br><br>(iii) Payor shall maintain Funding Account (but shall not make withdrawals or exercise control)<br><br>(iv) Maintain a reserve of at least $10M for purposes of Aggregate Trust Amount<br><br>(v)   Admin support for Payee's operation of ordinary course business consistent with historical practice<br><br>HONX Agreement § 4(a)-(e). |
| 3.   *Events of Default; Remedies* | | |
| (a)   **Payee Events of Default** | *None* | (i)   ***Payee fails to comply with the Milestones, subject to 5 Business Day grace period***<br><br>(ii)   ***Payee breaches any of the Payee Covenants, subject to 5 Business Day grace period***<br><br>HONX Agreement § 6(b). |

| PROVISION | LTL Funding Agreement[145] | HONX Agreement[146] |
|---|---|---|
| (b) **Payor's Remedies Upon Payee Event of Default** | ***None*** | Payor's sole remedy is to terminate Funding Agreement, *provided* Payee is not required to return any Payments received prior to an Event of Default<br><br>HONX Agreement § 7. |
| (c) **Payor Events of Default** | (i)   Failure to fund continues for 10 business days<br><br>(ii)  Breach of covenants or reps continues for 30 days (***or in the case of delivery of financials, 60 days***)<br><br>(iii) Insolvency proceeding or inability to pay debts as due<br><br>(iv) Court-ordered relief, custodian or liquidation, and unstayed for 60 days<br><br>LTL Funding Agreement § 6. | Same as LTL Funding Agreement, ***except in (ii), 60 day extended cure period applicable to Administrative Support covenant*** (not financials)<br><br>HONX Agreement § 6(a). |
| (d) **Payee's Remedies Upon Payor Event of Default** | Payee may pursue any available remedy to collect unfunded Payments due and owing<br><br>LTL Funding Agreement § 7. | Same as LTL Funding Agreement<br><br>HONX Agreement § 7. |