# EXHIBIT 2

```
                 UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF TEXAS (HOUSTON)


                                   .
                                   .   Case No. 22-90035
        IN RE:                     .   Chapter 11
                                   .
        HONX, INC., et al.         .   515 Rusk Street
                                   .   Houston, Texas 77002
                     Debtors.      .
                                   .   Monday, July 10, 2023
        . . . . . . . . . . . . . . .  2:00 p.m.


                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE MARVIN ISGUR
               UNITED STATES BANKRUPTCY COURT JUDGE


        TELEPHONIC APPEARANCES:

        For the Debtor:          Kirkland & Ellis LLP
                                 By:  MICHAEL F. WILLIAMS, ESQ.
                                 1301 Pennsylvania Avenue, N.W.
                                 Washington, D.C. 20004
                                 (202) 389-5174

                                 Kirkland & Ellis LLP
                                 By:  MATTHEW FAGEN, ESQ.
                                 601 Lexington Avenue
                                 New York, NY 10022
                                 (212) 446-4734

                                 Kirkland & Ellis LLP
                                 By:  WHITNEY C. FOGELBERG, ESQ.
                                 300 North LaSalle
                                 Chicago, IL 60654
                                 (312) 862-2000

        TELEPHONIC APPEARANCES CONTINUED.

        Audio Operator:          Courtroom ECRO Personnel


        Transcription Company:  Access Transcripts, LLC
                                 10110 Youngwood Lane
                                 Fishers, IN 46048
                                 (855) 873-2223
                                 www.accesstranscripts.com

            Proceedings recorded by electronic sound recording,
        transcript produced by transcription service.
```

```
TELEPHONIC APPEARANCES (Continued):


For the Debtor            Jackson Walker LLP
                          By:  EMILY FLYNN MERAIA, ESQ.
                               VERONICA POLNICK, ESQ.
                          1401 McKinney Street, Suite 1900
                          Houston, TX 77010
                          (713) 752-4200


For the Official          Akin Gump Strauss Hauer & Feld LLP
Committee of              By:  MITCHELL P. HURLEY, ESQ.
Unsecured Creditors:           KATHERINE PORTER, ESQ.
                               ARIK PREIS, ESQ.
                               JAMES SALWEN, ESQ.
                          One Bryant Park
                          Bank of America Tower
                          New York, NY 10036-6745
                          (212) 872-1000

                          Akin Gump Strauss Hauer & Feld LLP
                          By:  MARTY L. BRIMMAGE, JR., ESQ.
                          2300 N. Field Street, Suite 1800
                          Dallas, TX 75201
                          (214) 969-2885

                          Akin Gump Strauss Hauer & Feld LLP
                          By:  KATE DOORLEY, ESQ.
                          Robert S. Strauss Tower
                          2001 K Street Northwest
                          Washington, DC 20006-1037
                          (202) 887-4000

For Hess Corporation:     Haynes and Boone, LLP
                          By:  ARSALAN MUHAMMAD, ESQ.
                          1221 McKinney Street, Suite 2100
                          Houston, TX 77010
                          (713) 547-2000


For the U.S. Trustee:     Office of the United States Trustee
                          By:  ALICIA BARCOMB, ESQ.
                          515 Rusk Avenue, Suite 3516
                          Houston, TX 77002
                          (713) 718-4661


For Alcoa World           Reed Smith
Alumina LLC and           By:  PAUL MOAK, ESQ.
Lockheed Martin:          1221 McKinney Street, Suite 2100
                          Houston, TX 77010
                          (713) 469-3661
```

```
TELEPHONIC APPEARANCES (Continued):

For Barbara J. Houser,      O'Connor Wechsler PLLC
Future Claimants'           By:  ANNIE E. CATMULL, ESQ.
Representative:             4400 Post Oak Parkway, Suite 2360
                           Houston, TX 77027
                           (281) 814-5977

                           Young Conaway Stargatt & Taylor, LLP
                           By:  EDWIN J. HARRON, ESQ.
                                ROBERT S. BRADY, ESQ.
                                JOSEPH M. MULVIHILL, ESQ.
                           Rodney Square
                           1000 North King Street
                           Wilmington, DE 19801
                           (302) 571-6600

Also Present:              BARBARA J. HOUSER
                           Future Claimants' Representative
```

I N D E X
7/10/23

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| FOR THE DEBTORS: | | | | |
| Todd Snyder | 27 | -- | -- | -- |

1          (Proceedings commence at 2:00 p.m.)

2          THE COURT:  For those of you waiting on the phone,

3     I'm having trouble with my computer.  There may be a short

4     delay.  We'll call the case in a moment.

5          (Pause)

6          THE COURT:  All right.  I apologize for the delay.

7          We are here in the HONX case.  The case number is

8     22-90035.  Appearances have been made electronically.

9          Let me start by asking the debtor to tell me his

10    status, and then anyone else that wishes to participate may do

11    so if you would press "five star" one time on your line.  I

12    can't hear you yet.  I need to get you connected up.

13         All right.  Who do we have for the debtor?

14         MR. FAGEN:  Thank you.  Your Honor, good afternoon,

15    it's Matthew Fagen from Kirkland & Ellis on behalf of the

16    debtor, HONX.

17         THE COURT:  Thank you, Mr. Fagen, I've got a couple

18    other people who want to talk.  But again, electronic

19    appearances have been made.  I will start with you and then

20    I'll hear from them.  Go ahead, Mr. Fagen.

21         MR. FAGEN:  Appreciate that.  Your Honor, it has been

22    several months since we've had a matter before you for a

23    hearing, but the parties have been active working to move this

24    case forward, most notably filing a plan disclosure statement

25    on May 24th and working toward this day, the disclosure

1    statement hearing.  But we're going to seek momentarily

2    approval of our disclosure statement.

3            We've also had several other matters pending and

4    moving forward in the case.  We had the bar date, which passed

5    on -- in March.  We received many claims -- approximately 1,259

6    asbestos claims, approximately 35 non-asbestos claims.

7            On those 1,259 asbestos claims, approximately 300

8    were new claimants not represented by Burns Charest and the

9    Meirowitz firm, who sit on the Creditors' Committee.  And those

10   are parties whose claims we need to learn more about.  That set

11   off our personal injury questionnaire process and then pursuant

12   to that process, the order approved by your court, we have

13   served those personal injury questionnaire forms on those

14   approximately 300 new claimants.  We're looking forward to

15   receiving more information about their injury and other aspects

16   of their relationship to the debtor, with those forms due on

17   August 26th and then with supporting documentation to verify

18   the information in those forms due on September 26th.

19           But otherwise, Your Honor, we have been proceeding

20   ahead with our agreement in principle that was reached in early

21   February and announced on the record with -- between HONX,

22   Hess, the Creditors' Committee, and Burns Charest, who

23   represents the majority of the asbestos claimants.  That

24   included negotiating, documenting, and filing the plan and

25   disclosure statements, the trust distribution procedures that

1 | go along with the disclosure statement and plan, and other

2 | confirmation related documentation.

3 | The party I'm leaving out here, Your Honor, the party

4 | of which you say is not currently supported, and I think you'll

5 | hear from them.  I believe it's going to be exacting to our

6 | claim process, is the future claimants' representative and

7 | their professionals at Young Conaway.

8 | Your Honor, we're going to continue to work with the

9 | future claimants' representative and the other parties to see

10 | if we can bridge the differences and potentially reach a goal

11 | for resolution.  We don't have that today and in the absence of

12 | that, Your Honor, we're prepared to proceed to a confirmation

13 | hearing that we expect to be contested by the future claimants'

14 | representative.  That should be an interesting process, Your

15 | Honor.  I don't believe that there has been a contested 524(g)

16 | process between a debtor and the future claimants'

17 | representatives, although section 524(g) does provide an

18 | opportunity for such a process and for confirmation of such a

19 | claim.  Again, not before the Court today, but I wanted to put

20 | before the Court that we could be, and likely are, proceeding

21 | toward a contested confirmation here.

22 | With that, Your Honor, I'm going to pause, give the

23 | podium to other parties who may wish to make statements, and

24 | then my colleague, Ms. Fogelberg, will present the disclosure

25 | statement motion for approval.

1          THE COURT:  Thank you.  Mr. Moak, good afternoon.

2          MR. MOAK:  Your Honor, you've got Paul Moak here with

3     Reed Smith.  Can you hear me?

4          THE COURT:  Yes, sir.

5          MR. MOAK:  I represent Alcoa and Lockheed Martin.  We

6     filed what I'll call a limited objection to the disclosure

7     statement, which I believe has been resolved in full.  I don't

8     want to steal Ms. Fogelberg's thunder.  I think she's going to

9     describe the resolution to the Court and assuming everything's

10    in order, I'll just say that's right.  If she gets it wrong, I

11    guess I'll let you know.

12         THE COURT:  All right.  So there was an amended

13    disclosure statement that dealt specifically with your

14    objection.  Is there something beyond that that's occurred as

15    well?

16         MR. MOAK:  I don't believe so, Your Honor.  We had a

17    few points, one of which we wanted clarity with respect to how

18    our agreement was going to be treated.  The debtors have now

19    told us it's going to be rejected.  That's not the outcome we

20    wanted, but at least we have some clarity on how to move

21    forward.  We also wanted clarity that our claims against third

22    parties, namely Hess and other non-debtors, were not going to

23    be affected by either the third-party releases or the debtor

24    releases.  The debtors have confirmed that that is the case.

25    They will not be impacted in any respect.

1          And finally, Your Honor, we have asked for some

2   clarity on the potential treatment and distributions to

3   asbestos claimants to allow us to evaluate a potential unfair

4   discrimination objection of confirmation.  I think the debtor

5   is going to tell you that they view the compromise with the

6   current claimants as effectively paying those folk's claims in

7   full.  Again, that was my discussion with Ms. Fogelberg, and I

8   think that's what you'll hear her tell you.  And if that's the

9   case, then we'll proceed to confirmation on that point as we

10  need to.  But it's not an issue for today.

11          THE COURT:  Thank you.  I do believe that the

12  disclosure addresses the issues the way that you've described

13  them, Mr. Moak.  We'll hear if Ms. Fogelberg thinks differently

14  in a moment.

15          Ms. Barcomb?

16          MS. BARCOMB:  Good afternoon, Your Honor.  Alicia

17  Barcomb, on behalf of the United States Trustee.

18          Your Honor, I'll just briefly let the Court know that

19  we had many discussions with debtor's counsel prior to today to

20  discuss a couple of issues that the U.S. Trustee noted with the

21  disclosure statement.  At this point, one of those issues was

22  resolved, and the second issue is likely a plan confirmation

23  issue, and so we'll take that issue up at the time.

24          The first issue that we noted was with adequate

25  disclosure in the disclosure statement, particularly with the

1  absence of the asbestos trust distribution procedures.

2  However, with the amendments on file to the disclosure

3  statement and the understanding that the asbestos trust

4  distribution procedures in their current form will be

5  solicited, that satisfies the U.S. Trustee on that issue.

6          Your Honor, the second issue related to the

7  exploitative party definition that was included in the plan and

8  otherwise described in the disclosure statement.  We are in

9  continuing discussions with debtors' counsel, and we will do so

10 up until plan confirmation.  We don't yet have an agreement on

11 which parties should and should not be included in the

12 exploitative party's definition.  Though, Your Honor, we'll

13 note that there's been some separation now into a few buckets

14 of different parties receiving different types of relief under

15 the confirmed plan.  But we'll continue those negotiations,

16 Your Honor, and file any objection that we see necessary when

17 the plan confirmation comes.

18         THE COURT:  Thank you, Ms. Barcomb.

19         Mr. Harron?

20         MR. HARRON:  Good afternoon, Judge Isgur.  For the

21 record, Ed Harron on behalf of retired Judge Barbara Houser

22 from this court, appointed as future claimants' representative.

23         Your Honor, Mr. Fagen accurately represented that at

24 this point the future's rep does not agree to the plan and

25 intends to oppose it at confirmation.  We filed a brief of

1  disclosure statement objection noting our concern that the

2  proposed plan does not satisfy 524(g) so far as its treatment

3  of the future claimants.

4          We have met with the debtor and made a proposal of

5  what we believe would be necessary to satisfy 524(g) in terms

6  of this plan and the Hess contribution.  We've also talked with

7  the debtor after we filed our disclosure statement objection,

8  and the revised disclosure statement does address most of our

9  issues.  We're down to two issues:  One is confirmation

10 scheduling, and then one is a point about the terms of the

11 future reps retention and ability to participate in any

12 confirmation appeals, which I'm prepared to address at the

13 appropriate time.

14          THE COURT:  So I want to understand a little bit

15 better your client's view of the timing issue from the filing

16 of the claim on -- in August, to the filing of the

17 documentation in September.  So if someone files a claim and

18 your client thinks it is too low, I presume that she would do

19 nothing about that.  So that what she would be worried about is

20 a claim that is too high.  But tell me if I'm wrong.

21          MR. HARRON:  Your Honor, it's a slightly different

22 issue.  So far as we understand the plan, the current claims

23 that are subject to the proof of claim and the PIQs.  They're

24 going to share pro rata from the current claim high.  So it's

25 our view that the value of those claims that come in is not --

1    we won't object to any other claims coming in.

2            We have a different issue.  So we have a forecast, as

3    the Court is aware, the Court approved the retention of NERA.

4    The debtor has Bates White and in this professional's forecast

5    a number of future claims.  In broad brush, the way they do

6    that is there's generally accepted epidemiological curves that

7    kind of show the portion of population that's likely to

8    contract asbestos disease in the future, a portion of an

9    exposed population.  And what these experts do is they look at

10   the pool of current claims.  They come up with a view of how

11   many people likely were exposed in this case.  They look at the

12   percentage of people who file claims -- current claims, and

13   they extrapolate that percentage to the total incidence curve

14   going forward.  And then you break it down by disease:

15   mesothelioma, lung cancer, asbestosis.

16           So for us it's a data issue.  The proposal we made to

17   Hess and HONX is our current view of what the future claims

18   liability may be, and it's broken down by disease level.  And

19   it's informed by that process.  We looked at the claims that

20   have been paid by Hess and HONX in the past.  We look at the

21   pending claims, the Burns Charest claims, and we have a view of

22   what they're likely to receive under the proposed plan.  And

23   we're also considering the claims that came in of the -- under

24   the bar date, the non-Burns Charest claims.

25           And it's those claims that are really the focus.

1  There's about 300 of them.  They didn't do a great job of

2  identifying a disease.  They didn't provide much backup.  In

3  this case, the proposed -- the payments historically made by

4  Hess, by disease, is pretty substantial.  So even though there

5  may not be as many claims, it's still a significant liability

6  because in its history, Hess has paid big dollars to cancer

7  claimants and to non-cancer claimants.  So here a difference of

8  even a few claims could move the needle relatively

9  dramatically.

10          So we'd like to do is have the benefit of the data

11  that's coming in under the PIQ, use that to refine the work of

12  our expert so that between now and confirmation and when we get

13  to confirmation, our work will be as precise as it can be under

14  the circumstances, which will enable us to either negotiate a

15  resolution, which we're still attempting to do, or it will make

16  for the best possible record under the circumstances for

17  confirmation.  So the problem is that the attachments -- the

18  proof of disease are not due under the current schedule until

19  the 28th of September, which just doesn't give us time for our

20  experts to do the work -- exchange expert reports, depose, all

21  the kind of things that we are going to do leading up to

22  confirmation.

23          So we benefit from the data.  We supported the PIQ

24  process in the context of this case.  We supported the bar date

25  process.  We think the benefit of more folks in data is worth

1  adjourning the hearing for what we've asked, the 30 days.

2          THE COURT:  So I'm not --

3          MR. HARRON:  That's our position.

4          THE COURT:  -- I'm not appreciating yet what's going

5  on.  So I want to understand it better.  So in late August,

6  people are going to fill out a form and send it in that

7  identifies all the information that you're asking for.  But you

8  want to verify that with the backup information, right?

9          MR. HARRON:  Yes.  We'd like the most information

10 possible under the circumstance.  But what -- what you said is

11 accurate, Your Honor.

12          THE COURT:  So if 300 of the 300 follow through,

13 which is usually unlikely, but it could happen, we're worried

14 about the subset of the 300 where you believe the backup data

15 is inconsistent with the statements that are submitted on

16 August 26th.  Is that right?

17          MR. HARRON:  That's accurate.  Yeah, we -- none of

18 these --

19          THE COURT:  So if it's consistent, you're not worried

20 about it.  You're worried about inconsistent backup.

21          MR. HARRON:  Right.  Either way.  It could be

22 inconsistent -- they could understate the disease, they could

23 overstate the disease; we don't know what the backup is going

24 to look like.  But yes, inconsistencies between the backup and

25 what's alleged in the PIQ is the issue we're trying to address

 1  with the extension.

 2          THE COURT:  Okay.  And let me ask, whether it's

 3  Ms. Fogelberg or Mr. Fagen, do you agree that he needs to

 4  accurately understand that information?  Because then I want to

 5  talk about maybe a staged way to deal with inconsistent

 6  information.  Or do you think that he doesn't even need the

 7  August 26th data if it's accurate?

 8          MR. FAGEN:  Your Honor, it's Mr. Fagen.  Can you hear

 9  me or am I muted?

10          THE COURT:  I can hear you.

11          MR. FAGEN:  Okay, great.  We do agree that he, and

12  we, need the August 26th data.  That it is relevant to the

13  case-in-chief.

14          THE COURT:  So --

15          MR. FAGEN:  But where we disagree -- where we

16  disagree is that -- and where we disagree is that there's going

17  to be a major change between -- or a lot of data on September

18  26th, I believe it is, that's going to change the analytics and

19  the information we get on August 26th.  That it can't be done

20  quickly for the subset of claimants whose data -- whose backup

21  documentation does not match their PIQ responses submitted on

22  August 26th.

23          THE COURT:  How long do you think it will take to

24  determine whether the backup data is inconsistent?  Is that a

25  long process or is that a short process to determine

1    inconsistency?  And I put that --

2             MR. FAGEN:  Your Honor, we --

3             THE COURT:  -- to both of you too, because I don't

4    know how to know that at all.

5             MR. FAGEN:  Your Honor, we're spoken to Bates White,

6    who is our economic consultant for this matter, about this very

7    issue over this past weekend, as we learned of this open issue

8    with the future claimants' representatives.

9             Bates White is highly confident that there will be

10   enough time in between the supporting documentation deadline at

11   the end of the September, and the two weeks that we would have

12   between then and the October 10th confirmation hearing.  They

13   believe it could be done in a matter of days.

14            THE COURT:  Yeah, my question is a little different

15   than that.  And it may be I need you to take a break to get me

16   the answer to this.  How long is it going to take just to

17   identify whether the information is inconsistent or not?  And

18   I'm not talking about then the additional amount of time to

19   plug it into the model once you figure out any inconsistency.

20   But how long would it take just to determine if there is an

21   inconsistency?  Can that be done in one day?  Or is that, you

22   know, a month to figure out if there is inconsistent data?

23   Does that question make sense?

24            MR. FAGEN:  It does, Your Honor.  Before answering,

25   let me see if Mr. Williams can give a specific date.  Otherwise

1  we would ask to take a five minute -- or two-minute recess to

2  speak directly to Bates so I can get a number.

3              THE COURT:  And here's what I'm thinking about with

4  respect to both of you, is if the numbers of inconsistencies

5  are large, then this does seem like a very short period of

6  time.  But if the number of inconsistencies are small, it

7  doesn't seem that way.  And so I want to figure out sort of my

8  step one, is how many inconsistencies are there?

9              You know, if -- to be real about stuff, if there is

10 300 claimants, 200 submit data, and then only 100 of those are

11 going to submit their backup data.  You're going to have a huge

12 dropout rate as we move forward, is my guess.  But if all 100

13 are inconsistent, that's an awful lot of work to figure out.

14 But if only, you know, four are inconsistent, that's not much

15 work to figure out.  But I don't know how hard it is to tell if

16 there is, in fact, inconsistency.  So I would like to learn

17 that.

18             We just had somebody that's clicked in.  Let me see

19 who that is.  From the 703 area code.  Who do we have?  Let me

20 try that again.  Yes, who do we have?

21             MR. WILLIAMS:  Good afternoon, Your Honor, it's Mike

22 Williams from Kirkland & Ellis, the gentleman who Mr. Fagen

23 just referred to.

24             THE COURT:  Hi, Mike -- hi, Mr. Williams.

25             MR. WILLIAMS:  Hi, Your Honor.  I think I might have

1   an answer for your question, and I might also, if Your Honor

2   will allow me, describe a proposal that we made to the SER that

3   might let us get to this issue --

4           THE COURT:  I'm not -- I'm not going to let you --

5   I'm not going to -- I will not let you describe settlement

6   negotiations that have occurred.  So, no.  You can -- you can

7   make a proposal to me, but not tell me what proposal or what

8   discussions you've had with them.  But let's start by answering

9   my question, if you know the answer to it.

10          MR. WILLIAMS:  Understood.  I think it's more along

11  the lines of a day, Your Honor, for three reasons.

12          First, we're talking about a contingency here.  That

13  is the possibility that some of the data might be inconsistent

14  with the forms that will have been filled out 30 days prior,

15  according to the court's order, the PIQ forms.  So that's one.

16          Second, I think even as Mr. Harron was suggesting,

17  the focus here is going to be on a particular category of

18  claimants who are filling out these PIQs.  So we need to focus

19  our efforts to determine that it's based on the PIQs that were

20  received on August 26th.  I'm able to take a look and be able

21  to see if there is some gap -- if there's questionable

22  information, if people are checking too many boxes when they

23  should have checked one, for example, then they are throwing

24  out these forms.  So we'll be ready to review the information.

25          And then the third point, Your Honor, is one that you

1  raised, which in particular with this category of people who --

2  many are pro se -- these are the people who aren't represented

3  by Burns Charest, the firm that Your Honor has seen in this

4  case, the chance that they're going to submit significant

5  amounts of medical records and supporting documentation that

6  we'll have to wade through, is relatively small.

7          So what we propose, Your Honor, is that in order to

8  keep the current schedule, we have the PIQ deadline on

9  August 26th and supporting information deadline on September

10  26th.  And we propose on September 28th, if either party sees

11  that there is in some glaring inconsistency in this data that

12  would require a supplemental expert report, that party, whether

13  it's the debtor, whether it's the UCC, whether it's

14  (indiscernible) stakeholder, could provide notice that they

15  intend to submit a supplemental expert report within a matter

16  of days.  And then in order to accommodate expert depositions,

17  the other parties could take a deposition of the witness who is

18  submitting the supplemental report, just before they testified

19  in confirmation trial.

20          So this would give us a safety valve in case there

21  really is some information that's inconsistent.  But it would

22  also allow us to keep moving forward with the court's schedule.

23          THE COURT:  So, Mr. Harron, how long do you think it

24  will take to determine the extent of inconsistencies?

25          MR. HARRON:  Judge, just looking at the calendar, the

1  26th of September is when they're due.  That's a Tuesday.  So,

2  you know, they'll probably come in -- you know, assuming

3  they're going to come in later or what have you, you know, we

4  receive them on Wednesday.  I would think a week -- October the

5  3rd -- would be a reasonable time to identify, you know,

6  whether there are issues.

7           THE COURT:  Okay.  I thought the 26th was a real

8  deadline.  Is that not a real deadline?

9           MR. WILLIAMS:  It is a real deadline, Your Honor.

10          THE COURT:  So what if we came in -- I don't buy

11 Mr. Williams' offer.  I don't think that's fair, because we

12 don't know what's required at this stage.  But what if we

13 set -- and I'm asking, not saying, but what if we set a

14 confirmation hearing, but also set a hearing on October the

15 2nd?  And on October the 2nd, we're going to determine whether

16 there is adequate time for the parties to prepare for the

17 confirmation hearing, you know, based on this information,

18 where we'll then know the level of inconsistencies and give you

19 the week that you want.  And if you need more time, I would

20 then just continue the confirmation hearing out at that point.

21          But I don't see how I act on this until we know what

22 the inconsistencies are.  We certainly are setting a

23 confirmation hearing that is, you know, well out from what

24 rules require in terms of notice.  And I certainly don't want

25 to be proceeding with it if you can't evaluate the data.  But I

1  don't think you know that either, because if things come in

2  very consistent, you don't really need that extra time.

3          So what would you think of coming in on the 2nd, and

4  we'll hear it?  We'll hear disputes about inconsistencies and

5  what additional work needs to be done.

6          MR. FAGEN:  Your Honor, that proposal is acceptable

7  to the debtor.

8          MR. HARRON:  That's acceptable to the FCR as well,

9  Your Honor, but we have to -- you know, I don't know what that

10  means for the confirmation objection deadline.

11          THE COURT:  Well, first of all, what I'm going to

12  require leading up to that before we even go to that, is I want

13  a rolling turnover of the data provided to the FCR, because the

14  26th of September is an outside deadline.  And what I'm worried

15  about are inconsistencies that are learned about late.  So a

16  lot of people may turn over their data along with their forms

17  that are only submitting one thing.  So that's -- you know, do

18  that rolling turnover.  And then I want to have a real hearing

19  about what kind of prejudice we're going to have on October the

20  2nd.

21          What is the current proposed deadline, Mr. Harron?

22  Because I'm not going to short you on your deadline for

23  objecting.

24          MR. HARRON:  Well, I don't know if this is a typo.  I

25  didn't focus on it until too late.  But it looks like the

 1  confirmation objection is August 21, which is even before the

 2  PIQs come in.  But that's the date that we picked up from the

 3  solicitation procedures.

 4          THE COURT:  For objections to confirmation?

 5          MR. HARRON:  I know my friends at Kirkland will

 6  correct me if I have that wrong.

 7          THE COURT:  Mr. Fagen, when do you believe that

 8  Ms. Houser's objection deadline should be?

 9          MR. FAGEN:  Your Honor, we believe it's September

10  11th in the material that we filed.

11          THE COURT:  When do you think her deadline should be

12  if she isn't going to get the data from you until the end of

13  September?

14          MR. FAGEN:  Well she's going to get -- she's going to

15  get the fixed data on August 26th.  We still think that that is

16  a fair objection deadline, although we are supportive of her

17  getting an opportunity to supplement her objection based on the

18  additional data that comes in on September 26th.  And for that,

19  if we're going to come before the Court on October 2nd, and we

20  have our confirmation hearing on October 10th -- let me just

21  look at the calendar very quickly, Your Honor, but -- give me

22  one moment.

23          THE COURT:  I can do this a little easier.  Why

24  wouldn't we just say that the objection deadline for objections

25  that are dependent upon this data will be determined at the

1    October 2nd hearing, and then I will set a reasonable objection

2    deadline following that.  I'm not going to --

3              MR. FAGEN:  That works for us, Your Honor, thank you.

4              THE COURT:  -- I'm not going to make Ms. Houser guess

5    at what the objection is when -- till she can get the data.

6              MR. FAGEN:  That's okay with the debtor, Your Honor.

7              THE COURT:  But other objections that aren't

8    dependent on this data, Mr. Harron, would have to come in

9    earlier.  I assume that's okay with you?

10             MR. HARRON:  That's fine, Your Honor.

11             THE COURT:  Okay.  We'll do that.

12             MR. HARRON:  But would like me to note that --  just

13   like the Court's indulgent to participate virtually on the 2nd?

14             THE COURT:  Everyone can participate virtually on the

15   2nd that is a party or an attorney for that party or a

16   participant in the case.  By October 2nd we will no longer

17   allow members of the general public or the media to participate

18   remotely in hearings, but they are welcome in open court if

19   they want to hear what's going on.  But we can't broadcast

20   after the end of the national emergency, but all other

21   participants I'm authorized to allow to participate, and they

22   may.  I don't think that hurts anyone at all, right?  In terms

23   of -- I doubt we even have media present today, but if we do

24   then they'll have to come in person to the hearing.

25             MR. HARRON:  Thank you, Your Honor.

 1          THE COURT:  Mr. Muhammad, go ahead.

 2          MR. MUHAMMAD:  Good afternoon, Your Honor, Arsalan

 3  Muhammad for Hess Corporation.

 4          Your Honor, we've obviously been involved in these

 5  negotiations and to the parties and we appreciate the parties

 6  working hard to at least narrow the issues.  But with respect

 7  to everything that you said, we have no issues with having a

 8  preliminary hearing to ensure that, you know, if the parties

 9  can go forward, we do.  That being said, obviously we really do

10  believe that October 10th is a perfectly adequate date, but to

11  me, there is not anything that happens that's terribly

12  unexpected.  We do think that, you know, on August 26th we

13  should get a substantial amount of information, as Mr. Williams

14  addressed, and that that should be a streamlined process with

15  respect to the September documents.

16          So, Your Honor, no issues with kind of what you're

17  outlining, but we do believe as of right now that the

18  confirmation starting, you know, as soon as possible would be

19  appropriate here.

20          THE COURT:  Okay.  What time on the 2nd?  I am

21  available.  So do you all want to do it maybe afternoon to give

22  you all the morning to polish stuff up from over the weekend?

23  Or what -- I don't care.

24          MR. HARRON:  Yes.  Afternoon is our preference, Your

25  Honor, just for that reason.

1          THE COURT:  Two o'clock in the afternoon?

2          MR. FAGEN:  It's okay with the debtor, Your Honor.

3          THE COURT:  Two o'clock in the afternoon on October

4    2nd we'll have the data hearing, if that's what we can refer to

5    it as.

6          Okay.  On the other objection dealing with for how

7    long the FCR receives compensation.  Isn't that a confirmation

8    objection and not a disclosure statement objection?  It sounds

9    like everybody knows what they're proposing.  I'm betting this

10   is a pretty novel question, and I'm wondering if we shouldn't

11   just wait and see if it materializes as a confirmation

12   objection, which is pretty easily repairable if it's valid and

13   something not to worry about too much today, if it isn't.  Am I

14   just going to -- if I just let you preserve that till later, do

15   you need a ruling today?

16         MR. HARRON:  We do not need a ruling today, Your

17   Honor.  We wanted to flag the issue for everyone's

18   consideration, but we agree it's a confirmation issue, and it

19   is novel, as Mr. Fagen noted.  We're not aware of another plan

20   that went forward without a CR support, and that kind of --

21   that affects this issue.  But yes, Your Honor, we agree this is

22   a confirmation issue, and we'll rate it at that time, thank

23   you.

24         THE COURT:  Let me ask Mr. Fagen and Ms. Fogelberg,

25   you all agree that that's one that should be reserved for

```
1    confirmation, or do you all think we need to resolve it today?

2           MR. FAGEN:  Your Honor, we're okay with preserving it

3    for confirmation.

4           THE COURT:  Okay.  Who else wants to speak up then

5    about what's going in the case?  Or should we go to

6    Ms. Fogelberg and then let you all work on a form of order that

7    approves this with the changes that we've talked about today,

8    and to get that uploaded to me.

9           Okay, Ms. Fogelberg --

10          MR. WILLIAMS:  Your Honor, it's Mike --

11          THE COURT:  I'm sorry, Mr. Williams, go ahead.

12          MR. WILLIAMS:  Sorry, Your Honor, we have a

13   representative of the debtor available if Your Honor would like

14   to take evidence relating to the disclosure statement -- just

15   foundational evidence.  But if Your Honor would prefer to not

16   do that, we have the representative available.

17          THE COURT:  Yeah, I assumed that was something

18   Ms. Fogelberg was going to do, if I've got that wrong and

19   you're going to do it, call your witness.

20          MR. WILLIAMS:  I think that would be me, Your Honor.

21   Thank you very much.  And for the record, Mike Williams from

22   Kirkland & Ellis on behalf of the debtor.

23          The debtor calls Todd Snyder.

24          THE COURT:  All right.  If I can get Mr. Snyder to

25   press "five star"  one time on your phone.
```

1              MR. SNYDER:  I should be able to be heard, Your

2   Honor.

3              THE COURT:  Pardon me?

4              MR. SNYDER:  Can you hear me?  It's Todd Snyder, Your

5   Honor.

6              THE COURT:  Yes.  Would you raise your right hand,

7   please?

8                TODD SNYDER, DEBTOR'S WITNESS, SWORN

9              THE COURT:  Thank you.  Mr. Williams, go ahead.

10                        DIRECT EXAMINATION

11  BY MR. WILLIAMS:

12  Q    Please state your name for the record.

13  A    I'm Todd R. Snyder.

14  Q    What is your connection with the debtor of this case,

15  Mr. Snyder?

16  A    I am the chief administrative officer of HONX.

17  Q    Do you have personal knowledge concerning the contents of

18  the debtor's disclosure statement that appears at Docket Number

19  867 in this case?

20  A    Yes, I do.

21  Q    What's the basis for your knowledge, sir?

22  A    I have participated in all of the proceedings of the

23  bankruptcy case and from slightly before the bankruptcy case.

24  I have been involved in the negotiations that were brokered by

25  Judge Jones that have led to a resolution of many of the core

1   issues in the case.  In my capacity as chief administrative

2   officer, I have interacted with the debtor's other

3   professionals as they've developed the disclosure statement.

4   I've read drafts.  I've had the opportunity -- Mr. Williams

5   sent out questions of you and others who have put those drafts

6   together.  Some of my comments have been reflected in a way

7   that seems to address my issues as I raised them.  And then I

8   had the opportunity to review the final product.

9   Q    Are the statements in the debtor's disclosure statement,

10  to your knowledge, true and accurate?

11  A    Yes, I believe they are.

12  Q    Does debtor's disclosure statement provide adequate

13  information for stakeholders to decide whether or not to vote

14  to approve the first amended Chapter 11 plan in this case?

15  A    I believe the disclosure statement contains adequate

16  information of parties to make a decision of whether to support

17  or object to the plan.

18          MR. WILLIAMS:  Thank you, Your Honor.  Nothing

19  further.

20          THE COURT:  Is there any cross-examination for

21  Mr. Snyder?  I'm not hearing any.

22          On the other hand, I've lost Mr. Harron's picture.

23  Ms. Houser, does he have questions, or did he -- there you go,

24  sorry, Mr. Harron, I just want to be sure we didn't forget

25  about it.  You're hard to forget about, but I didn't want to

1   forget about you today.

2           MR. HARRON:  Thank you, Your Honor.  No questions

3   today, but thank you.

4           THE COURT:  Thank you.  All right, anyone else?

5   Okay.

6       (Witness excused)

7           THE COURT:  I agree with the testimony that's now

8   uncontested, that the disclosure statement does meet all of the

9   requirements of the Bankruptcy Code and does contain adequate

10  information in it.  I very much appreciate the amendments that

11  were made.  I think they strengthen the disclosure statement

12  quite a bit and they tell people more about what is going on in

13  the case.

14          We also have a very large number of voters that are

15  represented by one firm that has participated heavily in this

16  and that frankly will control the outcome of the voting issues

17  in the case.  And it looks to me like we're heading to a

18  disclosure -- to a confirmation hearing that is in all

19  likelihood based on non-voting issues.  Those are obviously

20  very important issues that we need to take up, but I don't know

21  that voting is going to turn out to be the most important part

22  of this case.  We'll see.  I may be surprised by that.  But

23  even if voting is, I think the disclosure statement contains

24  adequate information, and I'll approve an order.

25          Ms. Fogelberg, I need to be sure that the order that

1  gets revised and submitted includes the changes that we have

2  talked about.  And what I would suggest to you that we do is to

3  tell people that the October 12th date is the date set for

4  confirmation.  Tell them that there will be a hearing on

5  October the 2nd.

6          Is it October 12th that is confirmation?  I

7  apologize.  Let me just be sure I've got that right.

8          UNIDENTIFIED:  I believe it's the 10th, Your Honor.

9          THE COURT:  October 10th, sorry.  I was looking at my

10  calendar, and I didn't see it there.  Right.  And I think the

11  way for people to learn about it is tell them that if it is

12  continued, it will be continued by an announcement about the

13  docket entry made on the 2nd and by an announcement at the

14  hearing on October the 10th.  So that anyone that is counting

15  on participating remotely in the October 10th hearing will be

16  able to hear the announcement of the continuance, but they also

17  can see it on the docket sheet, since there probably won't be

18  time, frankly, to mail notice to the Virgin Islands for

19  everyone to get it if, in fact, we do continue the hearing on

20  the 2nd.  So you can vote on an alternative proposal if you

21  want to, that you work out with Mr. Harron, but I want

22  something that people can learn about this and can understand

23  what will happen with the potential continuance, and that will

24  need to be in the order.

25          All right, Ms. Fogelberg.  Go ahead.

```
 1              MS. FOGELBERG:  Your Honor --

 2              UNIDENTIFIED:  All right.  Thank you.

 3              MS. FOGELBERG:  -- (indiscernible) on behalf of the

 4    debtors, that we understand, we'll make whatever change to make

 5    that clear, and we'll run it past counsel for the FCR  in

 6    advance of filing a revised order.

 7              THE COURT:  Thank you.  So tell me what you wanted to

 8    this afternoon, Ms. Fogelberg?

 9              MS. FOGELBERG:  I -- you know, I had a whole thing

10    ready to go and everybody already covered everything that I was

11    planning on to discuss.  So I'm -- I don't have anything else

12    that I need to go over.

13              Oh, sorry, I do have one thing.  There is one change

14    in the plan that was not shown in what we filed yesterday.  In

15    the plan that we filed yesterday, Article 4C12 of the plan, it

16    discusses Medicare reporting relating to distributions made on

17    account of asbestos claims.

18              THE COURT:  Okay.  Hold on just a minute.  I'm

19    putting that up in front of me.

20              MS. FOGELBERG:  I'll give you a second to get there.

21              THE COURT:  Do you know what page that's going to be

22    on?

23              MS. FOGELBERG:  It's --

24              THE COURT:  4C12.  I've got it.

25              MS. FOGELBERG:  Okay, great, thank you.
```

1          There's language currently bracketed requiring has to

2     pay those Medicare reporting costs, however I just got word

3     earlier, but just before the hearing, that Hess and Burns

4     Charest have agreed to split those costs between the two

5     parties.  So we'll update a plan to reflect that agreement.

6          THE COURT:  All right.  That's fine.

7          MS. FOGELBERG:  And that was all I had.  But we will

8     submit a revised order based on what we've discussed here.

9          THE COURT:  So is there anyone that has objections to

10    the contents of the order itself?  Okay.

11         When you get that filed, would you send an email to

12    Mr. Laws so that he can put it in my emergency box, and I'll

13    get that done?

14         MS. FOGELBERG:  Yes, Your Honor.  We will.

15         THE COURT:  What else should we try and accomplish

16    this afternoon?

17         MR. HARRON:  Your Honor, it's Ed Harron again.  May I

18    ask a housekeeping question?

19         THE COURT:  Yes, sir.

20         MR. HARRON:  What time on the -- assuming we go

21    forward on the 10th, is that a 10 a.m. start time?  9 a.m.?

22         THE COURT:  On -- my calendar -- I can move this.  My

23    calendar shows it's an all-day hearing that starts at 9 in the

24    morning.  So tell me when -- do you want to start at 8?

25         MR. HARRON:  I think 9 is fine with us, Your Honor.

1    Do we have time on the 11th if we need to carry over?

2              THE COURT:  We do.  I -- it won't stay.  But right

3    now you do.  It will get filled in.  But the 10th is fine for

4    you, but right now the 11th is pretty open.  I'm not doing much

5    these days, right, so I'll find time for you if you're quick.

6              MR. HARRON:  All right.  Thank you.

7              THE COURT:  Okay.  Thank you.  Anything else we need

8    to talk about or clean up on?  Okay.  I appreciate you --

9              MS. FOGELBERG:  This is Whitney Fogelberg.  Nothing

10   from the debtor's perspective.

11             THE COURT:  Thank you.  I'll look forward to the

12   order.

13             Mr. Fagen, anything else from you?

14             MR. FAGEN:  No, Your Honor, we just wanted to say,

15   thank you, and we'll see you soon.

16             THE COURT:  All right.  Thank you all.  We're in

17   recess until 4:30.

18        (Proceedings concluded at 2:44 p.m.)

19                            *  *  *  *  *

20

21

22

23

24

25

1                     **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428     DATE: July 12, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25